Exhibit 4

PAUL NICHOLAS WHELAN
January 18, 2013

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF MICHIGAN

 3                  SOUTHERN DIVISION

 4

 5    JOHN ISOTALO and

 6    DAN TOMICA,

 7

 8              Plaintiffs,

 9

10    v.                              No. 12-cv-11253

11

12    KELLY SERVICES, INC.,

13    a foreign profit corporation,

14

15              Defendant.

16    _____/

17    DEPONENT:   PAUL NICHOLAS WHELAN

18    DATE:       Friday, January 18, 2013

19    TIME:       10:20 A.M.

20    LOCATION:   2701 Cambridge Court, Suite 223

21                Auburn Hills, Michigan

22

23    REPORTER:   Karen R. Gruskin, CSR-3026

24

25
```

RECEIVED
FEB 0 3 2013
BY:

Page 1

PAUL NICHOLAS WHELAN
January 18, 2013

| | |
|---|---|
| 1 APPEARANCES: | 1 Auburn Hills, Michigan |
| 2 MS. HEIDI T. SHARP | 2 Friday, January 18, 2013 |
| 3 Burgess & Sharp, PLLC | 3 At about 10:20 A.M. |
| 4 Suite 280, 43260 Garfield | 4 - - - |
| 5 Clinton Township, Michigan 48038 | 5 P A U L   N I C H O L A S   W H E L A N, |
| 6 (586) 226-2627 | 6 was thereupon called as a witness herein, and after having |
| 7 Appearing on behalf of the Plaintiffs. | 7 been duly sworn to testify to the truth, the whole truth, |
| 8 | 8 and nothing but the truth, was examined and testified as |
| 9 MR. STEVEN M. POTTER | 9 follows: |
| 10 Potter, DeAgostino, O'Dea & Patterson | 10 EXAMINATION |
| 11 Suite 223, 2701 Cambridge Court | 11 BY MS. SHARP: |
| 12 Auburn Hills, Michigan 48326 | 12 Q. Good morning. Can you please state your full name for the |
| 13 (248) 377-1700 | 13 record? |
| 14 Appearing on behalf of the Defendant. | 14 A. Paul Nicholas Whelan. |
| 15 | 15 Q. My name is Heidi Sharp. I am an attorney for the plaintiffs |
| 16 Also Present: MR. JOHN ISOTALO and | 16 in this matter. |
| 17 MR. ROBERT Q. ROMANELLI | 17 Have you ever been deposed before? |
| 18 | 18 A. I have. |
| 19 | 19 Q. When was that? |
| 20 | 20 A. Mid '90s. |
| 21 | 21 Q. What was that in regard to? |
| 22 | 22 A. Traffic accident. |
| 23 | 23 Q. Was that a traffic accident you were involved in? |
| 24 | 24 A. No, a witness. |
| 25 | 25 Q. Witness to a traffic accident. |
| Page 2 | Page 4 |

CONTENTS

| 1 | C O N T E N T S | |
|---|---|---|
| 2 | WITNESS: | PAGE |
| 3 | PAUL NICHOLAS WHELAN | |
| 4 | Examination by Ms. Sharp | 4 |
| 5 | Examination by Mr. Potter | 189 |
| 6 | Re-Examination by Ms. Sharp | 190 |

EXHIBITS

| NUMBER | IDENTIFICATION | PAGE |
|---|---|---|
| 1 | Email dated 3/16/11 | 121 |
| 2 | Interview of Daniel Tomica dated 3/24/11 with attachment | 131 |

1 I will give you some brief instructions since it
2 has been a while since you were deposed. Hopefully, it will
3 help us today.
4 This is a question-and-answer session. I ask the
5 questions and you provide the answers. If you need a break,
6 just let me know. I'd just ask that you answer the question
7 pending before we take a break.
8 If your attorney provides an objection you still
9 need to answer the question. Just allow him to object, so
10 we have a clear record.
11 In regard to a clear record, as you can see and
12 as we discussed, she is taking everything down, so make sure
13 that I finish asking the question before you provide the
14 answer.
15 A. Correct.
16 Q. Also, in that regard, all of our questions and answers need
17 to be out loud. No nods of the head, shakes, uh-huhs,
18 uh-uhs and things like that; all yeses and noes.
19 A. Right.
20 Q. If you answer the question as I have asked it, I am going to
21 assume that you understood it. If you need me to reask it,
22 ask it another way or repeat it, please let me know.
23 Do you understand those instructions?
24 A. Yes.
25 Q. Any questions before we begin?

Page 3

Page 5

** GRUSKIN & ASSOCIATES ** WEST BLOOMFIELD, MICHIGAN
248.737.6691

PAUL NICHOLAS WHELAN
January 18, 2013

**Page 6**

1  A.  No.
2  Q.  Who is your current employer?
3  A.  Kelly Services.
4  Q.  How long have they been your employer for?
5  A.  Eleven years.
6  Q.  What is your current position?
7  A.  Senior manager of global security and investigations.
8  Q.  How long have you held that position for?
9  A.  Three years.
10 Q.  So that would take you back to 2010?
11 A.  Yes.
12 Q.  How many employees do you currently supervise?
13 A.  Ten.
14 Q.  Are you the direct supervisor of all of those employees?
15 A.  Yes.
16 Q.  Is this the same position as what is known as a global
17     security manager?
18 A.  No.
19 Q.  How does it differ from a global security manager?
20 A.  Global security is, you could say, the umbrella organization
21     that I belong to.
22         Within global security, you have global security
23     and investigations. Global security and investigations
24     handles investigations, while global security handles
25     business continuity and other miscellaneous things within

**Page 7**

1      the security realm, if that makes sense.
2  Q.  A little bit.
3          How about this: What are your duties as the
4      senior manager of global security and investigations?
5  A.  I manage investigations. I conduct investigations. I
6      manage personnel. I am in charge of the campus security
7      group. I manage projects that are security based, security
8      related. I handle some purchasing for global security and
9      global security and investigations. Anything electronic,
10     IT-related access, things of that nature.
11 Q.  What type of investigations are you referring to?
12 A.  Theft, fraud, sexual harassment, workplace violence.
13     Anything, really, that impacts Kelly Services as a global
14     company, whether it is in the United States or the countries
15     that I manage. Anything that really impacts our business,
16     our brand, things of that nature.
17 Q.  Now, when you are referring to personnel and campus
18     security, would that be you also overseeing the security
19     officers?
20 A.  Right. I have a coordinator who does not belong to campus
21     security, I have a security officer who doesn't work within
22     campus security, and then I have security officers in campus
23     security.
24 Q.  What do you mean that you have a coordinator and security
25     officer who do not work within campus security?

**Page 8**

1  A.  The coordinator works for global security and investigations
2      basically handling investigative tasks and projects for me.
3      Nothing to do with the campus itself. So he is handling
4      global issues at my behest.
5          The security officer that doesn't work in campus
6      security works executive services, driving the president of
7      the company, doing other executive tasks and he also handles
8      the campus badges, identification badges, issuing badges, et
9      cetera, et cetera, handling access.
10 Q.  So they work within the department, but they are not working
11     on actual campus security?
12 A.  Right.
13 Q.  You also have other security officers who are working on
14     campus security?
15 A.  Yes.
16 Q.  How many security officers are working on campus security?
17 A.  Eight right now.
18 Q.  Has it always been eight security officers since 2011?
19 A.  No.
20 Q.  In the beginning of 2011, how many security officers were
21     assigned campus security?
22 A.  Can you be more specific.
23 Q.  Let's backup a little, then.
24         MR. POTTER: You mean by date?
25         THE WITNESS: Yes.

**Page 9**

1          MS. SHARP: That's fine.
2          MR. POTTER: Go ahead.
3  Q.  (By Ms. Sharp) In January 2011, how many security officers
4      did you have assigned to campus security?
5  A.  I didn't.
6  Q.  What do you mean by that?
7  A.  I didn't manage the group in 2011, at that point.
8  Q.  Has your job changed over time in the last three years?
9  A.  It has, dramatically.
10 Q.  From the beginning of 2011 to currently, has it changed?
11 A.  Yes.
12 Q.  Tell me how it has changed from the beginning of 2011, for
13     example, January, throughout 2011.
14 A.  In March of 2011, I assumed responsibility for the now
15     titled campus security group.
16 Q.  So you did not oversee the campus security group as of
17     January 2011?
18 A.  No.
19 Q.  Are you aware of how many campus security officers there
20     were in January 2011?
21 A.  No.
22 Q.  Because you didn't manage that group?
23 A.  Right.
24 Q.  Who managed the group in January 2011?
25 A.  Steven Davis.

3 (Pages 6 to 9)

PAUL NICHOLAS WHELAN
January 18, 2013

**Page 10**

1  Q.  What was his title as of January 2011?
2  A.  **I believe he was a global security manager.**
3  Q.  Are you aware if he still holds that title today?
4  A.  **Yes, I believe it's the same title.**
5  Q.  The campus security department moved under your department
6      as of March 2011?
7  A.  **Right.**
8          MR. POTTER:  As of March 20th?
9          MS. SHARP:  March 2011.
10         MR. POTTER:  2011, okay.  I thought you meant
11     March 20th.  Sorry.
12  Q.  (By Ms. Sharp)  When the campus security group moved into
13     your department, do you recall how many campus security
14     officers there were?
15  A.  **No.**
16  Q.  Now, when the group moved into yours, there are employees
17     who were directly employees of Kelly Services; is that the
18     case?
19  A.  **Yes, there were.**
20  Q.  Were there also employers who were not Kelly Services direct
21     hires, but who were acting as campus security officers on
22     behalf of Kelly Services and were contracted through other
23     companies?
24  A.  **Yes.**
25  Q.  Do you recall what company they were contracted through?

**Page 11**

1          MR. POTTER:  At what time?
2          MS. SHARP:  March 2011.
3          MR. POTTER:  A change occurred in March 2011.
4          MS. SHARP:  I guess we will find out that in a
5      second.
6          MR. POTTER:  Okay.  Go ahead.
7  Q.  (By Ms. Sharp)  When the campus security group came to you.
8  A.  **On the day it came to me, we used Nationwide.  I think it's**
9      **Nationwide Security Services or something like that.**
10  Q.  We will use that as a reference point.
11         On the day that it came to you, do you recall how
12     many security officers were contracted by Nationwide at that
13     time?
14  A.  **No.**
15  Q.  Do you know approximately?
16  A.  **Yes.**
17  Q.  About how many?
18  A.  **Three.**
19  Q.  After the group came to you, did you continue the Nationwide
20     contract?
21  A.  **No.**
22  Q.  Do you know why the Nationwide contract didn't continue?
23  A.  **Yes.**
24  Q.  Why didn't it continue?
25  A.  **The level of staff they were providing us wasn't meeting our**

**Page 12**

1      needs.  As a specific point of reference, one of their
2      employees had used our assets to stalk her former lover and
3      basically ended up in prison for felonious stalking.
4      Because of that sort of quality, we decided to make a
5      change.
6  Q.  What do you mean by used one of your assets?
7  A.  **Our telephones.**
8          **She was a Detroit police sergeant.**
9          MR. POTTER:  We are laughing at assets instead of
10     telephone.
11         THE WITNESS:  Her girlfriend is a prosecutor in
12     Wayne County.  And, for whatever reason, she decided to
13     stalk her and use our assets so it wasn't a good fit.
14  Q.  (By Ms. Sharp)  Did you have any of the decision-making
15     authority to end the Nationwide contract?
16  A.  **No.**
17  Q.  Do you know who made the decision to end the Nationwide
18     contract?
19  A.  **Yes.**
20  Q.  Who was that?
21  A.  **Thomas Catalano.**
22  Q.  Did you have any discussion with him or take part at all in
23     providing input into any of the Nationwide contract?
24  A.  **Yes.**
25  Q.  Do you recall when that occurred?

**Page 13**

1  A.  **March 22 of 2011.  That was a Sunday.**
2  Q.  You recall that was a Sunday?
3  A.  **Yes.**
4  Q.  Because you were working on a Sunday, so you remember
5      that?
6  A.  **Yes.**
7  Q.  Did Mr. Catalano receive the information regarding the use
8      of this asset from you, this telephone?
9          Do you know if that was one of the reasons why he
10     decided to end the Nationwide contract?
11  A.  **Can you split the question in half?**
12  Q.  Sure.
13         Did Mr. Catalano receive the information
14     regarding the Nationwide employee's use of the telephone
15     from you?
16  A.  **No.**
17  Q.  Do you know if one of the reasons why he ended the
18     Nationwide contract was the use of the telephone?
19  A.  **Yes.**
20  Q.  Do you know any of the other reasons why he decided to end
21     the Nationwide contract?
22  A.  **The manner in which the security officers operated from that**
23     **company wasn't in keeping with what we desired as far as**
24     **security services.**
25  Q.  I want to backup a little, because we went down a road that

4 (Pages 10 to 13)

PAUL NICHOLAS WHELAN
January 18, 2013

**Page 14**

1  I did want to go down but not at this time.
2         You have been senior manager of global security
3  and investigations for quite some time, but your job has
4  changed over time during 2011 as you described to me.
5         In March 2011, when you took over the campus
6  security group, how did your job relate to Mr. Davis'?
7         Do you understand?
8  **A.  I understand the question.  It didn't at all.**
9  Q.  Were you lateral to him, or were you a manager to him?
10  **A.  Neither.**
11  Q.  Did you have authority over Mr. Davis?
12  **A.  No.**
13  Q.  In your position from January 2011 to March 2011, did you
14  have authority over the security officers?
15  **A.  Yes.**
16  Q.  Could you give them day-to-day instruction?
17  **A.  Yes.**
18  Q.  Did you supervise them?
19  **A.  Yes.**
20  Q.  When you provided them instruction, did you expect that
21  they would take your instruction and follow through with
22  it?
23  **A.  Yes.**
24  Q.  If they didn't listen to any of the instruction that you
25  provided, would that be insubordination?

**Page 16**

1  investigations, describe to me how it related to his
2  position.
3  **A.  It didn't at all.**
4  Q.  In no way do you feel it related?
5  **A.  No.**
6  Q.  But you could give instruction to the security officers?
7  **A.  Yes.**
8  Q.  If they did not follow through with the instruction that you
9  provided to them, do you feel that it would relate to
10  discipline?
11  **A.  I would have to turn that over to their manager, who would
12  then make that decision.**
13  Q.  Based on your relationship with Mr. Davis, describing the
14  situation to him, it was up to him?
15  **A.  Correct.  They were his people.**
16  Q.  How long total have you been with Kelly Services?
17  **A.  I think it's 11 or 12 years.**
18  Q.  Have you always been in global security?
19  **A.  No.**
20  Q.  What position did you first start in?
21  **A.  I was a project manager in information technology.**
22  Q.  Tell me about your educational experience.
23  **A.  Bachelor's in criminal justice, master's of business
24  administration.**
25  Q.  Do you have any military experience?

**Page 15**

1  **A.  I would say no.**
2  Q.  Why not?  I am trying to find out how --
3  **A.  How about a definition of insubordination.**
4  Q.  What I am trying to find out here is how Mr. Davis'
5  department of the campus security related to your department
6  from January 2011 through March 2011.
7         For example, if you were to make a basic tree,
8  how did Mr. Davis' -- do you understand what I am saying?
9  **A.  Yes.  It wouldn't look like a tree.**
10  Q.  What would it look like?
11  **A.  You have to understand that managers manage process as
12  opposed to people.  So you can have multiple managers that
13  don't manage anybody, but that manage process.**
14  Q.  It can be the case that a manager may just be in charge of a
15  process or a project, but from January 2011 to March 2011,
16  Mr. Davis was in charge of the campus security officers?
17  **A.  Right.**
18  Q.  And you were in charge, then, of campus security and
19  investigations during that time?
20  **A.  No.**
21  Q.  You were not?
22  **A.  No.  It's global security and investigations.**
23  Q.  That's correct.  I will get that by the end of this, and I
24  will forget it later.
25         In your position in global security and

**Page 17**

1  **A.  Yes.**
2  Q.  Tell me about that.
3  **A.  Marine Corps.  From 2003 actually to 2008, I was on a
4  military leave of absence from Kelly serving in Iraq
5  primarily.**
6  Q.  Was that with the Marines?
7  **A.  Yes.  And prior to joining Kelly, I was in the Marine
8  Corps.**
9  Q.  When was that?
10  **A.  1990 through 2001, when I joined Kelly.  Active duty on
11  reserve.**
12  Q.  So there was on-and-off periods where you were in there, and
13  for the reserves you would do like the weekends and things
14  like that?
15  **A.  Or longer periods of duty but, yes, basically.**
16         MR. POTTER:  Were you a reservist from 2003 to
17  '08 when you were in Iraq?
18         THE WITNESS:  Yes.
19         MR. POTTER:  So you were an active-duty
20  reservist, then?
21         THE WITNESS:  It is complicated, but yes.
22         MR. POTTER:  I want to make sure you were not
23  doing weekends in Iraq.
24         THE WITNESS:  I can attest that I was not doing
25  weekends in Iraq.

5 (Pages 14 to 17)

PAUL NICHOLAS WHELAN
January 18, 2013

**Page 18**

1 Q. (By Ms. Sharp) Other than your military experience, do you
2     have any law enforcement experience?
3 A. Yes.
4 Q. Tell me about that.
5 A. I was a deputy sheriff and a police officer from 1988
6     through 2000.
7 Q. Where at?
8 A. I started with the Chelsea police and worked with the
9     Washtenaw County Sheriff.
10 Q. Do you have any licenses or affiliations?
11 A. I have a federal firearms license, if that counts. I am a
12     notary.
13     Do you want professional organizations, that sort
14     of thing?
15 Q. No. That's okay. That's fine.
16     Do you know why the campus security group came
17     under your organization in March 2011?
18 A. Yes.
19 Q. Tell me about that.
20 A. There had been a series of incidents and events and
21     situations in which the credibility and reputation of the
22     group was called into question, including several thefts of
23     money, just a general lackadaisical attitude, violations of
24     company policy and issues that didn't really make the group
25     look good, didn't make the overall global security group

**Page 19**

1     look good. The credit union had a few hundred dollars
2     stolen.
3     One of the major incidents is there was a bank
4     bag of $4,000 that was turned over from the treasury
5     department to the security officers for delivery to the
6     bank. It was $4,000 of money collected by Kelly employees
7     for the Christ Church New Zealand Earthquake Relief Fund.
8     Basically, the money was going to our employees in New
9     Zealand who had suffered catastrophic loss due to an
10     earthquake.
11     That bag of money was taken by a security
12     officer, mishandled and then stolen from the control room,
13     which only security officers and facilities members had
14     access to. That was probably the climax.
15     But there was money stolen from a locked office
16     within the cafeteria that occurred at night when only our
17     people would have had access. The same with the credit
18     union. There were incidents where food was being taken from
19     the cafeteria storage rooms and also food had being taken
20     from the refrigerators, which caused spoilage and issues
21     with public health violations.
22     There was issues with employees coming to work
23     in a state that they couldn't perform their duties because
24     of alcohol or other issues. There were issues with
25     people just not turning up on time, not staying until

**Page 20**

1     their shift ended, not performing the duties expected of
2     them.
3     We have designated smoking areas on campus.
4     People were smoking where they wanted to, leaving their
5     butts where they wanted to.
6     There was an issue with an officer carrying his
7     firearm illegally. Sexual harassment comments. As women
8     were walking out the door, intercoms would be used to make
9     sexually-harassing comments.
10     That's really all I have off the top of my head.
11 Q. When you are saying "employees," are you referring to other
12     Kelly employees and these issues were not being addressed by
13     security officers or the security officers?
14 A. The security officers were committing all these offenses.
15 Q. You mentioned one of them that you considered the climax,
16     which was $4,000 for the New Zealand earthquake fund, which
17     was mishandled and then ultimately stolen.
18     Do you recall when that occurred?
19 A. It was early 2011.
20     Early January and February 2011?
21 A. I don't know.
22 Q. When you say there was a series of incidents and events
23     where the credibility of the group came into question, who
24     called the credibility of the group into question?
25 A. Members of global security as well as other managers and

**Page 21**

1     people within the Kelly Services organization.
2     MS. SHARP: Can you not coach the witness,
3     please?
4     MR. POTTER: I am just refreshing his memory with
5     the date on that investigation. That's all.
6     MS. SHARP: That's fine. I will show it to him,
7     if I need to.
8     MR. POTTER: That's all it is.
9 Q. (By Ms. Sharp) What members of global security are you
10     referring to?
11 A. Thomas Catalano, David Eager, Malcolm Thompson, Steven
12     Sovey, Diane McCormick.
13 Q. Tom Catalano, it is my understanding, was the vice president
14     of global security?
15 A. And is currently.
16 Q. And Dave Eager, what is his position?
17 A. He is another senior manager.
18 Q. He is the senior manager of what or was the senior manager
19     of?
20 A. He is a senior manager within global security and
21     investigations.
22 Q. And Malcolm Thompson?
23 A. He is a coordinator that works for me.
24 Q. So he was a coordinator within global security?
25 A. And investigations.

6 (Pages 18 to 21)

PAUL NICHOLAS WHELAN
January 18, 2013

**Page 22**

1  Q.  And Diane McCormick, what is her position?
2  A.  **She is a director within global security and business**
3     **continuity.**
4  Q.  And Steven Sovey?
5  A.  **He is a coordinator within global security and**
6     **investigations, who reports to David Eager.**
7  Q.  So each of these persons, in response, had a discussion
8     regarding the security officers and these incidences?
9  A.  **We had a number of discussions about the goings on.  I think**
10    **Eager investigated the thefts.**
11 Q.  Was Mr. Davis also involved in these discussions?
12 A.  **Yes.**
13 Q.  At the time Mr. Davis, obviously, was the supervisor of the
14    campus security officers.  What was his take on these
15    incidences?
16 A.  **When you say at the time...**
17 Q.  When the incidences were going on, wouldn't he have been the
18    supervisor of the campus security officers?
19 A.  **Yes.**
20 Q.  What was his take on these incidences?
21 A.  **He agreed with us, that it was casting a shadow over the**
22    **entire organization.**
23 Q.  Was he following up on the person or persons who was
24    supposedly blamed for any of these incidences?
25 A.  **I don't know.**

**Page 23**

1  Q.  Did you ask him if he was following up?
2  A.  **No.**
3  Q.  So you didn't find out if Mr. Davis was following up with
4     any of his employees?
5  A.  **No.**
6  Q.  Why not?
7  A.  **He didn't report to me.**
8  Q.  Who did Mr. Davis report to at the time?
9  A.  **Tom Catalano**
10 Q.  Do you know if Tom Catalano found out if Mr. Davis was
11    following up with his employees?
12 A.  **I don't know.**
13 Q.  Who made the decision, ultimately, to put the campus
14    security officers under your division?
15 A.  **I don't know.**
16 Q.  How did the group come to be under your division?
17 A.  **Tom Catalano directed me to assume management over the**
18    **group.**
19 Q.  As of what date was that?
20 A.  **March 18, 2011.**
21 Q.  Did your division, global security and investigations,
22    investigate any of the incidences and events that you just
23    described to me?
24 A.  **Yes.**
25 Q.  Which ones?

**Page 24**

1  A.  **The one I know about would be the March 7th theft, David**
2     **Eager.**
3  Q.  The one that you referred to regarding the earthquake money?
4  A.  **Yes.**
5  Q.  Any of the others?
6  A.  **I don't know.**
7  Q.  You mentioned violation of company policy, theft, money
8     stolen from a locked office, food taken from the cafeteria,
9     employees coming to work in a state where they could not
10    perform their duties, cigarette butts being out of place, an
11    officer carrying a firearm illegally and sexual harassment
12    comments over the loud speaker.
13        Did your division investigate any of those
14    incidences?
15 A.  **I don't know.**
16 Q.  You don't know if there was an investigation by your group,
17    so you wouldn't have any personal knowledge of any of those
18    other incidences?
19        MR. POTTER:  Whether they were investigated, you
20    mean?
21        MS. SHARP:  I want to know if he has any personal
22    knowledge of any of those other incidences or events.
23        MR. POTTER:  Go ahead.
24 A.  **Yes, I do.**
25 Q.  (By Ms. Sharp)  How do you have personal knowledge of them,

**Page 25**

1     if you don't know if your group investigated them?
2  A.  **Because there was discussion about the issues and complaints**
3     **were made about the conduct.**
4  Q.  There were complaints made by Dave Eager, Malcolm Thompson,
5     Diane McCormick or Steve Sovey within your internal
6     meetings?
7  A.  **No.**
8  Q.  Were where the complaints made?
9  A.  **They were made by third parties.  The discussion occurred**
10    **within our group.**
11 Q.  What do you mean there were complaints made by third
12    parties?
13 A.  **Third parties would complain about conduct.**
14 Q.  What type of third parties?
15 A.  **Other employees with Kelly Services.**
16 Q.  Employees would come to you?
17 A.  **Yes.**
18 Q.  Personally?
19 A.  **Yes.**
20 Q.  And tell you about things?
21 A.  **Yes.**
22 Q.  Had they witnessed it?
23 A.  **Yes.**
24 Q.  Did you, then, go investigate it yourself?
25 A.  **No.**

7 (Pages 22 to 25)

PAUL NICHOLAS WHELAN
January 18, 2013

**Page 26**

1 Q. So you don't have any personal knowledge of whether these
2 incidences and events actually occurred?
3 A. **No, that is not correct.**
4 Q. How is that not correct?
5 A. **Because I witnessed some of the incidents myself.**
6 Q. I just asked you if you investigated or if you had any
7 personal knowledge. Which incidences or events did you
8 actually witness?
9 A. **I witnessed people smoking where they shouldn't have been,**
10 **leaving their butts where they shouldn't have been, carrying**
11 **weapons that they shouldn't have been.**
12 Q. Did you report any of these things?
13 A. **Oh, yes.**
14 Q. Who did you report it to?
15 A. **Steven Davis.**
16 Q. When did these events occur?
17 A. **I would say the middle of 2010 to March 2011.**
18 Q. Did you report this verbally or in writing?
19 A. **Verbally. I would have to take that back, to the middle of**
20 **2009.**
21 Q. So from the middle of 2009 through March 2011, if you saw
22 security officers carrying their firearms illegally and
23 leaving cigarette butts where they shouldn't have been, you
24 reported it to Steven Davis?
25 A. **Correct.**

**Page 27**

1 Q. But this was all verbal?
2 A. **Yes.**
3 Q. When you took over the campus security group, you had
4 approximately three contract employees from Nationwide
5 security. How did the Nationwide security employees' duties
6 differ from the employees hired at Kelly Services to be
7 campus security officers?
8 A. **They didn't.**
9 Q. They did the same exact type duties?
10 A. **Correct. Same expectations.**
11 Q. Same expectations, same position description and if you
12 needed a Nationwide security officer to fill in for a Kelly
13 security officer, they could do so?
14 A. **Yes.**
15 Q. They had the same security clearance? All of those things?
16 A. **Yes.**
17 Q. After Nationwide's contract ended, was another contract
18 obtained for more contract employees?
19 A. **It was. Not as you stated it, but it was.**
20 Q. That was probably a bad question anyway. Sometimes after
21 you hear it out loud, it wasn't very good.
22 After Nationwide's contract was discontinued, a
23 time came when another contract was signed for security
24 officers to be contracted to Kelly Services?
25 A. **Yes. There was an overlap period.**

**Page 28**

1 Q. Do you know who that contract was with?
2 A. **Yes.**
3 Q. Who was the contract with?
4 A. **Whelan Security.**
5 Q. As we have come to learn, Whelan Security has a similar
6 surname to yourself?
7 A. **They do.**
8 Q. Do you know why that's the case?
9 A. **Why?**
10 Q. Yes. Is it anything other than coincidence?
11 A. **I can go back to the history of our families and where the**
12 **name originated, if you'd like that.**
13 Q. That would be an interesting way of saying no.
14 A. **No.**
15 Q. Whelan Security and yourself share no commonality. You are
16 not related, as you know, to Whelan Security?
17 A. **My name is actually Weylan, but everybody pronounces it**
18 **Whelan and I let it go. So it's no relation.**
19 Q. You don't know if they pronounce it Weylan or Whelan?
20 A. **They pronounce it Whelan. My name is Weylan. It is the**
21 **same spelling.**
22 Q. And it is the same spelling?
23 A. **Correct.**
24 Q. Which was my next question.
25 A. **So if I go back to the etymology of the name, then it all**

**Page 29**

1 makes sense.
2 Q. But as far as you know, you are not related, in any way, to
3 the owner of Whelan Security?
4 A. **I am not.**
5 Q. Do you know how Kelly found Whelan Security?
6 A. **I do.**
7 Q. Tell me about that.
8 A. **Members of global security and investigations belong to an**
9 **organization called ASIS. It used to be the American**
10 **Society of Industrial Security, I believe, but they have**
11 **changed that. I think the moniker now is just ASIS. It is**
12 **a professional security organization.**
13 **We are bombarded with advertising and**
14 **solicitations for security services and whatnot, different**
15 **product services, from members of ASIS. Whelan Security is**
16 **one of those.**
17 **At one point, they had sent us information about**
18 **their services. They were new in Michigan. I actually**
19 **contacted one of their vice presidents due to the similarity**
20 **in name, but also to see what they offered.**
21 **Generally, when the solicitations came in, we**
22 **would vet them to see if they had any applicability to our**
23 **global program or our national program.**
24 Q. Did you, yourself, conduct what you call the vetting
25 process?

PAUL NICHOLAS WHELAN
January 18, 2013

| | |
|---|---|
| 1 **A.** I did and others, yes. | 1 **Q.** What else did you guys talk about? |
| 2 When I say "vetting" -- | 2 **A.** Probably sports and weather. |
| 3 **Q.** I know what you mean. | 3 **Q.** Was there anything else in relation to the campus security |
| 4 **A.** It's a phone call. | 4 officers and Whelan Security and your position in global |
| 5 **Q.** And that's what I am wondering. What was your vetting | 5 security? |
| 6 process? | 6 **A.** Yes. |
| 7 What kind of information did you obtain from | 7 **Q.** Tell me about that. |
| 8 them? | 8 **A.** The model for security services that we wanted or envisioned |
| 9 **A.** Generally, we would give them a phone call, and they would | 9 was different, for lack of a better word, than the typical |
| 10 send us a package with brochures and product information. | 10 staffing model that security services generally provide. |
| 11 Sometimes pricing, but generally just an overview of what | 11 **Q.** What do you mean by the typical staffing model? |
| 12 the company provided as far as services. | 12 **A.** Generally, a security company will come in and take over a |
| 13 **Q.** Did you, at that time, obtain information from any other | 13 security operation, and it will be quote, unquote |
| 14 contract companies about security officers? | 14 outsourced. That's not what we were looking for. We wanted |
| 15 **A.** What do you mean by at that time? | 15 a team of contract security people that simply augmented our |
| 16 **Q.** March 2011. | 16 full-time staff. |
| 17 **A.** This information was gathered in previous years. | 17 **Q.** Why did you want that rather than directly hiring |
| 18 **Q.** Information about other security companies? | 18 individuals and training them and augmenting them into your |
| 19 **A.** Yes. It was an ongoing process, because we were constantly | 19 current employees? |
| 20 being solicited, as we are today. | 20 **A.** Well, Kelly Services is a staffing company. |
| 21 **Q.** The information from Whelan may or may not have been | 21 **Q.** But Kelly also has direct-hire employees like yourself, |
| 22 gathered in March 2011? | 22 right? |
| 23 **A.** Oh, no, it wasn't. | 23 **A.** Right. |
| 24 **Q.** Do you know when it was obtained? | 24 **Q.** And you need to have employees, security officers, |
| 25 **A.** I believe it was 2010. | 25 patrolling the campus, working the monitors and doing things |
| Page 30 | Page 32 |
| 1 **Q.** Did you contact them again in March 2011 at the time that | 1 like that? |
| 2 the Nationwide contract was terminated? | 2 **A.** Right. |
| 3 **A.** Yes. | 3 **Q.** Why not directly hire individuals to work at Kelly rather |
| 4 **Q.** Was that a contact, then, to sign a contract with them or to | 4 than contract and bring in these individuals that you can't |
| 5 get further information about them? | 5 select yourself? |
| 6 **A.** I actually returned a phone call to have a business lunch, | 6 **A.** Using contract security simply followed the model that was |
| 7 because one of their vice presidents happened to be in town. | 7 already in place. |
| 8 **Q.** Did you have that lunch meeting with them, or was it | 8 **Q.** The model that was in place was more direct-hire individuals |
| 9 yourself and someone else from Kelly? | 9 than contract employees, wasn't that the case? |
| 10 **A.** Myself. | 10 **A.** Yes. |
| 11 **Q.** When you say "one of their vice presidents," do you remember | 11 **Q.** Why go to a contract company at that time? |
| 12 who that was? | 12 At the time that you took over the campus |
| 13 **A.** Steve Lyle, L-y-l-e, I believe. | 13 security officers on what you are saying is March 18, 2011, |
| 14 **Q.** Do you recall when you met with him? | 14 there is approximately three contract employees through |
| 15 **A.** It was either on the 18th or 21st of March 2011. | 15 Nationwide? |
| 16 **Q.** What did you discuss at that meeting? | 16 **A.** Yes. |
| 17 **A.** The fact that I had just been assigned to manage the campus | 17 **Q.** And there was approximately how many direct-hire Kelly |
| 18 security group. | 18 Services employees that were campus security officers? |
| 19 MR. POTTER: I don't mean to interrupt you, but I | 19 **A.** Six or seven. |
| 20 need a break. | 20 **Q.** Six plus three is nine, so two-thirds were direct hire. So |
| 21 (Brief pause was taken.) | 21 the model was to have more direct-hire employees than |
| 22 **Q.** (By Ms. Sharp) You were telling me that when you went to | 22 contract employees at the time; isn't that right? |
| 23 this business lunch with the VP of Whelan Security, you had | 23 **A.** That's how the numbers worked out when I took over the |
| 24 just been assigned to manage the campus security? | 24 group. I can't tell you what happened prior to. |
| 25 **A.** Right. | 25 **Q.** When you took over the group, the model at the time was to |
| Page 31 | Page 33 |

9 (Pages 30 to 33)

PAUL NICHOLAS WHELAN
January 18, 2013

1     have more direct-hire employees, and you were actually
2     changing the model, weren't you?
3  A.  No.
4  Q.  Why is this not a change from the current model?
5  A.  **From March of 2011?**
6  Q.  On March 18, 2011 there is a contract in place that's in the
7     process of being terminated with Nationwide security?
8  A.  **Yes.**
9  Q.  And now you are speaking to Whelan Security about bringing
10     in contract employees to augment with your direct-hire
11     employees; isn't that the case?
12  A.  **Right. Basically, switching from Nationwide to another**
13     **service.**
14  Q.  Why not seek out full-time employees to fill in the place of
15     Nationwide? Why go to Whelan Security?
16  A.  **You are asking me why we didn't cancel the contract with**
17     **Nationwide and hire full-time employees?**
18  Q.  Yes. Why not maintain the control yourself?
19  A.  **The cost.**
20  Q.  You felt the cost was --
21  A.  **I didn't feel the cost.**
22  Q.  From your position in global security, you felt the cost was
23     better to maintain contract employees for anything over the
24     five or six direct-hire campus security officers?
25  A.  **I'd have to say no to that, because of the question.**

Page 34

1  Q.  What do you mean by that?
2  A.  **It wasn't my decision.**
3  Q.  What was not your decision?
4  A.  **Whether we had full-time Kelly employees and contract or all**
5     **contract or all full time.**
6  Q.  Whose decision was it?
7  A.  **I couldn't tell you.**
8  Q.  Were you instructed to seek out contract employees for
9     anything over the five or six direct-hire employees that
10     there were when you took over the group on March 18, 2011?
11  A.  **No.**
12  Q.  Why did you seek out a new contract when Nationwide's was
13     canceled rather than get authority from someone to hire more
14     direct campus security officers?
15  A.  **We wanted to end Nationwide's contract because of the**
16     **quality of the people they were sending us, and basically**
17     **replace that with a security service that had a better**
18     **program, better employees.**
19  Q.  When you say "we," who is we?
20  A.  **Thomas Catalano and myself.**
21  Q.  The discussion to replace Nationwide was between yourself
22     and Tom Catalano?
23  A.  **Yes.**
24  Q.  Was there ever a discussion between yourself and Mr.
25     Catalano about why don't we hire more employees directly in

Page 35

1     campus security so we have control over them?
2  A.  **No.**
3  Q.  Was there ever a discussion between yourself and Mr.
4     Catalano regarding the cost of employees?
5  A.  **Yes.**
6  Q.  Were you of the understanding that it was cheaper to
7     maintain contract employees?
8     Where did you get the understanding that the cost
9     was cheaper to maintain contract employees, and that's why
10     he wanted to replace the Nationwide contract?
11  A.  **Where did I get the idea?**
12  Q.  Yes. Why do you have that understanding?
13  A.  **Simple mathematics.**
14     **You might want to restate.**
15  Q.  When you are saying the cost to get a new contract with what
16     ultimately is Whelan Security is cheaper than hiring direct
17     employees, is this because of a discussion between yourself
18     and Mr. Catalano?
19  A.  **Yes, we had a discussion.**
20  Q.  And this is when you are taking over the department on March
21     18, 2011?
22  A.  **Actually, it was the 22nd, but thereabouts.**
23  Q.  Was there ever a discussion about we need more security
24     officers, why don't we bring in more direct hires? Or it
25     was just known between yourself and him that it is cheaper

Page 36

1     to bring in contract employees?
2  A.  **The budget wasn't going to increase. So bringing in**
3     **additional on either side would not have been appropriate.**
4  Q.  When you are having this discussion with Mr. Catalano about
5     replacing the Nationwide contract, why don't you tell me
6     about how yourself and him came to the decision to replace
7     the Nationwide contract.
8  A.  **Basically, because one of the security officers sent by**
9     **Nationwide ended up in prison.**
10  Q.  I understand that. Then the idea was we are going to
11     replace the Nationwide contract.
12     Was there ever a discussion about the number of
13     security officers you wanted to obtain from the new
14     contract, whoever it would be? We know it ultimately ended
15     up being Whelan Security.
16  A.  **No.**
17  Q.  Was there a goal about how many officers you needed to
18     obtain from the new contract?
19  A.  **No.**
20  Q.  Was there a discussion about what their duties would be?
21  A.  **Yes.**
22  Q.  What were their duties going to be?
23  A.  **They would maintain cognizance over the control room, where**
24     **our security cameras, security system and fire system are**
25     **located. They would patrol the campus. They would respond**

Page 37

10 (Pages 34 to 37)

PAUL NICHOLAS WHELAN
January 18, 2013

1　to emergencies that were within a security officer's
2　purview.
3　　　　Obviously, they don't have powers of arrest and
4　whatnot. They weren't armed. So any major issue would be
5　turned over to the police immediately.
6　Q.　Are these the same duties as the Kelly Services campus
7　　　security officers, which was directly hired by Kelly
8　　　Services?
9　A.　Yes.
10　Q.　Why did you seek out to have additional officers via a
11　　　contract? Was it that Kelly just needed more than what --
12　　　　　MR. POTTER: Object to form and foundation, that
13　there were any additional officers brought on board when
14　Whelan came in. You used the word additional.
15　Q.　(By Ms. Sharp) Other than the campus security officers that
16　　　Kelly had on its staff directly hired, why did Kelly need
17　　　more officers than the five or six that it had on March 18,
18　　　2011?
19　A.　If I understand the question that you are asking, the campus
20　　　security group is challenged with a 24/7 operation. The
21　　　headquarters building and other buildings are occupied on a
22　　　24/7 basis. In order to staff a 24/7 operation, you have to
23　　　have a certain number of employees.
24　Q.　In order to have enough employees to staff it on a 24/7
25　　　operation, is this more than five or six campus security

Page 38

1　officers?
2　A.　Yes.
3　Q.　So at some point prior to you taking over the campus
4　　　security group, was a determination made that a contract
5　　　would be obtained in order to have enough security officers
6　　　around the clock, 24/7, always at Kelly Services?
7　　　　Do you know what I am asking you?
8　A.　Kind of. We always had a contract.
9　Q.　So you always had a contract in order to maintain campus
10　　　security officers at Kelly Services 24/7?
11　A.　Yes.
12　Q.　So in order to have a population of security officers over
13　　　and above the ones directly hired by Kelly Services?
14　A.　Yes.
15　Q.　Were you involved at all in the decision to directly hire
16　　　Dan Tomica to Kelly Services in January 2011?
17　A.　Yes.
18　Q.　What was your involvement in that?
19　A.　Dan Tomica had been a contract security officer with
20　　　Nationwide. He was then transitioned into a Kelly temporary
21　　　employee role. He was the first what we call a KTE in the
22　　　security organization.
23　　　　In order to get that approved, I assisted Steve
24　　　Davis with the routing issue through the Detroit territory
25　　　management and our risk department. I assisted him with the

Page 39

1　paperwork, taking Dan from a KTE position to a full-time
2　　　position. So he transitioned from contracted to temporary
3　　　and then temporary to full time.
4　　　　MR. POTTER: KTE is Kelly temporary employee.
5　　　　MS. SHARP: I caught that.
6　Q.　(By Ms. Sharp) When you say you assisted Steve Davis with
7　　　"the routing issue," you assisted him in the paperwork?
8　A.　Yes.
9　Q.　Did you at all have any involvement in the decision to hire
10　　　him?
11　A.　Yes.
12　Q.　How was that?
13　　　　If it was in January 2011, as you have explained
14　to me before, you were not the supervisor over the campus
15　security officers?
16　A.　Right.
17　Q.　In the tree, you were not a direct supervisor over Mr. Davis
18　　　at that time?
19　A.　Correct.
20　　　　It's more of a shrub.
21　Q.　Shrub works for me.
22　　　　At that time, Mr. Davis would have been the
23　direct supervisor over the campus security officers. So if
24　I understand this correctly, it would have been his decision
25　over which campus security officers to hire into his group.

Page 40

1　　　　Does that make sense to you?
2　A.　Yes.
3　Q.　How is it that you had decision-making authority over the
4　　　decision to hire Mr. Tomica in January 2011?
5　　　　MR. POTTER: Object to form and foundation. I
6　don't think he said he had decision-making authority.
7　Whatever he said he said, so I will object to your
8　question.
9　　　　Go ahead and answer.
10　Q.　(By Ms. Sharp) You can answer the question.
11　A.　I didn't have that authority.
12　Q.　How were you involved in the decision to hire Mr. Tomica in
13　　　January 2011?
14　A.　Steve Davis asked me for assistance with the administrative
15　　　process, and I didn't object to what he was asking me to do.
16　Q.　So he asked you for assistance with documents?
17　A.　Right.
18　Q.　And you assisted him in completing the documents and, as I
19　　　would assume, having them completed on the computer and
20　　　submitting them through the Kelly system?
21　A.　Yes and no.
22　Q.　I would assume, nowadays, all documents, especially in a
23　　　company like Kelly, are submitted on a computer.
24　A.　I wouldn't assume that.
25　Q.　So you assisted him in the paperwork?

Page 41

11 (Pages 38 to 41)

PAUL NICHOLAS WHELAN
January 18, 2013

**Page 42**

1  A.  Yes.
2  Q.  Other than that, did he ever come to you and ask you should
3  I hire Dan Tomica?
4  A.  No.
5  Q.  At any point, did you ever give your opinion on whether or
6  not he should hire Dan Tomica?
7  A.  Yes.
8  Q.  When did that occur?
9  A.  That would have been when I was assisting him with the
10  administrative process.
11  Q.  And you did give him your opinion during that paperwork?
12  A.  Yes.
13  Q.  Had he already completed the paperwork at that point, when
14  you were giving him your opinion?
15  A.  No.
16  Q.  It was blank paperwork, and you were actually helping him
17  with it?
18  A.  Yes.  He didn't know what to do.
19      You have to backup a step, because we are still
20  talking transitioning a KTE in a security role,
21  which hadn't been done.  It was a new process.  Nothing had
22  been done at all.
23  Q.  When he is a KTE and you are assisting him in completing the
24  paperwork in order to make Mr. Tomica full-time, was this an
25  actual conversation between you and Mr. Davis?

**Page 43**

1  A.  Yes.
2  Q.  Do you recall when this was?
3  A.  No.
4  Q.  Approximately?
5  A.  December of 2010.
6  Q.  Tell me about the conversation.
7  A.  To take a step back, when Davis had come to me and asked
8  about bringing Tomica on board as a KTE, which, as I said,
9  had never been done before in the security realm, Steven
10  didn't know how to handle the discussions, the
11  administrative process dealing with the Detroit region, who
12  would basically be in charge of Tomica administratively, not
13  operationally.
14      So Steven asked me to help him, and at that time
15  I did, with that process.  And when he wanted to take Dan
16  from a temporary employee to a full-time, he asked me again
17  to assist.
18  Q.  At any time did you voice your opinion, other than assisting
19  him with the administrative process, about his decision to
20  hire Mr. Tomica?
21  A.  Yes.
22  Q.  Tell me what that opinion was.
23  A.  On both occasions, when we brought him from contract to KTE
24  and then KTE to full time, I was in favor of bringing him on
25  board in both of those positions.

**Page 44**

1  Q.  This was an actual conversation with Mr. Davis?
2  A.  Yes.
3  Q.  You told this to him out loud?
4  A.  Yes.
5  Q.  Do you recall exactly what you said to him?
6  A.  No.
7  Q.  Why were you in favor of bringing him on board?
8  A.  From my interactions with him, he seemed like a good fit.
9  He was a better security officer than the one that went to
10  prison and a few others that had fallen asleep, come in
11  late, left early, things of that nature.
12  Q.  Is it my understanding, then, from your testimony that, as
13  far as you know, none of the contract employees had ever
14  transitioned to a KTE in the past?
15  A.  They had not.
16  Q.  So Kelly had never asked a contract employee to come on as
17  either a temporary or a full-time employee in the past?
18      MR. POTTER:  In a security officer role.
19  Q.  (By Ms. Sharp)  In a security officer role.
20  A.  That I cannot answer.
21  Q.  You cannot answer because you don't know it, or you cannot
22  answer because --
23  A.  It's a poorly-worded question.
24  Q.  What I am wondering is, do you know if Kelly had ever
25  transitioned a contract employee in a security officer

**Page 45**

1  position to, as you term it, a KTE prior to Mr. Tomica?
2  A.  They had not.
3  Q.  Had Kelly ever transitioned a contract employee in a
4  security officer position to a full-time position?
5  A.  I don't know that one.
6  Q.  Again, prior to Mr. Tomica?
7  A.  Right.
8  Q.  In December 2010, when the decision was made to transition
9  Mr. Tomica from contract to KTE, do you know why that was
10  done?
11  A.  Yes.
12  Q.  Why?
13  A.  The head count at the time was not sufficient to properly
14  manage the security operation.
15  Q.  Was there a target head count?
16  A.  No.  There were members of the full-time staff, who were on
17  medical leave.
18  Q.  Why not just maintain him at contract in order to maintain
19  the head count for full-time positions and contract?
20  A.  I don't know.
21  Q.  Was that a decision that was made by Mr. Davis?
22  A.  I don't know.
23  Q.  Do you know who did make the decision?
24  A.  No.
25  Q.  Prior to you beginning direct supervision of the campus

** GRUSKIN & ASSOCIATES **  WEST BLOOMFIELD, MICHIGAN
248.737.6691

PAUL NICHOLAS WHELAN
January 18, 2013

1  security officers in March 2011, in your position in global
2  security, what kind of day-to-day interactions did you have
3  with the campus security officers?
4  A.  I would obviously speak with them as they walked through the
5  lobby.  They maintained the security desk.  I'd go in the
6  control room and say hello, discussions about the weather
7  and sports and what have you.
8          If there was an issue on campus, we would be
9  notified by them, if there was a need for an investigation.
10  They would pass along phone calls that came in regarding
11  issues from our branch offices.  Basically that.
12  Q.  So is it fair to say you interacted with the security
13  officers on a daily basis?
14  A.  No.
15  Q.  Weekly?
16  A.  Yes.
17  Q.  Did you go in the control room on at least a weekly basis?
18  A.  Yes.
19  Q.  And you had regular access in your position?
20  A.  Right.
21  Q.  You didn't have to ask permission or anything like that?
22  A.  No.  Everyone in global security has that permission.
23  Q.  As far as giving them direction and things like that, do you
24  think you did that on a weekly basis?  Monthly basis?
25          How often would that occur?

Page 46

1  A.  It was quite rare.  I wouldn't even say it was monthly.
2  Q.  If you needed to give a security officer direction in
3  regards to an investigation, would it normally be the case
4  that you would go through Mr. Davis, or would you meet with
5  them directly and provide them direction?
6  A.  Either/or.
7  Q.  So it didn't matter?  You wouldn't feel the need to go
8  through Mr. Davis?
9  A.  No.
10  Q.  I am going to take you to March 16, 2011.
11  A.  Okay.
12  Q.  Do you recall being in the security or control room that day
13  with Mr. Isotalo?
14  A.  Yes.
15  Q.  Do you recall approximately two o'clock in the afternoon?
16  A.  Thereabouts, yes.
17  Q.  Do you recall at approximately two o'clock in the afternoon
18  that day you asked Mr. Isotalo to go and obtain the license
19  plate of a Kelly employee?
20  A.  The license plate of a vehicle.
21  Q.  The license plate of a vehicle of a Kelly employee?
22  A.  Again the question.
23  Q.  You don't like the question.
24  A.  No.
25  Q.  Let's backup.  You were in the control room with Mr. Isotalo

Page 47

1  on March 16, 2011, at approximately two o'clock in the
2  afternoon?
3  A.  Yes.
4  Q.  In the control room is a series of TV monitors, which shows
5  various things on the Kelly campus?
6  A.  Right.
7  Q.  At that time, did you point him to a female who had just
8  exited what you guys called the Lindsey Building?
9  A.  The Lindsey Center.
10  Q.  The Lindsay Center?
11  A.  No.
12  Q.  Not the Lindsey Center?
13          MR. POTTER:  No, he did not point to the woman,
14  is the way he is answering.
15          MS. SHARP:  I am sure he will tell me if that's
16  not the right answer.
17          MR. POTTER:  I'm going to tell you if the record,
18  I think, is ambiguous.  That's my job, so I pointed that
19  out.
20          But go ahead.
21  Q.  (By Ms. Sharp)  You are in the control room with Mr.
22  Isotalo?
23  A.  Yes.
24  Q.  Did you point to a monitor in which a female had just exited
25  the Lindsey Center Building?

Page 48

1  A.  No.
2  Q.  Did you at all point out anything on a monitor to him
3  regarding the Lindsey Center Building?
4  A.  Yes.
5  Q.  What did you point to on the monitor and call to Mr.
6  Isotalo's attention?
7  A.  The fact that we had a view of the front door.
8  Q.  A view of the Lindsey Center front door?
9  A.  Which is the north door, yes.  We call it the front door.
10  Q.  You generally always have a view of the Lindsey Center front
11  door?
12  A.  No.
13  Q.  Why not?
14  A.  The cameras move.  So if the camera is moved, it is not on
15  the north door.
16  Q.  Did you point to anything in particular when you had a view
17  of the Lindsey Center front door?
18  A.  No, because it is not a very good view.
19  Q.  When you pointed to the Lindsey Center front door on the
20  north view, was there anything on that screen in particular
21  you pointed out to him?
22  A.  No.
23  Q.  Was there anything else that was in particular about the
24  fact that you could see the Lindsey Center front door?
25  A.  No.

Page 49

13 (Pages 46 to 49)

PAUL NICHOLAS WHELAN
January 18, 2013

| | |
|---|---|
| 1  Q.  Why did you point that out to him? | 1  agent, it means a member of the DEA task force who has |
| 2  A.  **I wanted to see if we could, from the control room, use the** | 2  **assumed the role of an agent.** |
| 3  **cameras to watch somebody walk out the front door and** | 3  Q.  I was going to ask that, but you made that easier. |
| 4  **approach a vehicle.** | 4  Was this not necessarily a member of the DEA, but |
| 5  Q.  Were you looking for anybody in particular? | 5  a member of law enforcement who called you? |
| 6  A.  **Yes.** | 6  A.  **No.** |
| 7  Q.  Who were you looking for? | 7  Q.  Who called you? |
| 8  MR. POTTER:  Just use the initials. | 8  A.  **A DEA agent.** |
| 9  A.  **TW.** | 9  Q.  Was he actually a member of the DEA, or was he a member of a |
| 10  Q.  (By Ms. Sharp)  And did you explain that to him? | 10  local police force?  Clinton Township?  Troy?  Something |
| 11  A.  **Yes.** | 11  like that? |
| 12  Q.  Did you tell him why? | 12  A.  **I believe he is an actual DEA agent.** |
| 13  A.  **Yes.** | 13  Q.  Do you recall his name? |
| 14  Q.  What did you tell him? | 14  A.  **I do.** |
| 15  A.  **She was involved in a federal investigation, law enforcement** | 15  Q.  What is his name? |
| 16  **was on our premises, they wanted to follow her as she left** | 16  THE WITNESS:  Do I have to provide that? |
| 17  **work, they didn't know which vehicle she was driving and** | 17  Q.  It's public record. |
| 18  **they had asked us to secure a license plate.** | 18  MR. POTTER:  Yes, you have to provide that. |
| 19  Q.  Is that exactly what you told him? | 19  A.  **JD.** |
| 20  A.  **In specific words?** | 20  Q.  (By Ms. Sharp)  And he called you and identified himself by |
| 21  Q.  Is that exactly what you recall telling him? | 21  his first name? |
| 22  A.  **In those specific words, is that what you are asking?** | 22  A.  **Yes.  My concern is that he works undercover.** |
| 23  Q.  Yes.  Is that exactly what you recall telling him? | 23  **(Discussion held off the record.)** |
| 24  A.  **Maybe not those specific words.** | 24  Q.  (By Ms. Sharp)  JD called you, and upon him using his name, |
| 25  Q.  You told him that TW was involved in a federal | 25  you knew who he was and where he worked? |
| Page 50 | Page 52 |

| | |
|---|---|
| 1  investigation? | 1  A.  **Yes.** |
| 2  A.  **Yes.** | 2  Q.  You didn't have to say, oh, please identify yourself?  Send |
| 3  Q.  And that law enforcement was on your premises? | 3  me your information?  Those kinds of things? |
| 4  A.  **I might have said DEA as opposed to law enforcement or** | 4  A.  **No.** |
| 5  **federal agents.** | 5  Q.  Because you have worked with him in the past? |
| 6  Q.  And you told him that they wanted to follow her as she left | 6  A.  **Yes.** |
| 7  work and wanted us to secure her license plate? | 7  Q.  And what did he tell you when he called you? |
| 8  A.  **Yes.** | 8  A.  **On March 16th when he called me, he said that the DEA had** |
| 9  Q.  And you are sure that you told him that DEA or federal | 9  **raided a house where TW lives, belonging to a boyfriend, and** |
| 10  agents was on our premises? | 10  **they had confiscated property, including vehicles, from that** |
| 11  A.  **Yes.  Specifically because of what we were trying to do.** | 11  **residence.** |
| 12  **They were there waiting for her to leave.** | 12  Q.  Do you know why he chose to call you? |
| 13  Q.  Now, how did you learn that they were there? | 13  MR. POTTER:  I don't know if he was done. |
| 14  A.  **A DEA agent phoned me and told me.** | 14  Is that everything he told you? |
| 15  Q.  When? | 15  THE WITNESS:  Yes. |
| 16  A.  **Earlier the same day.** | 16  MR. POTTER:  I'm sorry.  Thanks. |
| 17  Q.  March 16th? | 17  Q.  (By Ms. Sharp)  Do you know why he chose to call you? |
| 18  A.  **Yes.** | 18  A.  **Yes.** |
| 19  Q.  How do you know it was DEA? | 19  Q.  Why? |
| 20  A.  **Prior association.** | 20  A.  **TW works for Kelly Services.** |
| 21  Q.  And you've met or conversed with him in the past? | 21  Q.  And that makes sense that she works at Kelly Services.  But, |
| 22  A.  **Yes.** | 22  obviously, there are lots of other people who work at Kelly |
| 23  Q.  So when he called up and said, for example, I am John Smith, | 23  Services. |
| 24  you knew who he was? | 24  Do you know if he selected to call you because he |
| 25  A.  **Yes.  And let me just clarify, for the purposes of DEA** | 25  knew you from prior association? |
| Page 51 | Page 53 |

** GRUSKIN & ASSOCIATES ** WEST BLOOMFIELD, MICHIGAN
248.737.6691

PAUL NICHOLAS WHELAN
January 18, 2013

| | |
|---|---|
| 1    He could have called any number of people in | 1  A.  No.  I had personal knowledge of her. |
| 2  campus security at Kelly. | 2  Q.  You already had personal knowledge of her? |
| 3        MR. POTTER:  Object to foundation.  He wouldn't | 3  A.  Yes. |
| 4  know why. | 4  Q.  There are a lot of employees who work at the Kelly campus, |
| 5        But go ahead and answer, if you do. | 5  aren't there? |
| 6  A.  Prior association. | 6  A.  There are. |
| 7  Q.  (By Ms. Sharp)  He knew you from prior association and that | 7  Q.  Hundreds, actually? |
| 8  you worked in global security at Kelly? | 8  A.  Thousands. |
| 9  A.  Yes. | 9  Q.  How did you have personal knowledge of her? |
| 10 Q.  He said he told you this.  What else did he tell you in that | 10 A.  She works in IT, and for two years I sat next to her. |
| 11 phone call? | 11 Q.  A coincidence, isn't there, that he is calling you about her |
| 12 A.  That TW was under investigation for potential controlled | 12 and you happened to sit next to her for two years? |
| 13 substances act violations, income tax violations and other | 13 A.  Could be. |
| 14 federal violations. | 14 Q.  So you knew her and which building she worked in already, so |
| 15 Q.  Did he tell you anything else in regard to TW and Kelly? | 15 you didn't have to look her up or check into her or |
| 16 A.  No. | 16 anything? |
| 17 Q.  Did he tell you that they were surveilling her? | 17 A.  Exactly. |
| 18 A.  Yes.  But that doesn't really have anything to do with | 18 Q.  Did you know what car she already drove on a daily basis? |
| 19 Kelly. | 19 A.  No. |
| 20 Q.  He told you that in that same phone call? | 20 Q.  So you would have had to do some investigation into that? |
| 21 A.  Yes. | 21 A.  Yes. |
| 22 Q.  Tell me everything he told you in the phone call. | 22 Q.  You would have had to have someone follow her or observe her |
| 23 A.  That TW was under investigation.  The DEA had raided the | 23 getting into a car, obtain the license plate and then |
| 24 house she lives in with her boyfriend.  They had confiscated | 24 provide that to him? |
| 25 property, including vehicles. | 25 A.  To the DEA agent? |
| Page 54 | Page 56 |

| | |
|---|---|
| 1     The DEA/police/task force was in our parking | 1  Q.  Yes. |
| 2  lot.  They wanted to follow her, and they wanted to know | 2  A.  Yes. |
| 3  what vehicle she was using, if she was using a vehicle, or | 3  Q.  When he told you all of this, did you tell him that you |
| 4  if she was being picked up, dropped off, et cetera. | 4  would assist him in obtaining a license plate? |
| 5  Q.  So he told you that they were already in your parking lot | 5  A.  Yes. |
| 6  that day on March 16th? | 6  Q.  Was there any other conversation with the DEA agent that |
| 7  A.  Yes. | 7  morning? |
| 8  Q.  What time of day did this phone call come in? | 8        MR. POTTER:  I am going to object to form, |
| 9  A.  It would have been between 10:00 A.M. and 2:00 P.M. | 9  because he said between 10:00 and 2:00.  You said morning. |
| 10 Q.  Where were you when you received this phone call? | 10       I will object to form, but go ahead. |
| 11 A.  My desk. | 11 A.  No. |
| 12 Q.  Was this on a Kelly phone or a cell phone? | 12 Q.  (By Ms. Sharp)  He told you all the things you described to |
| 13 A.  I don't know. | 13 me, you told him that you would help and you would try and |
| 14 Q.  Once you received this phone call, what did you do? | 14 obtain the license plate.  Was there anything else that you |
| 15 A.  Apart from leaving my workstation, I went to the control | 15 and he discussed? |
| 16 room, if that's what you mean. | 16 A.  That morning? |
| 17 Q.  I don't know what you would have done afterward, so I don't | 17 Q.  Or afternoon.  The phone call came in between 10:00 and 2:00 |
| 18 mean anything. | 18 you said. |
| 19       Once you received this phone call, was it, then, | 19 A.  Yes. |
| 20 your intention to go try and find out what vehicle she was | 20 Q.  Did you discuss anything else with him? |
| 21 driving? | 21 A.  Yes. |
| 22 A.  No. | 22 Q.  What else did you discuss? |
| 23 Q.  Did you already know what Kelly employee this was, or did | 23 A.  His first call was basically to tell me what they had done |
| 24 you have to look her up to find out which building she | 24 and ask for my assistance.  He made a second call to say -- |
| 25 worked in? | 25 actually, I think I made a call to him. |
| Page 55 | Page 57 |

** GRUSKIN  &  ASSOCIATES  **  WEST BLOOMFIELD, MICHIGAN
248.737.6691

PAUL NICHOLAS WHELAN
January 18, 2013

**Page 58**

1  Q.  Let's focus on the first call right now.  It is some time
2  between 10:00 A.M. and 2:00 P.M.
3  Besides everything you have described to me so
4  far, did he tell you anything else?
5  A.  Not in that phone call, no.
6  Q.  And you told him, yes, I will try and get the license plate?
7  A.  Right.
8  Q.  Did you tell him anything else?
9  A.  I think that she normally leaves at 4:30 to 5:00 P.M.
10  Q.  And you knew that because you sat next to her for two years
11  working, and you knew which department she worked in?
12  A.  No.
13  Q.  How did you know that?
14  A.  The standard Kelly day is 8:30 to 5:00, so most people leave
15  at 5:00.
16  Q.  Did you tell him anything else?
17  A.  I don't know.
18  Q.  Did he say anything about how many officers would be in your
19  parking lot?
20  A.  No.
21  Q.  Did he say anything about what cars they would be driving?
22  A.  No.
23  Q.  Did he say anything that he, himself, would be there?
24  A.  They were undercover, so they weren't in any kind of marked
25  vehicle.

**Page 59**

1  Q.  Did he tell you that, or did you know that?
2  A.  I knew that.
3  Q.  How did you know that?
4  A.  Because they are undercover officers.
5  Q.  Did he say they are going to be undercover, or you just
6  assumed that because they were surveilling her?
7  A.  I know them to be undercover officers who surveil in
8  unmarked cars out of uniform.
9  Q.  And that's because you had a prior association with this
10  person?
11  A.  Yes.
12  Q.  What is your prior association with him?
13  A.  Kelly Services is a global company, and we work with federal
14  agencies all the time, whether it is OSAC or the LEGATT at
15  the foreign embassies, or we work with HUD or DEA, FBI, ATF,
16  whomever in the United States.  We work with federal
17  agencies in Canada and what have you all over the place.
18  So we come in contact with federal agencies and
19  officers all the time.
20  Q.  Has this person conducted surveillance on your campus in the
21  past?
22  A.  I don't know.
23  Q.  I understand that Kelly comes in contact with all sorts of
24  agencies.  What is your association with this individual?
25  A.  He had called me prior to the March 16th call and he had

**Page 60**

1  asked about whether TW worked for us, what information we
2  had on her and things of that nature.
3  Q.  Any other prior association with him in particular?
4  A.  I don't know.
5  Q.  So in the past he called you about TW, introduced himself to
6  you so you knew which agency he worked for, that he was an
7  undercover agent surveilling her and he needed information
8  about her employment with Kelly?
9  A.  Yes.
10  Q.  So that's your only prior association with him?
11  MR. POTTER:  Well, objection.  He just said, I
12  don't know.
13  A.  We interact with these people at meetings and seminars and
14  conferences, and it's quite possible that I had met him on
15  numerous occasions and just did not remember.
16  Q.  (By Ms. Sharp)  Do you know if you ever met him on any
17  occasion prior?
18  A.  I don't recall.
19  Q.  After this call between 10:00 A.M. and 2:00 P.M., did you go
20  directly to the control room to try and see if you could see
21  the Lindsey Center entrance and exit?
22  A.  I don't recall.
23  Q.  How long after you received this call from him did you go to
24  the control room?
25  A.  I am sure it was within 20 to 30 minutes.

**Page 61**

1  Q.  Was it the next thing you did after receiving this call from
2  him?
3  A.  I don't know.
4  Q.  Is it fair to say that it was shortly thereafter?
5  When you are saying 20 to 30 minutes, it would
6  have been the next thing on your list of things to do?
7  A.  Yes.
8  Q.  The next thing that you did, then, is you are in the control
9  room with Mr. Isotalo.  Is there anybody else in the control
10  room that you can recall?
11  A.  There was not.
12  Q.  So it's you and Mr. Isotalo, and you point out the Lindsey
13  Center front door north view.  Do you see anybody enter or
14  exit while you are viewing that screen?
15  A.  I don't know.
16  Q.  You don't recall if you see anybody enter or exit while you
17  are looking at that monitor?
18  A.  People go in and out of that door, deliveries.  I don't know
19  if anybody did or when we were looking at it.
20  Q.  You tell him that they wanted to follow TW as she left work
21  and wanted to secure a license plate.  Do you give him any
22  instruction at that time?
23  MR. POTTER:  Objection.  You are
24  mischaracterizing.  He previously said more than that.
25  You can go ahead and answer the question.

16 (Pages 58 to 61)

PAUL NICHOLAS WHELAN
January 18, 2013

**Page 62**

1  A.  Yes, I did.
2  Q.  (By Ms. Sharp)  What did you tell him in addition to what I
3      just described to you?
4          MR. POTTER:  Objection.  Asked and answered.
5          Go ahead.
6  A.  I told him to take our vehicle, the security vehicle -- let
7      me backup.  I asked him if he knew who TW was.  He said he
8      did.
9          So I asked him to take the security vehicle, to
10     go to the Lindsey Center, to park so that he could see the
11     north door that we couldn't see with the camera and observe
12     the parking lot, as our security officers normally do, to
13     watch as she left and to document the license plate of
14     whichever car she got into, whether it was a parked vehicle
15     or a vehicle that picked her up.
16         I asked him to do that in the afternoon at about
17     that time frame.
18 Q.  (By Ms. Sharp)  So it is approximately two o'clock in the
19     afternoon when you are in the control room with Mr. Isotalo?
20 A.  Roughly, yes.
21 Q.  Did you give him a specific time frame when you wanted him
22     to do this?
23 A.  Yes.
24 Q.  What time frame did you tell him to do this during?
25 A.  It would have been before 3:00 P.M.

**Page 63**

1  Q.  So you are telling him to go do it at 3:00 P.M.?
2  A.  No.  Before 3:00 P.M.
3  Q.  You are telling him to drive over to the Lindsey Center and
4      park where he can see the north door, but where he cannot be
5      seen, then observe her as she leaves the Lindsey Center and
6      copy down the license plate of the car that she gets into,
7      whether she is picked up or whether it's a car that she is
8      driving, and do this beginning at 3:00 P.M.?
9  A.  No.
10 Q.  How does 3:00 P.M. relate to the instruction that you
11     provided?
12 A.  Since she was working day shift, she got off duty at 3:00
13     P.M., so it had to occur before 3:00 P.M.
14 Q.  So if you are in the control room with him at 2:00 P.M., do
15     you want him to then leave right after you provide
16     instruction?
17 A.  Yes.
18 Q.  So you want him to do this between 2:00 P.M. and 3:00 P.M.?
19 A.  Yes.
20 Q.  You told the DEA agent, JD, that she is going to leave work
21     between approximately 4:30 and 5:00 P.M. is your
22     expectation?
23 A.  Right.
24 Q.  If he is sitting in the car between 2:00 P.M. and 3:00 P.M.,
25     most likely she is not going to leave the building, is she?

**Page 64**

1  A.  Correct.
2  Q.  Why would you have him observe her between 2:00 P.M. and
3      3:00 P.M.?
4  A.  Her manager called me and said that she requested to leave
5      early for a personal matter.  So instead of the afternoon
6      shift handling this issue, the day shift was going to handle
7      it.
8  Q.  When did her manager call you?
9  A.  It would have been between probably 2:00 and 2:15 or 2:20.
10     Between the time that I spoke to JD and went to the control
11     room.
12 Q.  So if you are in the control room at approximately two
13     o'clock with Mr. Isotalo, is it fair to say that this phone
14     call from the DEA agent came in just some time before two
15     o'clock?
16 A.  I am not sure that I was in the control room at two
17     o'clock.  I think I said that I was there after two o'clock.
18 Q.  You are telling me that TW's manager called you and alerted
19     you that she had requested to leave early for a personal
20     issue?
21 A.  Yes.
22 Q.  As you have testified, there are thousands of employees
23     at Kelly?
24 A.  Yes.
25 Q.  I doubt that all of their managers call you and tell you

**Page 65**

1      when their employees are leaving early, do they?
2  A.  Only the ones under federal investigation.
3  Q.  How would her manager know that she was under federal
4      investigation?
5  A.  Her and I had a discussion.
6  Q.  The manager?
7  A.  Yes.
8  Q.  When did this discussion occur?
9  A.  When JD had first informed me of the investigation, because
10     of her job, Tom Catalano, this manager and I discussed
11     whether or not we should leave her in her role.
12 Q.  In IT?
13 A.  Yes.
14 Q.  When did this first phone call come in from JD?
15 A.  I don't know.
16 Q.  Two weeks?  One month?
17 A.  Within days.
18 Q.  Days before March 16th?
19 A.  Yes.
20 Q.  A couple of days before March 16 you received a phone call
21     from JD advising you that she is under federal
22     investigation?
23         MR. POTTER:  I will object to form.  He said
24     within days.  You said "a couple."
25     Object to form.  Go ahead.

17 (Pages 62 to 65)

PAUL NICHOLAS WHELAN
January 18, 2013

**Page 66**

1  A.  Yes.
2      MS. SHARP: I am going to take about a
3  five-minute break.
4      (Brief pause was taken.)
5  Q.  (By Ms. Sharp) You were telling me that TW's manager called
6  and said that she requested to leave early for a personal
7  issue?
8  A.  Yes.
9  Q.  The reason that this manager called you is because the
10 manager knew she was under federal investigation?
11 A.  Yes.
12 Q.  Was the manager under any special instruction or anything to
13 alert you as to TW's comings and goings?
14 A.  Yes.  And if she was acting abnormally or if there was
15 anything within her demeanor that could be a concern based
16 on the position she has in IT.
17 Q.  Did you receive any other calls from this manager between
18 the time that you received the initial call from JD saying
19 that she was under federal investigation and March 16th?
20 A.  We had several conversations.
21 Q.  Regarding TW?
22 A.  Yes.
23 Q.  Her coming, going, acting abnormally and what else?
24 A.  And job description, what she had access to and what she
25 didn't.

**Page 67**

1  Q.  Was there any other day that you were told that she had left
2  early?
3  A.  I don't know.
4  Q.  You don't know, or you don't recall?
5  A.  I don't know.
6  Q.  From the first day that JD told you that she was under
7  federal investigation, were you monitoring her activities?
8  A.  No.
9  Q.  Was this manager under instruction to report to you her
10 activities?
11 A.  Only an activity that would be alarming or that would be out
12 of the norm.  Prior to the day or I guess the night when the
13 DEA had their raid, there was nothing untoward in her
14 behavior.
15     She didn't know she was under investigation at
16 that point.  So only knew she was under investigation after
17 they raided her house.
18 Q.  Did the manager know that her house had been raided?
19 A.  On the 16th, yes.
20 Q.  On the 16th you received a call from JD that her house had
21 been raided the night before.
22     When we say "her house," it is the house she had
23 been residing in with her boyfriend?
24 A.  Yes.
25 Q.  You received a call from JD that her house had been raided?

**Page 68**

1  A.  Yes.
2  Q.  But if you hadn't received that call, you wouldn't have
3  known otherwise?
4  A.  That the house was raided?
5  Q.  Yes.
6  A.  Those sort of things are on the news.
7  Q.  Was it on the news?
8  A.  I don't know.
9  Q.  Do you remember learning from the news -- you are sitting
10 and watching the Nightly News and you say, oh, they know
11 TW's house was raided, and you think that was one of my
12 Kelly employees that I know?
13 A.  No, that didn't occur.
14 Q.  You didn't learn that TW's house was raided from the news,
15 you learn from JD's phone call?
16 A.  Yes.
17 Q.  Did you relay this information to TW's manager?
18 A.  Yes.
19 Q.  After JD called you, you also called TW's manager and said,
20 in addition to finding out she is under federal
21 investigation, I just learned that her house was raided last
22 night?
23 A.  Yes.
24 Q.  So the manager also knew that her house had been raided?
25 A.  Yes.

**Page 69**

1  Q.  Was this phone call to her manager before or after you went
2  to the control room?
3  A.  Before.
4  Q.  Before you went to the control room, you also called her
5  manager?
6  A.  Yes.  And the point of that was to find out what shift she
7  was working, and when she would be leaving at the end of the
8  day.
9  Q.  Was this so that you knew when she would be leaving so that
10 you could try and obtain the license plate?
11 A.  Yes.
12 Q.  Tell me about the phone call with the manager.
13     MR. POTTER: Object to form.  He just did, but go
14 ahead.
15 Q.  (By Ms. Sharp)  The point of the phone call was to find out
16 what shift she was working and when she would be leaving at
17 the end of that day?
18 A.  Yes.
19 Q.  Was there anything else discussed in the phone call?
20 A.  Only the manner in which she was behaving, whether it was
21 normal or not, which was normal, apart from the fact that
22 she wanted to leave early.
23 Q.  So the manager told you that she was behaving normally.  She
24 had already told the manager she wanted to leave early?
25 A.  Yes.

18 (Pages 66 to 69)

PAUL NICHOLAS WHELAN
January 18, 2013

**Page 70**

1  Q.  Did she tell the manager what time?
2  A.  **Yes. That it would have been before three o'clock.**
3  Q.  He told you that she wanted to leave before three o'clock?
4  A.  **She did, yeah. The manager is a female.**
5  Q.  So when we are saying he, the manager is actually a she that
6  we have been referring to.
7  MR. POTTER: I don't think he ever said he before
8  that one.
9  MS. SHARP: I may have.
10  MR. POTTER: Go ahead.
11  A.  **TW's manager is a female.**
12  Q.  (By Ms. Sharp) The manager we're referring to is a female?
13  A.  **Right.**
14  Q.  She told you that TW had told her that TW wanted to leave
15  before 3:00 P.M.?
16  A.  **Right.**
17  Q.  And TW had been behaving normally that day?
18  A.  **Yes.**
19  Q.  And you told the manager that you were trying to find out if
20  she was working her normal shift?
21  A.  **Right.**
22  Q.  Anything else discussed during that phone call?
23  A.  **No.**
24  Q.  Did you tell the manager that you would be having someone
25  surveil her to obtain her license plate?

**Page 71**

1  A.  **Yes.**
2  Q.  Did you tell the manager anything else?
3  A.  **No.**
4  Q.  Just so we are clear, when you were in the control room, you
5  had the information that TW would be leaving early because
6  of the phone call with the manager, and that TW intended to
7  leave some time before 3:00 P.M.?
8  A.  **Yes.**
9  Q.  And you relayed this to Mr. Isotalo?
10  A.  **Yes.**
11  Q.  And you asked him to go to the Lindsey Center, park as to
12  see the north door, but without the persons exiting the
13  north door seeing him?
14  A.  **No. I didn't mind how conspicuous or not conspicuous he**
15  **was.**
16  Q.  Why not?
17  A.  **Because our security officers are in an unmarked vehicle,**
18  **and they routinely sit in the parking lots. It is actually**
19  **better that they are high visibility than low visibility.**
20  Q.  So whether he is seen or not doesn't matter, because the
21  Kelly employees regularly see them. So it wouldn't be out
22  of the ordinary for a Kelly employee to see him sitting in
23  the parking lot?
24  A.  **Right. And that's why I couldn't do it, because if they had**
25  **seen me sitting in the parking lot, it would be extremely**

**Page 72**

1  strange.
2  Q.  So it didn't matter where he sat?
3  A.  **No.**
4  Q.  And you wanted him to watch as TW left the Lindsey Center
5  and document her license plate, whether it was her car or
6  any other car which picked her up?
7  A.  **Right.**
8  Q.  Any other instruction which you provided him in relation to
9  TW?
10  MR. POTTER: I am just going to object, because
11  he gave you prior testimony in this deposition where he gave
12  other information to Mr. Isotalo.
13  I will just object that it has been asked and
14  answered.
15  Go ahead and answer.
16  A.  **Only to stay in the vehicle and then to report the**
17  **information that I had requested back to me.**
18  Q.  (By Ms. Sharp) Did you give him a timeline as to when that
19  information had to be reported back to you?
20  A.  **As soon as possible, because the DEA agents were in the lot**
21  **and they wanted to surveil her, and that information had to**
22  **be passed from one to another quickly so they could follow**
23  **her out of the parking lot.**
24  Q.  You told him specifically to stay in the vehicle and pass
25  the information to you ASAP so the DEA had it as soon as

**Page 73**

1  possible?
2  A.  **Yes.**
3  Q.  You are sure you told him that before he left the control
4  room?
5  A.  **Yes.**
6  Q.  Do you know if he, then, went to sit in the Lindsey Center
7  parking lot to observe her?
8  A.  **He did leave, yes.**
9  Q.  And you observed him leave the control room?
10  A.  **Yes.**
11  Q.  Could you monitor him on the cameras which are in the
12  control room and see if he sat in the Lindsey Center parking
13  lot?
14  A.  **Not the entire parking lot, but part of the parking lot,**
15  **yes.**
16  Q.  Did you remain in the control room after he left?
17  A.  **I did for a period of time, yes.**
18  Q.  About how long?
19  A.  **Probably 15 to 20 minutes.**
20  Q.  During the time you were in the control room, could you see
21  him in his Kelly security vehicle sitting, at any time, in
22  the Lindsey Center parking lot?
23  A.  **When you say "could," was it possible to? It would have**
24  **been possible to.**
25  **Did I? No.**

19 (Pages 70 to 73)

PAUL NICHOLAS WHELAN
January 18, 2013

| | |
|---|---|
| 1 Q. You did not see him? | 1 lot? |
| 2 A. **I didn't look.** | 2 What exactly did he tell you? |
| 3 Q. You didn't have a reason to. You just didn't look at any | 3 MR. POTTER: Objection. Asked and answered |
| 4 time? | 4 twice. |
| 5 A. **Right.** | 5 Go ahead. |
| 6 Q. Did Mr. Isotalo, then, contact you and provide you the | 6 A. **Basically, that one of our security officers had walked up** |
| 7 license plate number? | 7 **to an undercover car in the parking lot.** |
| 8 A. **He did later, yes.** | 8 Q. (By Ms. Sharp) How do you know it was John? |
| 9 Q. When you say "later," about how long after? | 9 A. **He was identified by the officer in the parking lot. He** |
| 10 A. **Thirty, forty-five minutes.** | 10 **also provided the license plate number of the car that TW** |
| 11 Q. How did he provide it to you? | 11 **had gotten into to that person in the parking lot.** |
| 12 A. **By telephone.** | 12 **JD said, yeah, we got the plate because he gave** |
| 13 Q. Via his cell phone? | 13 **it to him. John gave it to the officer in the parking lot.** |
| 14 A. **I don't know.** | 14 Q. When you are having this conversation with JD, did he tell |
| 15 Q. Which phone did he contact you on? | 15 you that the security officer who approached the undercover |
| 16 A. **My desk phone.** | 16 officer in the parking lot was himself, or is he relaying to |
| 17 Q. What did he tell you when he called you? | 17 you that another undercover officer told him this? |
| 18 A. **He gave me the license plate number, told me the vehicle** | 18 MR. POTTER: She is asking you if JD was in the |
| 19 **description, which I don't recall, and that she had left.** | 19 parking lot. |
| 20 Q. Did you respond to him at all? | 20 A. **No, it wasn't JD. JD wasn't the undercover officer** |
| 21 A. **I am sure I did. I said thank you or whatever.** | 21 **approached.** |
| 22 Q. Did you give him any other instruction at that time? | 22 Q. (By Ms. Sharp) So he is telling you that another undercover |
| 23 A. **No.** | 23 officer had called him and told him this? |
| 24 Q. Did you tell him to return to the control room? Did you | 24 A. **Yes.** |
| 25 tell him to return to his post? Anything like that? | 25 Q. Do you know if JD was in the parking lot at all that day? |
| Page 74 | Page 76 |

| | |
|---|---|
| 1 A. **No.** | 1 A. **He was at some point, but he was their supervisor so he** |
| 2 Q. Did he tell you any other information? | 2 **supervises the team.** |
| 3 A. **No.** | 3 Q. So he received this information from someone else? |
| 4 Q. As it relates to TW after that, what did you do with the | 4 A. **Yes.** |
| 5 information? | 5 Q. So he told you that they had been provided the license plate |
| 6 A. **I contacted JD.** | 6 number already? |
| 7 Q. Immediately? | 7 A. **Yes.** |
| 8 A. **Yes.** | 8 Q. Did he tell you anything else regarding receiving the |
| 9 Q. So you called JD? | 9 license plate number in the parking lot from one of your |
| 10 A. **Right.** | 10 security officers? |
| 11 Q. When you called JD, did you provide him the license plate | 11 A. **No.** |
| 12 number? | 12 Q. Anything else that you and JD discussed in that |
| 13 A. **Yes.** | 13 conversation? |
| 14 Q. Did you have any other discussion with JD regarding TW? | 14 A. **Only the fact that a known security officer approaching** |
| 15 A. **Regarding TW, no.** | 15 **somebody in a car could compromise an investigation.** |
| 16 Q. So you provided him the license plate number. Was there | 16 Q. Who said that? |
| 17 anything else discussed in that phone call? | 17 A. **JD.** |
| 18 A. **The fact that John had approached one of the undercover cars** | 18 Q. JD said that to you? |
| 19 **in the parking lot.** | 19 A. **Yes.** |
| 20 Q. Tell me the entire content of the discussion. | 20 Q. He said a known security officer approaching one of my |
| 21 A. **That he had walked up to an undercover car in the parking** | 21 undercover officers in a car could compromise an |
| 22 **lot.** | 22 investigation? |
| 23 Q. JD told you this? | 23 A. **Yes.** |
| 24 A. **Yes.** | 24 Q. Did you respond to him at all? |
| 25 Q. He said, John walked up to an undercover car in the parking | 25 A. **I am sure I apologized profusely, because it was** |
| Page 75 | Page 77 |

20 (Pages 74 to 77)

PAUL NICHOLAS WHELAN
January 18, 2013

| | |
|---|---|
| 1    embarrassing. | 1    number, but that it could have compromised the |
| 2   Q.   Did he say anything else to you? | 2    investigation. |
| 3   A.   He did thank me. We agreed that it was kind of a boneheaded | 3   Q.   Did you tell him anything else? |
| 4    thing to do under the circumstances. He thanked me for our | 4   A.   At that point, no. |
| 5    cooperation and whatnot. | 5   Q.   What was Mr. Catalano's response? |
| 6   Q.   Did you ask him anything else regarding the facts and | 6   A.   Displeasure. |
| 7    circumstances of the security officer approaching the | 7   Q.   Do you remember what he said? |
| 8    undercover officer in the car? | 8   A.   Not off the top of my head, no. |
| 9   A.   No. | 9   Q.   When you say "displeasure," are you saying that based on |
| 10   Q.   You just know that he told you they already had a license | 10    words or facial demeanor? |
| 11    plate, because one of the security officers provided it to | 11   A.   Facial. Kind of like, what was he thinking? Why would he |
| 12    him? | 12    do that? That sort of thing. |
| 13   A.   Right. There were only two security officers on. The other | 13    Disbelief that somebody in our capacity would |
| 14    one was at the front desk. | 14    actually do that sort of thing. |
| 15   Q.   Who was at the front desk at the time? | 15   Q.   You hadn't talked to Mr. Isotalo at that time, had you? |
| 16   A.   Dan Tomica. So it could have only been one person. | 16   A.   No. |
| 17   Q.   That was your assumption? | 17   Q.   So you don't know what had actually occurred as far as why |
| 18   A.   And only one person knew about what we were doing, other | 18    he may or may not have approached somebody, do you? |
| 19    than myself and Tom Catalano. | 19   A.   No. |
| 20   Q.   How did Tom Catalano know what was going on? | 20   Q.   So you went and talked to Mr. Catalano before you ever met |
| 21   A.   I told him. | 21    with Mr. Isotalo, didn't you? |
| 22   Q.   When did you tell him? | 22   A.   Right. But I know that my instructions to him were specific |
| 23   A.   On or about the same time that I had the phone call from JD. | 23    and, obviously, he hadn't followed them. |
| 24   Q.   JD called you some time between 10:00 and 2:00, and you also | 24   Q.   Now, you had had agents from agencies such as the Troy |
| 25    thereabout after told Tom Catalano about the phone call? | 25    Police Department on your premises in the past, haven't you? |
| Page 78 | Page 80 |
| 1   A.   Right. | 1   A.   Yes. |
| 2   Q.   You told Tom Catalano you had a conversation with the | 2   Q.   When agents like that were on your premises in the past, |
| 3    manager of TW? | 3    haven't you relayed this to all of your security officers to |
| 4   A.   Yes. | 4    make them aware of it? |
| 5   Q.   And some time after that is when you went to the control | 5   A.   Either myself or one of the other security managers, yes. |
| 6    room, knowing that she would be leaving some time before | 6    That is just common practice. |
| 7    3:00 P.M.? | 7   Q.   One of those security managers such as Mr. Davis? |
| 8   A.   Right. | 8   A.   Or Eager, yes. |
| 9   Q.   Did you do anything else in that time in relation to the | 9   Q.   And one of the ways that you relay this to people is via |
| 10    phone call that you received from JD? | 10    email? |
| 11    Did you tell anybody else about the phone call? | 11   A.   Right. |
| 12   A.   No. Nobody else was involved. | 12   Q.   You don't see all of your security officers? |
| 13   Q.   What did you do after JD called you and told you that they | 13   A.   Right. It is a 24/7 operation, and you don't see everybody. |
| 14    already received the license plate number? | 14   Q.   Isn't it routine that when security officers come on duty |
| 15   A.   I spoke to Tom Catalano about it. | 15    they are to check their email? |
| 16   Q.   You went right to Tom Catalano? | 16   A.   Yes, however -- yes, they should. |
| 17   A.   Yes. | 17   Q.   The purpose of checking your email when you come on duty is |
| 18   Q.   You didn't stop? You didn't talk to anybody else? You | 18    to see all of the recent emails that have come out, whether |
| 19    didn't go see Mr. Isotalo? You didn't see Mr. Davis? You | 19    it be notices about security, about local police being on |
| 20    went right to Mr. Catalano? | 20    the premises or things that are going to happen during their |
| 21   A.   His office is right next to my cubicle. It's right next | 21    shift that evening? |
| 22    door. | 22   A.   Well, actually, prior to when I took over, the Daily |
| 23   Q.   Tell me the conversation you had with Mr. Catalano. | 23    Activity Report was used for a lot of those things, and |
| 24   A.   I basically explained to Tom that John had approached the | 24    email wasn't used as commonly. That would have either been |
| 25    officer in the parking lot and gave him the license plate | 25    by email or on the Daily Activity Report. |
| Page 79 | Page 81 |

21 (Pages 78 to 81)

PAUL NICHOLAS WHELAN
January 18, 2013

**Page 82**

1  Q.  So the Daily Activity Report was also used to relay messages
2       between the security officers?
3  A.  **Right, but generally not security managers.**
4  Q.  Once you learn that federal agents are on your premises,
5       isn't this something that you want to relay to each of the
6       security officers who are working that day to ensure that
7       they do not interrupt the federal agents' operation?
8  A.  **Yes.**
9  Q.  And did you put this information on the Daily Activity
10      Report?
11 A.  **No. I didn't use the Daily Activity Report. Managers don't**
12      **use it. It was for the security officers.**
13 Q.  How does information get on the Daily Activity Report?
14 A.  **The security officers type it in.**
15 Q.  But you are the only manager who obtained that information
16      from the federal agent, the DEA agent, right?
17 A.  **Yes.**
18 Q.  So wouldn't it have made sense for you to put the
19      information in the Daily Activity Report to provide it to
20      the security officers?
21 A.  **No. I just said that security managers don't use the Daily**
22      **Activity Report, so there is no way that I would put**
23      **anything on it. We use email.**
24 Q.  So you used email?
25 A.  **Right.**

**Page 83**

1  Q.  Once you obtain the information from the DEA agents that
2       they are going to be on your premises that day, wouldn't it
3       have made sense, at that time, to send an email to each of
4       the security officers to provide them the information so
5       that they knew, as they came on shift, what was going on on
6       the premises that day and not to interfere in the DEA
7       agents' operation?
8  A.  **No. The two officers that were on duty were already on duty**
9       **when I came in, and they were on duty after I had received**
10      **that information.**
11      **I did send a message to them, but the two that**
12      **were on duty were already there and present.**
13 Q.  So you are telling me that they came on duty after you
14      received that information?
15 A.  **No, before. I came on duty after they did.**
16 Q.  Mr. Isotalo was on duty from 2:00 to 10:00 that day; do you
17      recall that?
18 A.  **No.**
19 Q.  You don't recall that he came on duty from 2:00 to 10:00
20      that day?
21 A.  **I don't know what shift it was.**
22 Q.  So if you received that information some time between 10:00
23      and 2:00, and Mr. Isotalo was on duty from 2:00 to 10:00, he
24      came on duty after you received that information.
25      Doesn't that make sense?

**Page 84**

1  A.  **No. Maybe I am missing something.**
2  Q.  Once you obtained the information, you are telling me that
3       you verbally told Mr. Isotalo to go obtain a license plate?
4  A.  **Yes.**
5  Q.  And at that time you also told him that the DEA agents were
6       on the premises?
7  A.  **Right.**
8  Q.  Have you seen Mr. Isotalo's testimony in this matter?
9  A.  **His deposition?**
10 Q.  Yes.
11 A.  **Yes.**
12 Q.  Have you read it?
13 A.  **Yes.**
14 Q.  Do you understand that Mr. Isotalo has testified that you
15      did not verbally tell him that the DEA agents were on the
16      premises?
17 A.  **Yes.**
18 Q.  Could it be the case that you did not verbally tell him that
19      the DEA agents were on the premises?
20 A.  **No, not at all.**
21 Q.  You are absolutely certain that you told him they were
22      there?
23 A.  **Yes. I explained the reason why we are looking for TW and**
24      **what we were trying to accomplish, and the fact that I**
25      **wanted him to stay in the building and just do things**

**Page 85**

1       normally.
2  Q.  You did not testify to that earlier. You did not say "just
3       do things normally."
4       What do you mean by just do things normally?
5       That's different from what you told me earlier.
6  A.  **I guess what I mean by doing things normally is not to do**
7       **anything untoward, not to spook TW or anybody else, just to**
8       **act as a normal security officer would, which would be**
9       **sitting in the vehicle and watching the parking lot, things**
10      **of that nature.**
11 Q.  It is your understanding that he did obtain her license
12      plate, he never spooked TW and he never alerted her to his
13      presence in any suspicious manner?
14 A.  **Right.**
15 Q.  So he did follow that instruction?
16 A.  **Yes.**
17 Q.  He obtained her license plate?
18 A.  **Yes.**
19 Q.  He provided it to you, he never spooked her or caused her
20      any suspicion?
21 A.  **Not that I know of.**
22 Q.  As far as you are concerned, he did follow that instruction?
23 A.  **He didn't stay in the vehicle. He didn't report it back to**
24      **me immediately.**
25 Q.  He stayed in the vehicle while he was gathering her license

** GRUSKIN & ASSOCIATES ** WEST BLOOMFIELD, MICHIGAN
248.737.6691

PAUL NICHOLAS WHELAN
January 18, 2013

Page 86

1  plate number. Do you agree with that?
2  **A.  I don't know.**
3  MR. POTTER: Foundation.
4  **A.  I don't know that to be true.**
5  Q.  (By Ms. Sharp)  Now, you have read his testimony, and you
6  understand that he has testified that after gathering his
7  license plate number, he saw a male sitting in a car that he
8  did not recognize in the Kelly parking lot?
9  **A.  Right.**
10 Q.  And do you agree that it's routine for Kelly security
11 officers to patrol the parking lot?
12 **A.  It is.**
13 Q.  And if he saw a male continuously sitting in a car in the
14 Kelly parking lot that he did not recognize, for a
15 continuous period of time, and he did not know that there
16 were federal agents patrolling the parking lot or
17 surveilling it, wouldn't it have been a routine part of his
18 job to approach that person and find out if they had a
19 reason to be there?
20 **A.  No.**
21 Q.  It would not be part of his job?
22 **A.  No.**
23 Q.  Why not?
24 **A.  People generally sleep in their vehicles during lunch. They**
25 **eat lunch in their vehicles. They wait for appointments, et**

Page 87

1  **cetera, et cetera, in their vehicles. It is not uncommon to**
2  **have people sitting in vehicles in the parking lot.**
3  Q.  As a security officer, it is his job to find out if a person
4  has a reason to be in their vehicle at three o'clock in the
5  afternoon. Wouldn't you agree?
6  **A.  Not at three o'clock in the afternoon, no.**
7  Q.  It was three o'clock in the afternoon when he went out to
8  find out TW's license plate, wasn't it?
9  **A.  Roughly. Yes.**
10 Q.  As a security officer, it would have been a routine part of
11 his job to find out if there was a reason for somebody to be
12 continuously sitting in the parking lot?
13 MR. POTTER: Objection. Asked and answered. He
14 just told you no.
15 Tell her again.
16 **A.  No. It's three o'clock in the afternoon. People are coming**
17 **and going. There is a lot of activity. That is not**
18 **unusual.**
19 Q.  (By Ms. Sharp)  For a security officer, you don't think that
20 that is part of his position to find out why somebody is
21 sitting in their car?
22 **A.  If it's ten o'clock when the building is closed, yes. If it**
23 **is 2:00 in the morning, yes. But not at 3:00 in the**
24 **afternoon. That is normal activity.**
25 **It is a staffing company, so people are coming in**

Page 88

1  and out for interviews. There is just a lot of activity.
2  Q.  So you don't believe it is part of his position to approach
3  someone and find out if they have a right to be there?
4  MR. POTTER: Objection. Asked and answered. He
5  gave multiple answers to that question and qualified the
6  time.
7  Tell her again.
8  **A.  No.**
9  The other issue is that suspicious activity is
10 supposed to be reported to the police. If somebody was in
11 our parking lot acting suspiciously, the expectation is that
12 the police would be called, and they would come and check it
13 out.
14 When the security officers were armed, which they
15 weren't in 2011, but when they were armed, one of our
16 concerns was that we were going to have a confrontation in
17 the parking lot between an armed security officer and a
18 member of the general public or whomever. The expectation
19 was that suspicious activity always be reported to the
20 police.
21 Again, security officers don't have law
22 enforcement powers. They can't ask people for their
23 identification. It's very dangerous to have a security
24 officer just approach some guy in a car, especially at
25 night, and ask them what they are doing. That is what law

Page 89

1  enforcement is for.
2  With Troy PD being five minutes away, we utilize
3  them all the time for suspicious people in vehicles.
4  Q.  (By Ms. Sharp)  What is the purpose of patrolling the
5  parking lot, then, for your security force?
6  **A.  Observation.**
7  Q.  To observe?
8  **A.  Yes.**
9  Q.  If he observed a person sitting continuously for a period
10 of time in the parking lot, what would you expect him to
11 do?
12 **A.  Contact law enforcement.**
13 Q.  So you would not expect him to ask what is the purpose
14 of you sitting continuously for a period of time in your
15 car?
16 **A.  No.**
17 Q.  Do you know if there was ever a time when you had a security
18 officer approach someone in their car?
19 MR. POTTER: Other than what Mr. Isotalo did?
20 MS. SHARP: Yes.
21 Q.  (By Ms. Sharp)  Other than Mr. Isotalo's incident. Other
22 than March 16th, that you later became aware of.
23 **A.  I do not, no.**
24 Q.  Other than the information that you obtained from JD
25 regarding Mr. Isotalo approaching an undercover officer and

23 (Pages 86 to 89)

PAUL NICHOLAS WHELAN
January 18, 2013

**Page 90**

1  then the conversation that you had with Mr. Catalano, what
2  information did you obtain about Mr. Isotalo approaching an
3  undercover officer on March 16th?
4  A.  I learned that he had actually gone into the Lindsey
5  Center.  He had spoken with another employee, who had then
6  told another employee about law enforcement being in the
7  parking lot.  He had smoked a cigarette with one of the
8  employees.
9       I believe at one point, either coming or going,
10  he actually spoke with TW in some kind of salutation or
11  something.
12       MR. POTTER:  Does that mean hello?
13       THE WITNESS:  Yes.  Or good-bye or whatever, a
14  greeting.
15  Q.  (By Ms. Sharp)  How did you obtain all of this information?
16  A.  It was told to me.
17  Q.  By whom?
18  A.  Cathy Sage, S-a-g-e.
19  Q.  K-a-t-h-y?
20  A.  No.  Actually, it is Catherine, with a C.  She told me that
21  she and Pam Sanders had been looking out the window of the
22  law department and that law enforcement was present.
23  Q.  When did she tell you this?
24  A.  That would have been the afternoon of the 16th.
25  Q.  How did it come about that she contacted you and told you

**Page 91**

1  this?
2  A.  We have regular communication.  She is the administrative
3  secretary for the law department.  We are a part of the law
4  department, global security, so we have a lot of contact
5  regarding cases, meetings.  She handles part of the
6  purchasing process, et cetera, et cetera.
7       So it is not uncommon that we discuss things on a
8  regular basis.
9  Q.  Did she call you on March 16th?  Did you run into her?  Did
10  you bump into her?
11  A.  She called me.
12  Q.  So she called you on March 16th?
13  A.  Yes.
14  Q.  Was she calling you about this or about something else?
15  A.  Something else, I believe.
16  Q.  And she happens to say, Pam Sanders and I are looking out
17  the window of the law department and seen law enforcement?
18  A.  That they had.
19  Q.  They had seen it?
20  A.  Yes.
21  Q.  Why is this of note to you?
22  A.  Because she shouldn't have known about what was going on.
23  Pam Sanders shouldn't have known what was going on.
24  Q.  If they saw a car in the parking lot that they believed to
25  be law enforcement, how did you know that they obtained that

**Page 92**

1  information from Mr. Isotalo?
2  A.  Cathy told me.  Cathy told me that Pam had told her, because
3  Pam and John had been outside smoking.
4       When Pam came back into the law department she
5  told Cathy, and they went to look out the window to see what
6  was going on.
7  Q.  Tell me what she told you in this conversation about what
8  she learned from Pam, other than what you have already told
9  me.
10  A.  Just that.
11  Q.  When did this call occur?
12  A.  I'd say between 3:00 and 4:00, maybe 3:00 and 5:00.
13  Q.  After talking to Mr. Catalano, did you have this call with
14  Cathy Sage, or was there contact with other persons
15  regarding Mr. Isotalo's contact with that undercover
16  officer?
17  A.  I spoke to Tom, then spoke with Steve Davis, then Cathy and
18  then Tom again.
19  Q.  After you talked to Tom, you went and talked to Steve Davis?
20  A.  Yes.
21  Q.  Tell me about the conversation with Steve Davis.
22  A.  Basically, that John had approached the undercover officer
23  in the parking lot, hadn't followed my instructions, I had a
24  conversation with JD and that we just really weren't happy
25  with that level of professionalism.

**Page 93**

1  Q.  Who was not happy with the level of professionalism?
2  A.  Me and Tom.  Tom and I.
3  Q.  What was Mr. Davis' response?
4  A.  He wasn't happy either.
5  Q.  What else did you tell Mr. Davis?
6  A.  Nothing.
7  Q.  Do you remember anything else Mr. Davis said?
8  A.  No.
9  Q.  How do you know Mr. Davis was not happy?
10  A.  By the conversations that we had, what he said, the way he
11  looked, his response.
12  Q.  Do you remember exactly what he said?
13  A.  No.  It was a conversation to the effect of why would
14  somebody do that.  That's not what they are supposed to be
15  doing.
16  Q.  But at that point, you only had JD's side?
17  A.  Yes.
18  Q.  You had not had a conversation with Mr. Isotalo?
19  A.  Right.  But in my association with JD, he had always been
20  accurate and truthful with me.
21  Q.  You only had one conversation with JD?
22  A.  Right.
23  Q.  He had called you and said that TW was under federal
24  investigation?
25  A.  Yes.

24 (Pages 90 to 93)

PAUL NICHOLAS WHELAN
January 18, 2013

| | |
|---|---|
| **Page 94** | **Page 96** |

**Page 94**

1   Q.   How did you know it to be true?
2   **A.   I knew it to be true.**
3   Q.   How did you know it to be true?
4   **A.   Generally, when federal agents call us and we discuss**
5        **issues, there is some credibility there.**
6   Q.   Other than the fact that he was a federal agent, what gave
7        him credibility?
8   **A.   Nothing.**
9   Q.   Other than the fact that he had called you prior and said
10       she is under investigation and then he called you that day
11       and said her house had been raided, could you obtain her
12       license plate, as far as you know, you had no other
13       conversations with this person?
14   **A.   With JD?**
15   Q.   With JD.
16   **A.   Actually, I did, because we discussed other issues related**
17       **to TW and what she did with Kelly and relatives and things**
18       **like that.**
19   Q.   When was this?
20   **A.   Between the first call and the call on the 16th.**
21   Q.   I very specifically asked you if you had had any other
22       conversations or association with him, and you never
23       mentioned this.
24   **A.   Well, you said prior to him calling about the investigation.**
25   Q.   Prior to him calling about the investigation I asked you

**Page 95**

1       what your association with him was, and you said you had a
2       phone call about TW?
3   **A.   Yes.**
4   Q.   Have you had more than two phone calls with JD?
5   **A.   Yes.**
6   Q.   How many phone calls have you had with JD?
7           MR. POTTER:  About this or anything?
8           MS. SHARP:  Anything.  I asked him what his
9       initial association with him was in general.
10   **A.   After JD called about TW, I think we had two calls and then**
11       **the call on the 16th.**
12       **Prior to that, as I said, I believe that I have**
13       **had contact with him for other matters and in seminars.**
14   Q.   (By Ms. Sharp)  You think you bumped into this person at
15       seminars, but you are not sure?
16   **A.   When we go to these seminars, we hand out cards.  And,**
17       **generally, when the different agents or officers or whomever**
18       **need something, they call us.  That's how they get better**
19       **information.**
20   Q.   Sure.  I think I bumped into Mr. Potter at employment
21       seminars before, because I am in the employment world and he
22       is in the employment world.
23       Other than knowing his name -- we have never had
24       a case together.  You are saying you think you had known
25       this person's name in the past from seeing him in a seminar,

**Page 96**

1       but you have never worked with him on a case prior to him
2       calling you about TW?
3   **A.   Correct.**
4   Q.   Prior to the first time that JD called you and told you this
5       woman was under federal investigation, did he call you any
6       time before that?
7   **A.   I don't know.**
8   Q.   You had two phone calls with him about TW or more?
9   **A.   More.**
10   Q.   How many?
11   **A.   Either three or four.**
12   Q.   And they were all about TW?
13   **A.   TW and her sister.  Her sister works for Kelly.**
14           MR. POTTER:  Twins.
15   **A.   They are identical twins.**
16   Q.   (By Ms. Sharp)  All the phone calls with this person were
17       related to TW, her sister and the federal investigation
18       involving her and/or her boyfriend?
19   **A.   Yes.**
20   Q.   He is a federal agent, and that's what gave him credibility?
21   **A.   The fact that he is a federal agent, yes.**
22   Q.   After he called you and tells you that the undercover agent
23       was approached, do you recall Mr. Isotalo coming up to you
24       and telling you, hey, I didn't know they were in the parking
25       lot; why didn't you tell me that they were in the parking

**Page 97**

1       lot so I didn't go up to them?
2   **A.   No.**
3   Q.   You don't recall that at all?
4   **A.   No.**
5   Q.   You don't recall that he approached you while you were on
6       the phone with JD?
7   **A.   No.**
8   Q.   Was there anybody in the room while you were on the phone
9       with JD?
10   **A.   It is an open cubicle area, so there would have been people**
11       **in and around the area.  Who, I couldn't tell you.**
12   Q.   Could Mr. Isotalo have come up to approach you and seen you
13       were on the phone?
14       You said, "it is an open cubicle area."  When you
15       are on the phone, is your back to the room?
16   **A.   Yes.  It is hard to put this on the steno, but I am sitting**
17       **in the corner, so my back would have been to anybody**
18       **standing here or here.  I wouldn't necessarily have seen**
19       **them.**
20       **I would have directed my attention towards the**
21       **phone.  There is a wall here with cabinets and whatnot.**
22       **If somebody was standing behind me, et cetera, et**
23       **cetera, I wouldn't necessarily know they were there unless**
24       **they drew my attention.**
25   Q.   Prior to Mr. Isotalo returning and providing you the license

** GRUSKIN & ASSOCIATES ** WEST BLOOMFIELD, MICHIGAN
248.737.6691

PAUL NICHOLAS WHELAN
January 18, 2013

**Page 98**

1  plate, you are telling me that he called you on his cell
2  phone or whatever phone it was?
3  A.  Right.
4  Q.  And gave you the license number on your phone at Kelly?
5  A.  Yes.  Either cell phone or desk phone, one of the two.
6  Q.  At that time did he also say to you, why didn't you tell me
7  there would be DEA in the lots?
8  A.  No.
9  Q.  He never said that to you?
10 A.  No.
11 Q.  And you never told him, don't worry about it?
12 A.  No.
13 Q.  You never told him that?
14 A.  No.  If that issue had come up in a conversation with him,
15 it would have been something I would have worried about.
16    But, as I said before, you don't hash it out with
17 the employee, you go to the manager.  The managers take care
18 of it.
19    So if I had been displeased with him, I wouldn't
20 have had a contentious conversation with John on the phone.
21 Q.  You consider that a contentious conversation?
22 A.  Yes.  Questioning him about something that he might have
23 done wrong that could have caused us a lot of embarrassment,
24 yes.
25 Q.  Where is the question?

**Page 99**

1       MR. POTTER:  He is saying if he had done it.
2       MS. SHARP:  I understand what he is saying.
3  Q.  (By Ms. Sharp)  What is the question in there?
4  A.  I am not asking a question.
5  Q.  You are saying questioning John about something he had done
6  wrong?
7  A.  Right.
8  Q.  Where was the question when I presented it to you?
9  A.  I don't follow.
10 Q.  If John had called you up and said, why didn't you tell me
11 that there would be DEA in the lots.
12 A.  Instead of me saying, well, I did and us getting into a
13 conversation about it or an argument, I would have referred
14 it to his manager.  If he had a problem with something, he
15 would have to talk to his manager.  We wouldn't have gotten
16 into an argument on the phone about it.
17 Q.  I don't think I was implying there was an argument.  I was
18 just asking you:  Why wouldn't you have responded to him and
19 just said simply, well, I did, or, no, I didn't; I'm sorry,
20 we will take care of it?
21 A.  That kind of thing could have occurred, but this is post me
22 finding out that a conversation had taken place in the
23 parking lot with an undercover officer, so I wouldn't have
24 been pleased at that point.
25 Q.  I am asking you if he had asked you this while he was

**Page 100**

1  providing you the license plate number, when he was still in
2  the parking lot?
3  A.  Without me knowing that he had approached somebody?
4  Q.  Yes.
5  A.  I would have told him that I did tell you.  That's exactly
6  the conversation we had in the control room.  That's exactly
7  why are doing what you are doing.
8  Q.  But you don't recall that occurring?
9  A.  No.  It didn't.  It didn't occur.
10 Q.  Did JD ever tell you that John Isotalo approaching the
11 undercover officer changed anything about the investigation?
12 A.  No.
13 Q.  Did he ever tell you that receiving the license plate number
14 assisted in their investigation?
15 A.  It did.
16 Q.  Did he ever tell you that Mr. Isotalo's actions had impeded
17 their investigation?
18 A.  No.
19 Q.  Now, when you relayed all of this to Mr. Davis, you told me
20 that Mr. Davis' responses to you that there was law enforcement
21 with Mr. Isotalo, but you can't recall what Mr. Davis said?
22 A.  Right.
23 Q.  Then you had this conversation with Cathy Sage?
24 A.  Yes.
25 Q.  Have we gone over everything that Cathy Sage told you on

**Page 101**

1  that phone call?
2  A.  Yes.
3  Q.  She said that Pam Sanders had told her that Pam had had a
4  cigarette break with Mr. Isotalo, and Mr. Isotalo had told
5  her in that cigarette break that there was law enforcement
6  in the parking lot, and after Pam came up, Pam and Cathy had
7  seen law enforcement from the window of the law department?
8       MR. POTTER:  Objection.  I don't think he ever
9  said that they had seen law enforcement.  I think he said
10 that they were looking.
11      Object to form.
12 A.  That they were looking out the window, yes.  All that would
13 be true, except for the point that they may or may not have
14 actually seen the law enforcement.
15 Q.  (By Ms. Sharp)  Did Cathy tell you when the cigarette break
16 with Pam occurred with Mr. Isotalo?
17 A.  Not specifically, no.
18 Q.  Did you ask Cathy any questions about the information she
19 had just provided you about Mr. Isotalo's and Pam's
20 cigarette break?
21 A.  No.
22 Q.  Time?  Location?  Anything else they talked about?  Anything
23 like that?
24 A.  No.
25 Q.  Just so we are clear, is that everything you learned from

26 (Pages 98 to 101)

PAUL NICHOLAS WHELAN
January 18, 2013

1  Cathy Sage about Pam Sanders' and Mr. Isotalo's
2  conversation?
3  A.  Right.
4  Q.  After that, you went and had another conversation with Mr.
5  Catalano?
6  A.  Yes.
7  Q.  Was that immediately after you got off the phone with Cathy
8  Sage?
9  A.  Yes.
10 Q.  Tell me about that conversation.
11 A.  I basically updated him as to the fact that the information
12 regarding the investigation and law enforcement's presence
13 at the Lindsey Center had been shared with third parties
14 outside of security, which was improper.
15 Q.  Now you are using general terms, law enforcement's presence
16 at the Lindsey Center shared with third parties.  Did you
17 tell him the exact information you learned from Cathy Sage?
18 A.  Yes.
19 Q.  Tell me what you told him.
20     MR. POTTER:  Objection.  Asked and answered.
21     Go ahead.
22 A.  Basically what I just said, that I had a conversation with
23 Cathy Sage, and she relayed the information that her and Pam
24 had looked out the window looking for the law enforcement
25 vehicle, DEA vehicle, what have you, and Pam had told her of

Page 102

1  the presence.  Pam and John had just smoked a cigarette, and
2  John had told her of the presence.
3  Q.  (By Ms. Sharp)  Did you tell him anything else?
4  A.  I don't think so, no.
5  Q.  How did he respond?
6  A.  He wasn't happy.
7  Q.  Do you remember what he said?
8  A.  Not specifically.
9  Q.  What did you do after that?
10 A.  I probably went back to my desk and continued working.
11 Q.  Did you have any conversations with Mr. Isotalo that day
12 that you recall?
13 A.  No.
14     MR. POTTER:  You mean after instructing him to go
15 to the Lindsey Center?
16 Q.  (By Ms. Sharp)  That day, after you spoke with Mr. Catalano
17 that second time.
18 A.  No, I didn't.
19     Actually, today is the first time that I have
20 seen him and spoken to him since then.
21 Q.  Since March 17th?
22 A.  Yes.
23 Q.  2011?
24 A.  Or 16th, yes.
25 Q.  Did you have any further conversation with Mr. Davis that

Page 103

1  day?
2  A.  I don't know.
3     MR. POTTER:  Counselor, what do you want to do?
4  It is one o'clock.  Do you want to take a break
5  and eat?
6     MS. SHARP:  Yes.
7  (Lunch break taken at
8  approximately 1:00 P.M.)
9     - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 104

1     Auburn Hills, Michigan
2     Friday, January 18, 2013
3     At about 1:45 P.M.
4     - - -
5  Q.  (By Ms. Sharp)  Prior to our lunch break, you were telling
6  me about the sequence of events after you received the phone
7  call from JD regarding one of your security officers
8  approaching one of his undercover officers in the parking
9  lot on March 16th.
10 A.  Yes.
11 Q.  Did you make or keep any notes on this sequence of events?
12 A.  No.
13 Q.  You have a habit usually of making notes on incidents, don't
14 you?
15 A.  Yes, depending on the incident.
16 Q.  Why didn't you make or keep any notes on this sequence of
17 events?
18 A.  I didn't see any need at the time.
19 Q.  You said that having your security officer approach the
20 uncover officer in the parking lot was embarrassing, and you
21 would have apologized profusely?
22 A.  Yes.
23 Q.  So wasn't this an event that you would have made notes on,
24 because it was embarrassing and something at Kelly that you
25 felt the need to go and see the vice president of global

Page 105

27 (Pages 102 to 105)

** GRUSKIN & ASSOCIATES ** WEST BLOOMFIELD, MICHIGAN
248.737.6691

PAUL NICHOLAS WHELAN
January 18, 2013

| | |
|---|---|
| 1    security about? | 1   A.   Because I worked for Mr. Catalano. |
| 2   A.   **Well, I see the vice president of global security every** | 2   Q.   But John worked for Mr. Davis? |
| 3    **day. He sits next to me. He eats candy out of my candy** | 3   A.   **Right.** |
| 4    **dish. It is not a big deal.** | 4   Q.   So why not take the information to Mr. Davis and allow Mr. |
| 5   Q.   You see the vice president of global security every day | 5    Davis to take it to Mr. Catalano, if he felt it was |
| 6    because your cube is next to his office, right? | 6    necessary? |
| 7   A.   **Right. I work for him.** | 7   A.   **That's just what I did.** |
| 8   Q.   You see him for lots of reasons? | 8   Q.   When you relayed this information to Mr. Catalano on March |
| 9   A.   **Yes.** | 9    16th, did you already know that the security officer group |
| 10   Q.   Everything from weather, sports, candy? | 10    would soon become part of your division in global security? |
| 11   A.   **Yes.** | 11   A.   **No. There had never been any discussions about that at all.** |
| 12   Q.   But you saw this as such an alarming event in your eyes, | 12   Q.   What do you mean there had never been any discussions about |
| 13    once you received this phone call from JD, that you wanted | 13    that at all? |
| 14    to tell him immediately about what one of the Kelly | 14   A.   **There had never been any discussions about me taking over** |
| 15    employees had done, right? | 15    **the group at all.** |
| 16   A.   **Uh-huh.** | 16   Q.   I thought your prior testimony was that there had been |
| 17   Q.   Yes? | 17    complaints about a series of incidences and things that had |
| 18   A.   **Yes.** | 18    reflected negatively on the security officers that were |
| 19   Q.   If this was such an alarming event, why didn't you keep | 19    ongoing and a potential need to move the security officers |
| 20    notes on what you had been told by Kelly employees and JD? | 20    under your command? |
| 21   A.   **I wouldn't.** | 21   A.   **No, that's not true. Or it's not accurate, I should say.** |
| 22   Q.   You just wouldn't? | 22    **There were complaints, there were a lot of** |
| 23   A.   **No.** | 23    **issues, but there never had been a conversation about me** |
| 24   Q.   An alarming event like this, in your mind, you don't keep | 24    **taking the group over.** |
| 25    notes? | 25   Q.   This was just a series of complaints that had come to light? |
| Page 106 | Page 108 |

| | |
|---|---|
| 1   A.   **No.** | 1   A.   **Yes.** |
| 2   Q.   Do you keep notes on other events that you investigate or | 2   Q.   What was being done, then, to address these complaints? |
| 3    that you consider alarming? | 3        MR. POTTER: I will object to foundation since it |
| 4   A.   **Well, we have an electronic reporting system called** | 4    wasn't his group. |
| 5    **IntegriLink. Generally, when we are doing cases and** | 5        But go ahead and answer, if you can. |
| 6    **whatnot, we have this program up in front of us, it's web** | 6   A.   **Steve Davis was the manager. There was a realignment that** |
| 7    **based, and we type information into our reporting system.** | 7    **put Steve Davis under David Eager so Dave Eager could** |
| 8        **So taking notes, as we are now, is kind of not a** | 8    **improve the group. That didn't work, so it was realigned** |
| 9    **thing of the past, but not as common as maybe it used to be.** | 9    **again so that Steve Davis was solely in charge of the group.** |
| 10   Q.   It is redundant? | 10   Q.   (By Ms. Sharp) When did the Eager to Davis realignment |
| 11   A.   **Yes, it is redundant.** | 11    happen? |
| 12   Q.   Did you open IntegriLink when JD called you and told you one | 12   A.   **'08/'09.** |
| 13    of the security officers that approached his undercover | 13   Q.   When did the Davis solely supervising the group happen? |
| 14    officer in the parking lot? | 14   A.   **Again in '09. Late '09.** |
| 15   A.   **No. Because that system is used for investigations, and I** | 15   Q.   So from 2009 through March 18, 2011, Davis solely supervised |
| 16    **wouldn't open an investigation into that.** | 16    the security officers at Kelly Services? |
| 17   Q.   So you didn't find there was a need to investigate? | 17   A.   **Yes.** |
| 18   A.   **I wouldn't be the person to investigate it. I'd go to my** | 18   Q.   Were you aware that Mr. Isotalo was terminated on March 17, |
| 19    **boss and tell him, and then he would take care of that.** | 19    2011? |
| 20        **Again, John didn't work for me, he worked for** | 20   A.   **Yes.** |
| 21    **somebody else.** | 21   Q.   How did you become aware of it? |
| 22   Q.   John worked for Mr. Davis, right? | 22   A.   **I believe Tracy Hopper, the human resources manager, told** |
| 23   A.   **Yes.** | 23    **me.** |
| 24   Q.   Why did you relay the investigation to Mr. Catalano instead | 24   Q.   When did she tell you? |
| 25    of Mr. Davis? | 25   A.   **At some point on March 17th, probably afternoon.** |
| Page 107 | Page 109 |

PAUL NICHOLAS WHELAN
January 18, 2013

| | |
|---|---|
| 1   Q.   Did Mr. Davis tell you prior to Mr. Isotalo's termination | 1   Q.   Early in the morning? Late in the day? |
| 2      that he was being terminated? | 2   A.   Late in the day, yes. She asked me who reported to who. |
| 3   A.   **No, not Davis. No.** | 3      She was fairly new in the HR section that she was |
| 4   Q.   Did someone else tell you prior to Mr. Isotalo's termination | 4      working with, and she asked who reported to who. When she |
| 5      that he was being terminated? | 5      ascertained that John worked for Davis -- |
| 6   A.   **No.** | 6   Q.   And you explained the shrub to her? |
| 7   Q.   Did you have any discussions with Mr. Catalano on the | 7   A.   Yes, and it is a shrub. She said, okay, thanks. She would |
| 8      morning of the 17th? | 8      speak to Davis. |
| 9   A.   **I am sure we did, yes. Like I said, I see and talk to him** | 9   Q.   Other than asking whom Mr. Isotalo reported to directly, are |
| 10     **all the time.** | 10     there any other questions that she had for you? |
| 11   Q.   On the morning of the 17th, did you have any discussions | 11   A.   No. |
| 12     that you recall with Mr. Catalano regarding Mr. Isotalo? | 12   Q.   Who initiated the conversation? |
| 13   A.   **Yes.** | 13   A.   She did. |
| 14   Q.   What do you recall about your conversations with Mr. | 14   Q.   Did she call you or meet with you directly? |
| 15     Catalano on the morning of the 17th regarding Mr. Isotalo? | 15   A.   I don't recall. We are on the same floor. She probably |
| 16   A.   **Specifically that Tracy Hopper was the human resources** | 16     just came down to our area. |
| 17     **manager handling the issue, and she was going to deal with** | 17   Q.   And she asked you who Mr. Isotalo reported to? |
| 18     **the issue through Steve Davis.** | 18   A.   Yes. |
| 19   Q.   What was your response? | 19   Q.   Any other questions about the activities of the 16th, the |
| 20   A.   **It was probably neutral, just to acquiesce to whatever he** | 20     undercover officer, the DEA, anything at all as it pertained |
| 21     **was telling me. I wouldn't have had an objection to it.** | 21     to Mr. Isotalo? |
| 22     **That's generally how things are handled.** | 22   A.   No. I think she handled it all with Davis. |
| 23   Q.   When you say that he told you that Tracy Hopper was handling | 23   Q.   Any questions about his work history? |
| 24     the issue, did he tell you at that time she was handling the | 24   A.   With me? |
| 25     issue by terminating Mr. Isotalo? | 25   Q.   Yes. |
|                      Page 110 |                      Page 112 |
| 1   A.   **No.** | 1   A.   No. |
| 2   Q.   Was his exact terminology, she is handling the issue through | 2   Q.   Nothing else about Mr. Isotalo? |
| 3     Mr. Davis? | 3   A.   Yes. |
| 4   A.   **With Mr. Davis, yes.** | 4   Q.   Just who did he report to? |
| 5   Q.   Did you know that that meant that Mr. Isotalo was being | 5   A.   Yes. |
| 6     terminated? | 6     I know she spoke to Tom, and she spoke to Davis. |
| 7   A.   **No.** | 7   Q.   How do you know that? Were you present? |
| 8   Q.   Did he tell you anything else? | 8   A.   I have been in the same cubicle area. |
| 9   A.   **No.** | 9   Q.   You saw her go speak to Mr. Davis and Mr. Catalano? |
| 10   Q.   Did you know that Mr. Isotalo was being terminated? | 10   A.   Right. |
| 11   A.   **No.** | 11   Q.   After she talked to you, or before she talked to you? |
| 12   Q.   Did he ask you any other questions about what had occurred | 12   A.   After. She went by me and then talked to them. |
| 13     on the 16th? | 13   Q.   Could you hear either of those conversations? |
| 14   A.   **No.** | 14   A.   No. |
| 15   Q.   Did you ever meet with Ms. Hopper prior to her meeting with | 15   Q.   On March 16, 2011, were you aware that Mr. Isotalo was a |
| 16     Mr. Isotalo on the 16th? | 16     ten-year employee with Kelly Services? |
| 17   A.   **No.** | 17   A.   A tenured? |
| 18   Q.   Did she come and ask you any questions about your knowledge | 18   Q.   A ten year, t-e-n. |
| 19     about anything that had happened on the 16th? | 19   A.   Yes. Actually, I should say that I knew that he had been |
| 20   A.   **Yes.** | 20     there quite a while. I wouldn't have known he was there for |
| 21   Q.   When was that? | 21     ten years, but he had been there for a number of years. |
| 22   A.   **She asked me about I guess I would say our chain of command,** | 22   Q.   Did you have any idea at that time how many years? |
| 23     **who reported to who.** | 23   A.   No. |
| 24   Q.   Backup. My question was: When, first? | 24   Q.   Were you aware at all of his discipline history or lack |
| 25   A.   **Probably late on the 16th.** | 25     thereof with Kelly Services? |
|                      Page 111 |                      Page 113 |

29 (Pages 110 to 113)

PAUL NICHOLAS WHELAN
January 18, 2013

| | |
|---|---|
| 1       MR. POTTER:  At what time? | 1  Q.  -- of Mr. Isotalo's prior concealed weapons license? |
| 2       MS. SHARP:  On March 16, 2011. | 2  **A.  The expired one, yes.** |
| 3  **A.  Yes.  I knew that there had been issues that had been** | 3  Q.  Do you know if Mr. Isotalo had obtained a new one and just |
| 4    **reported, and there hadn't been action taken.** | 4    hadn't provided a copy to Mr. Sovey? |
| 5  Q.  (By Ms. Sharp)  What do you mean by that? | 5  **A.  Yes.  Because when I asked John, he said that it had** |
| 6  **A.  That nothing disciplinary had occurred.** | 6    **expired, and he was waiting for it to be renewed.  That's** |
| 7  Q.  You say that you know that there had been issues reported, | 7    **when I made the offer to try to get it expedited for him.** |
| 8    and there hadn't been action taken? | 8  Q.  I initially asked you what was his response, and you said |
| 9  **A.  Yes.** | 9    that Mr. Isotalo told you he would take care of it.  Now, |
| 10  Q.  What issues are you aware of that had been reported | 10    you are saying his response was that it had expired, and he |
| 11    regarding Mr. Isotalo? | 11    was waiting for it to be renewed? |
| 12  **A.  He was carrying a gun illegally.** | 12  **A.  That's accurate.** |
| 13  Q.  How do you know this?  What is your personal knowledge of | 13  Q.  You are adding to your initial testimony of what his |
| 14    this? | 14    response was? |
| 15  **A.  He and I had a discussion about it.** | 15  **A.  Yes.** |
| 16  Q.  When did this occur? | 16  Q.  When you say that there were issues that you know that had |
| 17  **A.  It would have been at some point in 2009.** | 17    been reported and there hadn't been action taken on Mr. |
| 18      **His concealed weapons license had expired, and I** | 18    Isotalo, is that what you are referring to? |
| 19    **approached him to see if he needed help getting it renewed,** | 19  **A.  That and the comments that he would make to female employees** |
| 20    **because he was carrying his firearm illegally.** | 20    **as they left the building over the intercom system.** |
| 21  Q.  You are telling me in 2009, his concealed weapons license | 21  Q.  When you say that this is an issue, was this an issue that |
| 22    expired? | 22    had been reported to someone? |
| 23  **A.  Yes.** | 23  **A.  Yes.** |
| 24  Q.  And you approached him personally? | 24  Q.  What is the issue that had been reported that there was no |
| 25  **A.  Yes.** | 25    action taken on? |
|                            Page 114 |                            Page 116 |
| 1  Q.  How do you know his concealed weapons license expired? | 1  **A.  The gun issue and then the harassing comment issue.** |
| 2  **A.  Steve Sovey told me.** | 2  Q.  The gun issue, let's go to that.  Was that reported to |
| 3  Q.  Steve Sovey came and told you that Mr. Isotalo's concealed | 3    someone? |
| 4    weapons license expired? | 4  **A.  Yes.** |
| 5  **A.  Yes.** | 5  Q.  Who was that reported to? |
| 6  Q.  So you went and approached Mr. Isotalo? | 6  **A.  Steve Davis and Dave Smiatacz.** |
| 7  **A.  Right.** | 7  Q.  When was that reported to Steve Davis? |
| 8  Q.  What was the conversation you had with him? | 8  **A.  At the time that I learned about it.** |
| 9  **A.  To ask him if his license was expired, and if he needed help** | 9  Q.  In 2009? |
| 10    **with trying to expedite a renewal.** | 10  **A.  Yes.** |
| 11  Q.  What was his response? | 11  Q.  How do you know whether there was any action taken on it? |
| 12  **A.  No.  That he would take care of it.** | 12  **A.  On the gun issue?** |
| 13  Q.  What led you to believe that he was still carrying a | 13  Q.  Yes. |
| 14    concealed weapon? | 14  **A.  It is a serious offense.** |
| 15  **A.  I could see it.  He was carrying it.** | 15  Q.  My question is:  How do you know whether there was or was |
| 16  Q.  On him that day? | 16    not action taken on it? |
| 17  **A.  Yes.** | 17  **A.  David Smiatacz told me that they weren't going to do** |
| 18  Q.  Did you ever obtain any personal knowledge, other than | 18    **anything with it.** |
| 19    through Steve Sovey, that his concealed weapons license had | 19  Q.  At the time, were you Mr. Isotalo's supervisor? |
| 20    actually expired? | 20  **A.  No.** |
| 21  **A.  No.  I saw the copy that Steve had, and Steve told me.  He** | 21  Q.  So it wasn't your authority to take action on it, was it? |
| 22    **was the range officer, firearms instructor at the time, so** | 22  **A.  Right.** |
| 23    **he managed those records.** | 23  Q.  It was Mr. Smiatacz's or Mr. Davis' authority? |
| 24  Q.  Steve Sovey showed you a copy -- | 24  **A.  Correct.** |
| 25  **A.  Yes, of the expired.** | 25  Q.  That wasn't within your purview, was it? |
|                            Page 115 |                            Page 117 |

** GRUSKIN  ASSOCIATES **  WEST BLOOMFIELD, MICHIGAN
248.737.6691

PAUL NICHOLAS WHELAN
January 18, 2013

1  A.  **To?**
2  Q.  Discipline Mr. Isotalo, if this was something that he needed
3      discipline for?
4  A.  **Oh, right.**
5  Q.  You are saying that there was comments made over a speaker
6      system?
7  A.  **Yes.**
8  Q.  How did you become aware of this?
9  A.  **By hearing them, standing in the control room and watching**
10     **them being made.**
11  Q.  When you heard them, what did you do?
12  A.  **I reported it to Steve Davis and Dave Smiatacz.**
13  Q.  When did you hear these?
14  A.  **It would have been in '08 and '09. It was repeated.**
15  Q.  When you reported this to Davis and Smiatacz, what did they
16      tell you?
17  A.  **I don't know exactly what they told me. I know that**
18     **Smiatacz wasn't happy with it, and there was a concern about**
19     **sexual harassment claims. The behavior continued after**
20     **that.**
21  Q.  How do you know whether action was or was not taken against
22      Mr. Isotalo regarding these issues, as you called them?
23  A.  **Now I know what is in his employment records.**
24  Q.  On March 16th, do you know whether action was or was not
25      taken by Mr. Davis or Mr. Smiatacz?

Page 118

1  A.  **On March 16th?**
2  Q.  Yes.
3  A.  **The only way that I would know is the behavior didn't stop.**
4  Q.  You assumed because the behavior continued that neither Mr.
5      Davis or Smiatacz had taken any disciplinary action against
6      Mr. Isotalo?
7  A.  **Yes.**
8  Q.  So it was just an assumption on your part?
9  A.  **Yes.**
10  Q.  You actually had no personal knowledge whether they had
11     taken action against Mr. Isotalo for what you considered
12     inappropriate comments?
13  A.  **Correct.**
14  Q.  Again, it wasn't in your purview to take any action against
15     him at that time?
16  A.  **Right. I had no authority to take action against him.**
17  Q.  So the first that you learned of Mr. Isotalo's termination
18     was after he was terminated on the 17th?
19  A.  **Yes.**
20  Q.  After he was terminated, are you aware if a new security
21     officer was hired by Kelly Services to replace him?
22  A.  **I am aware. Nobody was.**
23  Q.  Nobody was hired?
24  A.  **No.**
25  Q.  Was a person obtained from Nationwide, through the contract,

Page 119

1     to fill the head count?
2  A.  **Yes, I believe so.**
3  Q.  Do you know who that person was?
4  A.  **No.**
5  Q.  Some time after Mr. Isotalo was terminated, did you become
6      aware that -- let me ask you this first. Let's backup a
7      little.
8          On March 16, 2011, did you send an email, at some
9      point, to the Kelly security officers regarding the federal
10     agents in the parking lot?
11  A.  **Yes.**
12  Q.  Do you recall when that was?
13  A.  **It was at the point where John had left the control room to**
14     **go and handle the mission that I had given him. Because the**
15     **control room couldn't be abandoned, I stayed in it and, at**
16     **that point, I sent the email out.**
17  Q.  You sent the email from the control room?
18  A.  **Yes. It would have been at the point where John was out**
19     **doing the license plate.**
20  Q.  So while John is trying to obtain TW's license plate, you
21      send the email?
22  A.  **Yes.**
23  Q.  Why do you send the email?
24  A.  **Why?**
25  Q.  Yes.

Page 120

1  A.  **To pass on the information that law enforcement was in the**
2     **parking lot. It's pretty standard whenever we have these**
3     **issues.**
4  Q.  That you let the other officers know law enforcement is in
5     the parking lot?
6  A.  **Right.**
7  Q.  Do you communicate verbally to Mr. Tomica, who is at the
8     desk at that time, that law enforcement is in the parking
9     lot?
10  A.  **No.**
11  Q.  Do you communicate verbally to any of the other officers as
12     they come on duty that law enforcement is in the parking
13     lot?
14  A.  **No.**
15          (Marked for Identification:
16          Deposition Exhibit No. 1.)
17  Q.  (By Ms. Sharp) Is the email on the bottom part of this
18     document, Exhibit 1, the email that you sent to the security
19     officers on March 16th?
20  A.  **I believe so. I think so.**
21  Q.  Did you know when you sent this email what any of the
22     surveillance vehicles would look like, what type of vehicles
23     they would be driving or anything like that?
24  A.  **Only the fact that they wouldn't be marked federal vehicles.**
25  Q.  But did you know the make or model or style?

Page 121

31 (Pages 118 to 121)

PAUL NICHOLAS WHELAN
January 18, 2013

**Page 122**

1  A.  No.
2  Q.  Van? Car? SUV? Anything like that?
3  A.  Nothing at all.
4  Q.  JD hadn't provided you any of that information?
5  A.  No.
6  Q.  Did you become aware at some point that Deposition Exhibit 1
7     existed in the form as you see it?
8        MR. POTTER:  You mean with David Freck at the
9     top?
10       MS. SHARP:  Yes.
11       MR. POTTER:  Go ahead.
12 A.  Yes.
13 Q.  (By Ms. Sharp)  How did you become aware?
14 A.  David Freck approached me and said that he had been asked to
15    print an email.  He was uncomfortable with the request,
16    because of the nature of it, and he wanted to report what he
17    thought might be a violation of what we call the Code of
18    Conduct, which is disseminating company information to
19    people outside the organization.
20 Q.  Did he have Exhibit 1 in his hand at the time?
21 A.  He did.
22 Q.  Did he provide it to you?
23 A.  Yes.
24 Q.  Do you recall when this was?
25 A.  It would have been on or about the 23rd or 24th of March

**Page 123**

1     2011.
2  Q.  Now, you told me that he had been approached to print an
3     email, and he was uncomfortable with it.  Did he tell you
4     anything else, like who he was asked to print the email by
5     and why he was uncomfortable?
6  A.  Yes.
7  Q.  Tell me exactly what he told you when he approached you,
8     then.
9  A.  I don't have the exact words, but basically what he said was
10    he had been asked by John Isotalo to help Dan Tomica print
11    an email.  Dan had been unable to print the email in the
12    control room, so Dave Freck had gone to the control room to
13    assist him.
14       Being unable to, the email was forwarded to Freck
15    so he could print it in the maintenance room or the
16    facilities room.  Once it was printed and he read it, he
17    became concerned and then reported back the issue.
18 Q.  Did he tell you why he was concerned once he read the email?
19 A.  Because he thought that the email was destined for someone
20    who had been terminated from the company.
21 Q.  Why did he believe it was destined for somebody who was
22    terminated?
23 A.  Because John was asking him to print it and to assist Dan
24    with printing it.  And at that point John wasn't an employee
25    of the company.

**Page 124**

1  Q.  Did he tell you if Mr. Tomica was ever able to print the
2     email himself?
3  A.  At that time, no, he wasn't able to.
4  Q.  Mr. Tomica was never able to print the email himself
5     according to Mr. Freck?
6  A.  At the time that I had the conversation with Freck, he had
7     not been able to.  If he has since then, I don't know about
8     it.
9  Q.  At the time that Mr. Freck approached you, as far as Mr.
10    Freck knew, Mr. Tomica had been unable to print it?
11 A.  Right.
12 Q.  As far as Mr. Freck knew, it had been forwarded to himself
13    and the email appeared as it did in Exhibit 1?
14 A.  Yes.
15 Q.  When he printed it and read it, he brought it to you?
16 A.  Yes.
17 Q.  Did Mr. Freck ever tell you if he had ever provided a copy
18    of it to Mr. Tomica?
19 A.  I think he had provided Tomica with a copy.
20 Q.  As it existed on Exhibit 1?
21 A.  Yes.
22 Q.  Do you recall him telling you that in that conversation?
23 A.  Yes.  He went through with helping Dan and then came to us
24    later.
25 Q.  So he did provide Dan Tomica a copy, but then came to you?

**Page 125**

1  A.  To be quite honest, I don't know.
2  Q.  Do you know, in relation to when he helped Mr. Tomica print
3     the email, when he came to you?
4  A.  I think I had a phone call that evening, and then the next
5     day is when he actually gave me the email.
6  Q.  When you say a phone call in the evening, were you still at
7     work?
8  A.  No.
9  Q.  Were you at home?
10 A.  I don't know.
11 Q.  Was this something where he was reaching you on a cell
12    phone?
13 A.  Somebody would have, yes.  And maybe I called back to the
14    office.
15 Q.  What do you mean by somebody would have?
16 A.  We have security officers on duty 24/7.  Freck had gone to
17    one of the security officers and somehow had notified me
18    that there was an issue.
19 Q.  Which security officer?
20 A.  I don't know who it was.  He could have gotten the phone
21    number from a phone list, to be quite honest.
22 Q.  Your phone number?
23 A.  Yes.
24 Q.  So he could have gone to one of the other security officers
25    and said, hey, I need to meet with Mr. Whelan, could you

** GRUSKIN & ASSOCIATES **  WEST BLOOMFIELD, MICHIGAN
248.737.6691

PAUL NICHOLAS WHELAN
January 18, 2013

| | |
|---|---|
| 1     please give me his cell phone number? | 1   Q.   I understand Ms. Hopper might be involved in any |
| 2   A.   **Right. Or he could have gotten it off of our department** | 2     investigation in some way, but did you consider this an |
| 3     **list or something.** | 3     investigation of Mr. Tomica? |
| 4   Q.   And you recall receiving a call from him in the evening? | 4   A.   **Yes. In the conduct.** |
| 5   A.   **Yes.** | 5   Q.   But this wasn't an investigation that your department would |
| 6   Q.   He explained this to you? | 6     conduct? |
| 7   A.   **Yes.** | 7   A.   **No.** |
| 8   Q.   And then you had a meeting with him the next day? | 8   Q.   What did you tell Ms. Hopper? |
| 9   A.   **I wouldn't say a meeting, but we did meet and he gave me a** | 9   A.   **The same story that Freck had told me.** |
| 10     **copy of the email.** | 10   Q.   Did you have Freck meet with Ms. Hopper? |
| 11   Q.   Was there anybody else present when he gave you the email? | 11   A.   **I didn't instigate or implement that, but I know that Hopper** |
| 12   A.   **I don't think so. I don't know.** | 12     **set up a meeting with the three of us.** |
| 13   Q.   Do you recall? | 13   Q.   Who is the three of us? |
| 14   A.   **No, I don't.** | 14   A.   **Tracy Hopper, Dan Tomica and myself.** |
| 15   Q.   What did you do after you got the email from Mr. Freck? | 15   Q.   This was on March 23rd or 24th at this point? |
| 16   A.   **I told Tom Catalano.** | 16   A.   **Yes. It was March 24th when we had the roundtable.** |
| 17   Q.   What did you tell Mr. Catalano? | 17   Q.   The meeting? |
| 18   A.   **I basically retold the story that Freck had told me about** | 18   A.   **The meeting, yes.** |
| 19     **the attempt of printing this email, having the printer** | 19   Q.   At this point you are now Mr. Tomica's direct supervisor? |
| 20     **problems and the email being destined for John.** | 20   A.   **Yes.** |
| 21   Q.   Did you tell him that Mr. Freck believed the email was | 21   Q.   Mr. Davis no longer is? |
| 22     destined for John, or that it was destined for John? | 22   A.   **Right.** |
| 23   A.   **That it was.** | 23   Q.   He has a different role in the company? |
| 24   Q.   But you didn't actually know it was destined for John? | 24   A.   **Right.** |
| 25   A.   **Based on what Freck had told me.** | 25   Q.   Was there any need for Mr. Davis to be there? |
|                   Page 126 |                   Page 128 |
| 1   Q.   But you assumed that at that point? | 1   A.   **No.** |
| 2   A.   **Yes.** | 2   Q.   Was Mr. Freck at this meeting with Ms. Hopper? |
| 3   Q.   Did you have any independent knowledge that it was destined | 3   A.   **No.** |
| 4     for Mr. Isotalo? | 4   Q.   Did you see a need for anyone else to be involved? |
| 5   A.   **No.** | 5   A.   **No. But, to be quite honest, it wasn't my call, it was** |
| 6   Q.   What did Mr. Catalano say? | 6     **Tracy's call. So she didn't see apparently the need for** |
| 7   A.   **To tell Tracy Hopper so she could look into the issue.** | 7     **anybody else to be present.** |
| 8   Q.   Did you? | 8   Q.   As far as you were concerned, the entire investigation was |
| 9   A.   **Yes.** | 9     run by her? |
| 10   Q.   Do you know if she did? | 10   A.   **Yes.** |
| 11   A.   **She did.** | 11   Q.   If you are Mr. Tomica's direct supervisor, don't you feel |
| 12   Q.   Your department did investigations, correct? | 12     that you also have to gather the information you need to |
| 13   A.   **My department does investigations, yes.** | 13     make a decision about him? |
| 14   Q.   Why didn't your department conduct an investigation into | 14   A.   **In this case, it was determined by my boss that Tracy would** |
| 15     this? | 15     **lead the investigation or inquiry into the issue.** |
| 16   A.   **Well, you don't conduct investigations on yourself, so human** | 16   Q.   You felt that was the direction you received from Mr. |
| 17     **resources will look into these sorts of things.** | 17     Catalano? |
| 18   Q.   So you are saying, because you were going to be | 18   A.   **Yes.** |
| 19     investigating Mr. Tomica, that's why Tracy Hopper was | 19   Q.   For the entire investigation, as we will call it, to be run |
| 20     looking into this? | 20     by Tracy Hopper? |
| 21   A.   **Yes. And whenever there is a personnel issue or someone has** | 21   A.   **Yes.** |
| 22     **done something or there is an issue, HR is always involved.** | 22   Q.   So she set up a meeting between yourself, Mr. Tomica and |
| 23     **So there is collaboration between security and HR and the** | 23     herself? |
| 24     **business units and whatnot in the company, that's just the** | 24   A.   **Right.** |
| 25     **way we do it.** | 25   Q.   On March 24th? |
|                   Page 127 |                   Page 129 |

33 (Pages 126 to 129)

PAUL NICHOLAS WHELAN
January 18, 2013

| | |
|---|---|
| 1   A.   Right. | 1   handwriting? |
| 2   Q.   Around what time? | 2   A.   Yes. |
| 3   A.   It was in the afternoon, three or four o'clock.  Probably | 3   Q.   These are notes you took during the meeting you had with Mr. |
| 4         four o'clock.  It could have been three o'clock. | 4         Tomica and Tracy Hopper on March 24, 2011? |
| 5   Q.   Had Mr. Tomica worked that day? | 5   A.   Uh-huh. |
| 6   A.   No.  He worked the afternoon shift, so he came in at either | 6         MR. POTTER:  Yes? |
| 7         3:00 or 4:00.  We changed the shifts, and I can't remember | 7         THE WITNESS:  Yes. |
| 8         at that point whether the afternoon shift started at 3:00 or | 8   Q.   (By Ms. Sharp)  Why did you take notes during this meeting? |
| 9         4:00. | 9   A.   This was actually written up after the fact.  It wasn't |
| 10  Q.   Did this meeting occur right after he arrived for a shift? | 10        taken during the meeting. |
| 11  A.   Yes. | 11  Q.   How long after the fact did you write these notes? |
| 12  Q.   Tell me what happened at this meeting. | 12  A.   Probably within an hour or so. |
| 13  A.   Tracy asked him to explain the conversation that he had had | 13  Q.   So you weren't writing during the meeting? |
| 14        with Dave Freck. | 14  A.   I could have been and then could have written it out in a |
| 15        He at first said that he had printer issues.  He | 15        more legible style.  Generally, we don't take notes sitting |
| 16        denied trying to print any email.  He said that he just had | 16        in meetings. |
| 17        general issues with the printer and Dave was helping him. | 17  Q.   This is pretty neat handwriting, so you may have rewritten |
| 18        When Tracy produced the email and said, well, is | 18        it afterwards? |
| 19        this the email, he said no at first.  Then he said, yes.  He | 19        MR. POTTER:  Off the record. |
| 20        admitted that he was trying to print the email for John, and | 20        (Discussion held off the record.) |
| 21        that he had asked Freck to assist with that. | 21  A.   It has to do with having a British family, Catholic schools |
| 22  Q.   Do you recall if he said anything else? | 22        and a mother who is a librarian. |
| 23  A.   I know that he explained that he did it because John was his | 23        How is that? |
| 24        friend, and John had asked him to.  He said he was doing it | 24  Q.   (By Ms. Sharp)  You may have written this afterwards based |
| 25        out of loyalty to his friend. | 25        on notes you took during the meeting? |
| Page 130 | Page 132 |

| | |
|---|---|
| 1   Q.   Did you ask him any questions during this meeting? | 1   A.   Yes. |
| 2   A.   Yes. | 2   Q.   Why did you take notes during this meeting, but not when you |
| 3   Q.   What questions did you ask him? | 3         gathered information regarding Mr. Isotalo on March 16th? |
| 4   A.   What the problem was with the printer in the control room, | 4   A.   Well, this was something that I was involved with as opposed |
| 5         and why, if we had a printer problem, that it hadn't been | 5         to something that I was passing on.  When the issue with |
| 6         reported to me so we could get it fixed. | 6         Isotalo came up, I passed on the information I had to other |
| 7   Q.   What was his answer? | 7         people.  There was no need for me to take notes or do a |
| 8   A.   I don't believe he gave me one. | 8         report. |
| 9   Q.   Were those the only questions you asked him? | 9         This was something that was under my purview, so |
| 10  A.   Directly, yes. | 10        I did. |
| 11  Q.   Did you ask him anything indirectly? | 11  Q.   Weren't you passing along the information regarding Mr. |
| 12  A.   No. | 12        Isotalo on March 16th to Mr. Catalano because you felt that |
| 13  Q.   Did you have anything else to say to him during this? | 13        what Mr. Isotalo had done was embarrassing to Kelly, and he |
| 14  A.   No. | 14        was insubordinate to your instructions? |
| 15        (Marked for Identification: | 15  A.   Insubordinate, potentially comprised a federal investigation |
| 16        Deposition Exhibit No. 2.) | 16        and violated a policy by passing confidential information to |
| 17  Q.   (By Ms. Sharp)  Can you review what I have had marked as | 17        a third party, yes. |
| 18        Deposition Exhibit No. 2.  Let me know when you are done | 18  Q.   So you had a purpose in going to Mr. Catalano? |
| 19        reviewing it. | 19  A.   Yes. |
| 20  A.   Okay.  Yes. | 20  Q.   When you received the information regarding Mr. Tomica, you |
| 21  Q.   Do you want to look at the other pages before we proceed. | 21        had a purpose when you went to Mr. Catalano and passed along |
| 22        MR. POTTER:  Read them all. | 22        that information, also? |
| 23  Q.   (By Ms. Sharp)  Read everything. | 23  A.   Yes. |
| 24  A.   Okay. | 24  Q.   Now, you are involved in a meeting regarding Mr. Tomica, and |
| 25  Q.   Is the first page, Bates numbered 101 at the bottom, your | 25        you are taking these notes? |
| Page 131 | Page 133 |

34 (Pages 130 to 133)

PAUL NICHOLAS WHELAN
January 18, 2013

**Page 134**

1  A.  Yes.
2  Q.  What I am wondering is, both times you went to Mr. Catalano
3     regarding Mr. Isotalo and Mr. Tomica you had the same
4     purpose each time, you felt they were doing something
5     outside their job duties and you wanted to report it to Mr.
6     Catalano?
7  A.  Yes.
8  Q.  But, in the past, things that each of these individuals had
9     done you thought were outside of their job duties and you
10    reported it to Mr. Davis and Mr. Smiatacz, but you hadn't
11    reported those things to Mr. Catalano, had you?
12  A.  Yes.
13  Q.  You had?
14  A.  We discussed all those issues, yes.
15  Q.  But you hadn't received the results you wanted in the past,
16    had you?
17  A.  I wouldn't say that, but it was handled as it was handled by
18    the people who had the authority to handle it.
19  Q.  You didn't agree with how to handle it in the past, though,
20    did you?
21  A.  No.
22  Q.  So this time you were going directly to Mr. Catalano with
23    the things that you disagreed with in their work behavior,
24    weren't you?
25  A.  Yes.

**Page 135**

1  Q.  These are your interview notes from the meeting with Mr.
2    Tomica on March 24, 2011?
3  A.  Correct.
4  Q.  And you are very meticulous in how you kept your notes here,
5    aren't you?
6  A.  Not really, no.  This is not meticulous.  This is just kind
7    of a note format.  It is not a formal report or an executive
8    summary or anything like that.
9  Q.  You could be more meticulous you feel?
10  A.  Oh, yes.
11  Q.  You note the location.  The person who is there from HR is
12    Tracy Hopper.
13         What is r-e-f colon?
14  A.  Reference.
15  Q.  So that's in reference?
16  A.  Yes.
17  Q.  Freck reported that Tomica/Isotalo asked him to print an
18    email from Whelan to security officers, for Isotalo post
19    termination.
20  A.  Yes.
21  Q.  Do you mean anything more by that than what is written
22    there?
23  A.  On the surface of your question, no.
24  Q.  So you mean exactly what you have written there?
25  A.  It is in reference to that incident or that complaint, that

**Page 136**

1    report.
2  Q.  Is there anything else that this meeting is in reference to
3    as far as you were concerned at that time?
4  A.  No.  Just that issue.
5  Q.  The next one is a word that, I regret to inform everybody, I
6    have a very hard time pronouncing.
7  A.  Admonition.
8  Q.  Admonition:  Confidential internal investigation.  Honest,
9    open, truthful, forthright.  Not cooperating could lead to
10    employment action.
11  A.  Correct.
12  Q.  And you have PW circled?
13  A.  Yes.
14  Q.  What do you mean by that?
15  A.  I would have given what we considered, at that point, a
16    basic admonition about how we handle investigations and what
17    is expected of a person that is being questioned or
18    interviewed.
19  Q.  To Mr. Tomica?
20  A.  Right.
21  Q.  Are these notes written in sequential order of how the
22    meeting went?
23  A.  No.  Well, the admonition would have been first, yes.  The
24    other stuff may or may not.  I can't recall at this time.
25  Q.  So you kind of would have opened the meeting with what you

**Page 137**

1    expected of him as a security officer?
2  A.  Right.  As one of my employees.  I want him to cooperate
3    with Tracy, and whatever he said needed to be honest and
4    open and forthright and that sort of thing.
5  Q.  This note is referencing what you would have told him at
6    that time?
7  A.  Yes.
8  Q.  Do you recall after you said that if he responded in any
9    way?
10  A.  He responded that he understood.
11  Q.  The next says, asked about situation, Tomica said email for
12    personal records.
13         What does TH with a circle around it mean?
14  A.  Tracy Hopper.
15  Q.  And is that a question she posed to him?
16  A.  Yes.  She would have asked him about the situation.  It is
17    not a Q and A, but she would have asked him about the
18    situation, the email, what it was for, how he got it, et
19    cetera, et cetera.
20  Q.  You have testified that she did ask him about that?
21  A.  Yes.
22  Q.  This is what it says in your notes.  Do you recall if she
23    asked him anything else about that email in reference to
24    this note?
25  A.  She did, because she finally got out of him that he was

35 (Pages 134 to 137)

**Page 138**

1      trying to print it for John.
2 Q.  It says in the next note, explained that we knew the truth:
3      Tomica admitted to trying to print email for Isotalo, said
4      Isotalo had called him, said he needed help with printing so
5      he and Isotalo called Freck, PW.
6      Is PW yourself?
7 A.  It is.
8 Q.  Is this what you were telling Mr. Tomica?
9 A.  Yes and no. Explained that we knew what the truth was, hey,
10     come on. We know the truth, so just tell us. Don't beat
11     around the bush.
12 Q.  This is you talking to Mr. Tomica during the meeting?
13 A.  Yes. I basically said we know what the truth is, just tell
14     us whatever. Then Tomica admitted blah, blah, blah.
15     Going down below, there is the explanation that
16     he should have reported it. Isotalo is a friend, and he was
17     trying to help his friend out.
18     What Tracy further said in that conversation I
19     don't have notes of, but we go down to the bottom where
20     Tracy, then, does the termination.
21 Q.  At the bottom you have TH, which is Tracy Hopper?
22 A.  Yes.
23 Q.  You have termination: Email User Agreement (attempt
24     unauthorized disclosure) and then provide false
25     information/investigation.

**Page 139**

1      Is that your notes on the reasons for Mr.
2     Tomica's termination?
3 A.  Well, yes and no, I should say. The termination actually
4     occurred later, but the notes are on this piece of paper.
5 Q.  The notes are on this piece of paper, and it is dated March
6     24, 2011 at 3:00 P.M.
7 A.  Yes.
8 Q.  You are telling me that you added the termination notes at a
9     later date?
10 A.  Yes.
11 Q.  Why didn't you date and time the termination notes?
12 A.  The information about that is in the report. The report
13     that is attached is the entire report. That's really more
14     of the company record. Whereas this would have been a note
15     record that I had in my file or what have you.
16 Q.  Sure. You made this note about the interview with Dan
17     Tomica on March 24, 2011 at 3:00 P.M.
18 A.  Yes.
19 Q.  But if the termination didn't occur on March 24, 2011, why
20     didn't you date and time stamp the termination note on this
21     piece of paper?
22 A.  Because we don't time stamp anything. You are right, I
23     could have put a date on it. I just didn't.
24 Q.  The way this appears, it appears that the termination was
25     made on March 24, 2011?

**Page 140**

1 A.  It might to you. It doesn't to me, because I know what it
2     is. Because that's not how we do things.
3 Q.  After the fact, you are telling me there was a termination
4     decision made on a different date?
5 A.  Yes.
6 Q.  But your notes appear to say that the termination decision
7     was made by Tracy Hopper on March 24, 2011.
8     MR. POTTER: Appears to you.
9     THE WITNESS: Yes, appears to you.
10     MR. POTTER: I will object to the foundation and
11     form of the question.
12 Q.  (By Ms. Sharp) I know you want to look at another page, but
13     let me ask you this: When I asked you what else occurred in
14     that meeting, one of the things you testified was that you
15     asked Mr. Tomica if there was a problem with the printer in
16     the control room, why hadn't he reported it to you.
17 A.  Yes.
18 Q.  Why didn't you include that in your notes?
19 A.  I didn't see a need to.
20 Q.  So you only included some of the things that were said in
21     that meeting in your notes?
22 A.  Yes.
23 Q.  You didn't include everything that actually occurred in that
24     meeting in your notes?
25 A.  Right.

**Page 141**

1     MR. POTTER: If he included everything, they
2     wouldn't be notes. It would be a transcript.
3 Q.  (By Ms. Sharp) You selected what to include in your notes,
4     didn't you?
5 A.  Yes.
6 Q.  What you thought was important to yourself?
7 A.  Yes.
8 Q.  So there are things missing from your notes as to what
9     occurred on March 24, 2011 in your meeting with Mr. Tomica?
10 A.  They are not missing to me, because I didn't feel I needed
11     to take note of them. They might be missing to you because
12     you think they are information.
13 Q.  Let's turn to the next page, the pages marked 102, 103 and
14     104. It says at the top, Global Compliance, Good For
15     Business.
16     Is this what you are referring to as an
17     IntegriLink report?
18 A.  Yes.
19 Q.  Did you initiate this?
20 A.  Yes, I did.
21 Q.  It says documented by paul.whelan@kellyservices.com?
22 A.  Yes.
23 Q.  That is your email?
24 A.  Yes.
25 Q.  When did you initiate this?

36 (Pages 138 to 141)

PAUL NICHOLAS WHELAN
January 18, 2013

**Page 142**

1   A.   On March 24, 2011, just after 6:00 P.M.
2   Q.   Why did you initiate this report?
3   A.   We are required to.
4   Q.   Why are you required to?
5   A.   We document Code of Conduct violations.
6   Q.   At what point did you initiate this IntegriLink report?
7          MR. POTTER: He just told you. Objection. Asked
8   and answered.
9   Q.   (By Ms. Sharp) Let me ask you this: You told me the time?
10   A.   The date and time I told you.
11   Q.   You told me the date and time, you are correct.
12         What event made you initiate this IntegriLink
13   report? Was it Mr. Freck's call? Was it receiving the
14   email from Mr. Freck?
15         Was it your conversation with Mr. Tomica?
16   A.   Understanding that there is a 72-hour clock on us doing
17   reports, we had just spoken with Dan and we suspended him
18   pending investigation, and then I completed the report.
19   Q.   After your conversation with Mr. Tomica on March 24, that is
20   when you initiated this report?
21   A.   Correct.
22   Q.   So you did this because you had to initiate the report, but
23   not in an effort to begin an investigation on Mr. Tomica?
24   A.   Yes, you are right. I did not investigate Mr. Tomica, Tracy
25   did. I documented this because we are required to.

**Page 143**

1   Q.   Does this report have any effect on the decision to
2   terminate Mr. Tomica?
3   A.   You mean the report itself?
4   Q.   Yes.
5   A.   No.
6   Q.   Was it reviewed by anyone who made the decision to terminate
7   Mr. Tomica?
8   A.   No, it wasn't.
9   Q.   Does it do anything but document --
10   A.   I'm sorry. Tracy Hopper would have seen it, too. But
11   nobody except the two of us.
12   Q.   Based on your answer, I understand, then, that this report
13   was initiated in the process, because you believe there was
14   an attempt to disclose confidential information and it was
15   part of the reporting process, but it was not part of the
16   investigative process of Mr. Tomica?
17   A.   Right. The way our process works is if you are made aware
18   of a Code of Conduct or a potential Code of Conduct
19   violation, you have to do the report, even if it's passed
20   off to somebody else to follow up.
21         In this case, should somebody else have added
22   more notes to this report, maybe, maybe
23   not. But the way our policy reads, if something comes to me
24   I have to document it.
25   Q.   You did this to document the situation, not as part of the

**Page 144**

1   investigation?
2   A.   Right.
3   Q.   On page 103 where it says Paul Whelan, case investigator,
4   what does that assignment mean?
5   A.   Now, it says case manager, but that is a generic term that's
6   used by IntegriLink for the people that are either assigned
7   or involved with the case.
8         So over to the right, under the box assigned by
9   case management, that is IntegriLink assigning me as what
10   they call a case manager, because I was the one who entered
11   the report. It is an automatic process.
12         Now, if you look below, it says case manager next
13   to Tracy Hopper, and then it says assigned by --
14         MR. POTTER: Paul, it says case investigator.
15         THE WITNESS: I'm sorry, case investigator, you
16   are right.
17   A.   It says assigned by Paul Whelan. So when I entered this I
18   assigned Tracy as the case investigator, because she was the
19   case investigator.
20         It is a little convoluted, but it is a system
21   that we kind of bootstrap to use for reporting purposes.
22         MR. POTTER: You are good.
23   Q.   (By Ms. Sharp) At the conclusion of the meeting with Mr.
24   Tomica on the 24th, was he told by Tracy Hopper that he was
25   suspended?

**Page 145**

1   A.   Yes.
2   Q.   Why didn't you include that on page one of Exhibit 2, or
3   what is Bates stamped page 101 of Exhibit 2?
4   A.   On 101?
5   Q.   Yes.
6   A.   I just didn't.
7   Q.   But he was told that by Tracy Hopper?
8   A.   Yes.
9   Q.   At the conclusion of that meeting, after Mr. Tomica was
10   excused, did you have a conversation with Tracy Hopper?
11   A.   Yes. I am sure I did.
12   Q.   Do you recall that conversation?
13   A.   I know that we would have discussed turning off his badge
14   access, suspending his email account, those sorts of things.
15   Q.   At some point, a decision was made to terminate Mr. Tomica?
16   A.   Yes.
17   Q.   Who made that decision?
18         MR. POTTER: Foundation.
19   A.   I don't know.
20         MR. POTTER: Withdraw.
21   Q.   (By Ms. Sharp) You don't know who made that decision?
22   A.   No.
23   Q.   Do you know who notified Mr. Tomica that he was terminated?
24   A.   Yes. Tracy did.
25   Q.   But you are unaware of who made the decision to terminate

** GRUSKIN & ASSOCIATES ** WEST BLOOMFIELD, MICHIGAN
248.737.6691

PAUL NICHOLAS WHELAN
January 18, 2013

**Page 146**

```
 1        Mr. Tomica?
 2  A.    Without speculating, no, I don't know who made that
 3  decision.
 4        MR. POTTER:  Do you know who the possibilities
 5  could be?
 6        THE WITNESS:  Yes.
 7        MR. POTTER:  Do you want that?
 8        MS. SHARP:  Sure.
 9        THE WITNESS:  It would have been Tracy's manager,
10  her director, it would have been Tom Catalano and it could
11  have been the general counsel being involved, also.
12        MR. POTTER:  Those are the three possibilities?
13        THE WITNESS:  Yes.  Either a combination of or
14  all three.
15  Q.    (By Ms. Sharp)  Did you meet with, or were you involved in
16  discussions with any of them regarding the termination of
17  Mr. Tomica?
18  A.    No.
19  Q.    Were you asked by any of those individuals regarding your
20  opinion on the termination of Mr. Tomica?
21  A.    Yes.
22  Q.    Which of those individuals were you asked your opinion about
23  the termination of Mr. Tomica?
24  A.    Tom Catalano asked me what I think should be done.
25  Q.    When was that?
```

**Page 147**

```
 1  A.    That, I am sure, would have been the 25th, 26th or shortly
 2  thereafter.  I am sure it would have been the next day,
 3  actually.
 4  Q.    And he asked you your opinion?
 5  A.    Yes.
 6  Q.    What did you tell him?
 7  A.    That he should be terminated for violating we call it the
 8  Email User Agreement.
 9  Q.    Did you tell him anything else?
10  A.    No.
11  Q.    Did Mr. Catalano respond in any way?
12  A.    Not that I recall, except for the fact that he was going to
13  speak with Tracy Hopper since she was really handling the
14  matter.
15        I was in an odd situation, because I was the
16  manager and also a member of the security team.  Really, it
17  was between Tom and Tracy and whomever in HR to handle the
18  issue.
19  Q.    I hate to ask this, but why do you think you were in an odd
20  situation as the manager and a member of the security team?
21  A.    Usually HR and security investigates these issues.  It just
22  happened to be that there was a security person involved.  I
23  am there as his manager, not really as a security person.
24        Does that make sense?
25  Q.    Sure.  And I guess that's what I am asking you:  As his
```

**Page 148**

```
 1  manager, don't you have an opinion about whether or not your
 2  man should be kept or not?
 3  A.    Yes.
 4  Q.    What was your opinion?
 5  A.    That we should let him go.
 6  Q.    Ultimately, Mr. Tomica was terminated?
 7  A.    Yes.
 8  Q.    How did you become aware of that?
 9  A.    Tracy told me.
10  Q.    When?
11  A.    On the day it occurred, we had a conversation with Dan by
12  telephone.
13  Q.    We as in you and --
14  A.    Tracy and I, yes.
15  Q.    You both called him together?
16  A.    Yes.
17  Q.    What was he told?
18  A.    That his employment was terminated.
19  Q.    Do you recall if anything else was said?
20  A.    No.
21  Q.    Do you recall if he was told why?
22  A.    He was told why.  He did reiterate the fact that he was
23  loyal to John, and he was doing his friend a favor.
24  Q.    You heard him say that on the phone that day?
25  A.    Yes.
```

**Page 149**

```
 1        MR. POTTER:  I'm sorry.  I missed something.
 2  Were you on the phone call that Hopper made to him?
 3        THE WITNESS:  Yes, I was.
 4        MR. POTTER:  I missed that.  Thank you.
 5  A.    I think he might have apologized to us also, after the fact.
 6  Q.    (By Ms. Sharp)  Do you recall that?
 7  A.    I know he was contrite.  I think he did.
 8  Q.    When this email was brought to your attention by Mr. Freck,
 9  did you ever have a discussion with Mr. Eager about it?
10  A.    Yes.  I believe Mr. Eager knew about it, also.  I think he
11  had been told simultaneously.
12  Q.    What makes you believe that?
13  A.    That's just a recollection I have.  He sits right next to
14  me.
15  Q.    It's yourself, Eager and Catalano in a row?
16  A.    Well, no.  Eager and I are in a row and Catalano is over
17  here.  Basically, yes.
18        I think Freck might have gone to both of us, off
19  the top of my head.
20  Q.    Your testimony was that Freck called you after hours?
21  A.    Freck did report it to me.  He might have reported it to
22  other people, too.  He might have gone to his management.  I
23  just don't know.
24  Q.    Do you recall any specific conversations with Mr. Eager
25  regarding Deposition Exhibit 1?
```

38 (Pages 146 to 149)

PAUL NICHOLAS WHELAN
January 18, 2013

---

**Page 150**

1  A.  This?

2  Q.  Yes.

3  A.  I think we did discuss it, the fact that it either existed

4  or it had been an issue.  I know that David turned over what

5  he had to me, which I think was just a comment or the fact

6  that Freck had reported it, but Freck had also reported it

7  to me, too.

8  Q.  At that time, was Mr. Eager Mr. Freck's first-line

9  supervisor?

10      MR. POTTER:  When you just said "David," you

11  meant David Eager?

12      MS. SHARP:  David Eager.

13      THE WITNESS:  Yes, David Eager.

14      MR. POTTER:  I just want to make sure that's

15  correct.

16  A.  No.  David Freck --

17      MR. POTTER:  You're done.

18      MS. SHARP:  He is answering another question.  I

19  threw that in there before you got that.

20      MR. POTTER:  Because it just dawned on me.

21      MS. SHARP:  I know.

22      MR. POTTER:  Now that we agreed on what the prior

23  answer was, why don't you reask your question again, Heidi,

24  please.

25  Q.  (By Ms. Sharp)  At the time in 2011, was David Eager David

---

**Page 151**

1  Freck's first-line supervisor?

2  A.  No.

3  Q.  Do you recall who was Mr. Freck's first-line supervisor?

4  A.  Yes.  Bob Harvey.  David Freck is in facilities, so he was

5  completely out of our group.

6  Q.  Once someone signs into their email system at Kelly

7  Services, if they were to walk away from their workstation,

8  could someone else approach it and then forward an email to

9  themselves?

10  A.  Theoretically, yes, except our policy is that if you walk

11  away from your desktop, you lock your monitor so somebody

12  can't --

13  Q.  You are supposed to do a Control-Alt-Delete, which locks

14  your monitor?

15  A.  Right.

16  Q.  If somebody were to have signed into their workstation and

17  they get called away or distracted, there are times when

18  they don't always hit Control-Alt-Delete, aren't there?

19  A.  That would be speculation.  I do it religiously.  Other

20  people I couldn't tell you, but it could happen.

21  Q.  At Kelly Services, there are employees who may not always

22  hit Control-Alt-Delete every time?

23  A.  We have -- what do you call it?  Not the screen saver.  It

24  automatically --

25  Q.  It can lock you out after so long?

---

**Page 152**

1  A.  Yes.  And it is only a few minutes I should say.

2  Q.  Did you get a chance to read Mr. Tomica's testimony?

3  A.  Yes.

4  Q.  Do you understand that his testimony was that he did not

5  forward this email, which is Exhibit 1, but that Mr. Freck

6  went to his workstation and sent an email, and that if he

7  had been signed in to his email, Mr. Freck could have done

8  that at that time?

9      MR. POTTER:  Heidi, can you ask one question at a

10  time.

11      MS. SHARP:  I probably could.

12  Q.  (By Ms. Sharp)  First, you have read Mr. Tomica's testimony?

13  A.  Yes.

14  Q.  And you understand his testimony was that he was signed in

15  to his email when Mr. Freck was in the control room with

16  him?

17  A.  Yes.

18  Q.  You understand that his testimony also was that Mr. Freck

19  went to his workstation and did something, and that he never

20  forwarded Exhibit 1 to Mr. Freck's workstation?

21      MR. POTTER:  The question is:  Are you aware

22  that's what he says?

23  A.  I am aware that the document said that, yes.

24      MR. POTTER:  No.  Are you aware that that's what

25  he said in his deposition?

---

**Page 153**

1      THE WITNESS:  Yes.

2  Q.  (By Ms. Sharp)  Under oath, as you are today, that was his

3  testimony?

4  A.  Yes.

5  Q.  Are you aware that that is what could have occurred?

6      MR. POTTER:  You are asking him if it's

7  possible?

8      MS. SHARP:  Sure.

9      MR. POTTER:  Go ahead.

10  A.  Yes.

11  Q.  (By Ms. Sharp)  And although Mr. Freck brought this to you,

12  because after the fact he could have realized I don't want

13  to be in trouble when this has occurred, you took Mr.

14  Freck's word for it right off the bat, didn't you?

15  A.  That the email had been forwarded and that Tomica had asked

16  for it?

17  Q.  Yes.

18  A.  Enough to not dismiss it, yes.

19  Q.  Because you have an email, actually, that's forwarded from

20  Mr. Tomica's email to Mr. Freck's email, and Mr. Freck is

21  bringing it to you.  But it's really printed from Mr.

22  Freck's account, isn't it?

23  A.  Yes, it is.

24  Q.  According to Mr. Freck, the whole point of this email is to

25  get it to Mr. Isotalo, isn't it?

---

39 (Pages 150 to 153)

PAUL NICHOLAS WHELAN
January 18, 2013

| | |
|---|---|
| 1 | A. Correct. |
| 2 | Q. But you have no evidence that it was ever sent to Mr. |
| 3 | Isotalo, do you? |
| 4 | A. No. But at the time I had evidence that this email had been |
| 5 | shared with Freck, and Freck should never have seen it. So |
| 6 | I knew there was a Code of Conduct violation in here |
| 7 | somewhere. |
| 8 | Q. As far as you know, Freck is really the one who sent it to |
| 9 | himself? |
| 10 | A. I don't know that to be true. |
| 11 | Q. But you don't know that what Freck said was true either, do |
| 12 | you? |
| 13 | A. At that time, no. |
| 14 | Q. But you accepted it? |
| 15 | A. To the point that it had to be reported and looked into, |
| 16 | yes. |
| 17 | Q. You accepted what Freck said and, instead, went to |
| 18 | Mr. Catalano and had Mr. Tomica investigated by Tracy |
| 19 | Hopper? |
| 20 | A. It was not my decision to do that, but that is what |
| 21 | occurred, yes. |
| 22 | Q. But it was your decision to go to Mr. Catalano to have Mr. |
| 23 | Tomica, one of your guys, investigated by Tracy Hopper? |
| 24 | A. Exactly. Because we had a clear case of a Code of Conduct |
| 25 | violation being presented to me, and there was no way I |

Page 154

| | |
|---|---|
| 1 | could just say, oh, we are going to dismiss that. |
| 2 | Q. Freck has an email he shouldn't have, right? |
| 3 | A. Yes. |
| 4 | Q. Did you ever tell his first-line supervisor, we need to look |
| 5 | into how he got this? |
| 6 | A. No. |
| 7 | Q. Shouldn't that have been investigated, also? |
| 8 | A. That would not have been up to me. It would have been up to |
| 9 | Tracy to look into. |
| 10 | Q. Do you know if Tracy looked into it? |
| 11 | A. I do. |
| 12 | Q. You do? |
| 13 | A. I do now. |
| 14 | Q. Did she look into how he obtained it? |
| 15 | A. She did. |
| 16 | Q. And what was her conclusion? |
| 17 | A. The conclusion was that it had been forwarded, because of |
| 18 | the whole thing about John and Dan asking for assistance |
| 19 | with the printer. |
| 20 | Q. So as far as she was concerned, it was forwarded by Mr. |
| 21 | Tomica's email to Mr. Freck's because of the help with the |
| 22 | printer? |
| 23 | A. Dan had asked for assistance, and this is part of the |
| 24 | product of that, yes. |
| 25 | Q. So as far as you know, that was Ms. Hopper's conclusion? |

Page 155

| | |
|---|---|
| 1 | A. Right. |
| 2 | Q. Were you part of that conclusion? |
| 3 | A. No. |
| 4 | Q. Did you believe David Freck? |
| 5 | A. Not entirely. |
| 6 | Q. Why not? |
| 7 | A. All I had was this to look at. I had him telling me that |
| 8 | the printer in the control room wasn't working, and this |
| 9 | email had gone from Dan to him and he was telling it off. |
| 10 | It didn't seem right. And that was one reason it |
| 11 | needed to be looked into. |
| 12 | Q. You received this information from Mr. Freck the evening of |
| 13 | the 23rd? |
| 14 | A. Yes. Whatever evening it was. |
| 15 | Q. So on the 24th, you are back at work, right? |
| 16 | A. Correct. |
| 17 | Q. Did you go look, ever, and find out if the printer in the |
| 18 | control room had any problems with it? |
| 19 | A. I did, as a matter of fact. |
| 20 | Q. Did it have any problems with it? |
| 21 | A. It didn't. |
| 22 | We were using Windows XP. The printer is set up |
| 23 | based on profile, so my profile worked. Dan's might not |
| 24 | have been set up, or it could have been misconfigured. So |
| 25 | without signing on as Dan, I wouldn't have been able to know |

Page 156

| | |
|---|---|
| 1 | if his access or configuration was accurate or not. |
| 2 | Q. Did you ever sign on as Dan and find out if his profile had |
| 3 | a problem? |
| 4 | A. No. |
| 5 | Q. Why not? |
| 6 | A. It's against our policy. |
| 7 | Q. You were the head of global security and investigations at |
| 8 | Kelly Services at that time, right? |
| 9 | A. No. |
| 10 | Q. Did I have your title wrong? |
| 11 | A. You got my title right, but I am not in charge of the group. |
| 12 | Q. On March 23, 2011, wouldn't you not have had the authority |
| 13 | to sign on as Dan Tomica and find out if there was a problem |
| 14 | with his profile and his printer? |
| 15 | A. No. |
| 16 | Q. Why not? |
| 17 | A. Number one, as a manager, I can't investigate one of my own |
| 18 | people. As a member of security, I couldn't investigate |
| 19 | somebody that works for me in the security group. That's |
| 20 | why it was all turned over to Tom Catalano. |
| 21 | If Tom had asked IT to do that or had asked Tracy |
| 22 | to do that, et cetera, et cetera, that could have been done, |
| 23 | but it wasn't something that I would have done. |
| 24 | Q. Did you ever tell Tom Catalano, don't entirely believe |
| 25 | Freck's story because I checked the printer this morning, |

Page 157

40 (Pages 154 to 157)

PAUL NICHOLAS WHELAN
January 18, 2013

| | |
|---|---|

1 and it seems to work fine for myself?
2 **A.   No.**
3         MR. POTTER:  Can I ask one question so I don't
4 forget?
5         MS. SHARP:  Sure.
6         MR. POTTER:  It will be something you may want to
7 know.
8         MS. SHARP:  Why not.
9         MR. POTTER:  Did Mr. Freck's supervisor in
10 maintenance also report to Mr. Catalano?
11         In other words, was the maintenance group under
12 Mr. Catalano at the time?
13         THE WITNESS:  Yes.
14 Q.   (By Ms. Sharp)  Did you know that Mr. Tomica and the other
15 security officers had access to their Kelly Services' email
16 off site?
17 **A.   Yes.  Every employee does.**
18 Q.   Did you know that because they were able to print emails off
19 site?
20 **A.   Yes.**
21 Q.   Would you expect that if they needed to print emails as it
22 related to Kelly Services' business that they would print
23 emails off site?
24 **A.   No.  Generally, people don't send emails.  It is a little**
25 **redundant.  If you got it in your email, you got it in your**

Page 158

1 email.  Why would you print a copy of it?
2 Q.   Does every Kelly Services employee have a smartphone?
3 **A.   No.**
4 Q.   Have you ever considered that a Kelly Services employee may
5 need to print the email in order to obtain that information
6 for themselves during business hours?
7 **A.   Why would they need to do that?**
8 Q.   That has never occurred to you?
9 **A.   No.  If you have access to your email at work, you have**
10 **access to your email at work.**
11 Q.   Just for the sake of asking it again, it's never occurred to
12 you that you might need to print the email in order to have
13 access to the information in printed form?
14 **A.   No.**
15 Q.   Were you aware that Mr. Tomica would make notes in his
16 notebook or print emails in order for him to help recall
17 what was in the information in the emails?
18 **A.   I was made aware after the fact.**
19 Q.   When is after the fact?
20 **A.   After the investigation.  Maybe it was when I read his**
21 **deposition.**
22 Q.   So not while he was employed for Kelly Services?
23 **A.   No.**
24 Q.   If Mr. Tomica had no intent to provide Mr. Isotalo
25 Deposition Exhibit 1 while he was employed at Kelly

Page 159

1 Services, would you consider there had been no violation of
2 the Kelly Services Email User Agreement?
3         MR. POTTER:  Say that again, please.
4 Q.   (By Ms. Sharp)  If Mr. Tomica had no intent to provide Mr.
5 Isotalo a copy of Deposition Exhibit 1 while he was employed
6 at Kelly Services, wouldn't it be the case that there would
7 be no violation of the Kelly Services Communication and
8 Information Systems User Agreement?
9 **A.   If Dan and John had both been employed at the same time?**
10 Q.   No.  Mr. Isotalo is already terminated.
11 **A.   So Dan works for us.**
12 Q.   Dan works for you.  He does have a copy of Deposition
13 Exhibit 1, the email, because he has printed it for his own
14 use.  I understand that you don't understand that some
15 people might do that, but he has printed it for his own use
16 to have that information while he is employed there.
17         MR. POTTER:  She is asking you to assume that's
18 the truth.
19 Q.   (By Ms. Sharp)  Assume that's the truth.
20         If he had printed it for his own business use
21 while at Kelly Services but with no intent to provide it to
22 Mr. Isotalo, would you agree that there is no violation of
23 the Kelly Services Communication and Information Systems
24 User Agreement?
25 **A.   It would depend on what he was doing with it and what the**

Page 160

1 end result, the disposition of that piece of paper was.  If
2 he took it home and left it at home, if he lost it, if he
3 threw it in the trash can, et cetera, and that
4 information was improperly disseminated, yes, it is a
5 violation.
6         That's why most of us don't print email.  The
7 standard practice is you leave it in your email.
8 Q.   He prints it to use it while at work.  He has no intention
9 to provide it to Mr. Isotalo, who is now a terminated
10 employee.
11         Would you agree, then, there is no violation of
12 the Kelly Services Communication and Information Systems
13 User Agreement?
14 **A.   As long as that information didn't go home or go astray.  If**
15 **it was used at work and shredded, yes, that would be fine.**
16 Q.   You believe that it has to be used at work and shredded each
17 time?
18 **A.   Yes.**
19 Q.   If it's inadvertently taken home at the end of the day, you
20 believe that's a violation of the Communication and
21 Information Systems User Agreement?
22 **A.   There is no reason to take it home.**
23 Q.   No matter what?
24 **A.   No matter what.**
25 Q.   Do you have a smartphone?

Page 161

** GRUSKIN  &  ASSOCIATES **  WEST BLOOMFIELD, MICHIGAN
248.737.6691

PAUL NICHOLAS WHELAN
January 18, 2013

**Page 162**

1  A.  I do.
2  Q.  Each evening do you take it home with you?
3  A.  Most evenings, unfortunately.
4  Q.  Each evening do you check emails?
5  A.  I do.
6  Q.  So you take your email home with you each evening, isn't
7     that the case?
8  A.  I take a device home that's secure. It's password
9     protected, nobody else gets it and I don't leave it around
10    for people to look at.
11 Q.  So you believe that that's different, because even though
12    you are taking your email home, he may have had printed
13    emails which somebody could have obtained?
14 A.  Right. The phone that I have has dual passwords. It
15    doesn't go out of my sight. A piece of paper could be
16    thrown in the garbage, and then who knows who gets it.
17 Q.  And a piece of paper in a briefcase is not secure in your
18    determination?
19 A.  Yes. We deal with a lot of cases where proprietary
20    information, laptops and things, are stolen out of
21    briefcases in cars and on trains.
22       Again, we don't print documents. We don't leave
23    the stuff sitting around. We don't leave our iPhones out of
24    our sight.
25 Q.  When that information is stolen, are each of those employees

**Page 163**

1     disciplined?
2  A.  I don't know.
3  Q.  After Mr. Tomica was terminated, was a new Kelly Services
4     employee hired to replace him?
5  A.  Full-time employee, no.
6  Q.  Was there a KTE employee hired to replace him?
7  A.  No.
8  Q.  Was there a new employee requested from the contract company
9     to obtain head count at the Kelly Services security officers
10    group?
11 A.  Yes. From Nationwide.
12       MR. POTTER: From who?
13       THE WITNESS: Nationwide.
14 Q.  (By Ms. Sharp) At the time that Mr. Tomica was terminated,
15    the next employee that you requested to obtain head count
16    was from Nationwide?
17 A.  The next several. Until that contract ran out, we had to
18    use them.
19 Q.  Do you recall when that contract ran out?
20 A.  There was a 30-day window. April 25th, I think is when the
21    contract ran out with Nationwide.
22 Q.  April 25th?
23 A.  Yes, of 2011.
24 Q.  Someone was requested from Nationwide to obtain head count
25    at Kelly Services after Mr. Tomica was let go?

**Page 164**

1  A.  Actually, I think it was somebody who was working for us
2     from Nationwide -- or they just increased the number of
3     hours the employees were putting in. I don't know if
4     another physical person turned up.
5  Q.  Do you recall who that was?
6  A.  No.
7  Q.  You don't have any recollection of that?
8  A.  I don't.
9  Q.  When the Nationwide contract ran out on April 25th, about
10    how many Kelly Services direct-hire employees were working
11    as security officers?
12 A.  Let's see.
13 Q.  Let me ask you this: Kyron Bradstrom was an employee?
14 A.  Yes. I think there were five.
15 Q.  Kyron Bradstrom, Robert Haynes, Darryl Schoenweg and Ralph
16    Gatewood?
17 A.  And Gary something.
18       THE WITNESS: What was Gary's last name?
19       MR. POTTER: Galesewicz.
20 A.  So five. One, two, three, four, five.
21 Q.  (By Ms. Sharp) Kyron, Robert, Darryl, Ralph and Gary.
22       So you had five security officers who were
23    directly hired by Kelly?
24 A.  Yes.
25 Q.  You did not seek out or obtain replacements for Mr. Tomica

**Page 165**

1     or Mr. Isotalo?
2  A.  On a full-time basis, no.
3  Q.  That was your decision?
4  A.  No.
5  Q.  Whose decision?
6  A.  I believe it was Tom Catalano and higher. It was a
7     budgetary issue.
8  Q.  But contract employees were obtained to continue having 24/7
9     security officers at Kelly Services?
10 A.  Like I said, I don't believe we brought anyone extra in. We
11    just increased the hours of the contract officers we had
12    working for us.
13 Q.  Until April 25?
14 A.  Right.
15 Q.  Then after April 25, the contract with Whelan Security
16    began?
17 A.  Yes.
18 Q.  During 2011, Mr. Bradstrom was terminated?
19 A.  Yes.
20 Q.  Mr. Haynes was terminated?
21 A.  Right.
22 Q.  Mr. Schoenweg quit?
23 A.  No. He still works for us. He still reports to me.
24 Q.  But Mr. Gatewood did quit in 2012?
25 A.  Right.

** GRUSKIN & ASSOCIATES ** WEST BLOOMFIELD, MICHIGAN
248.737.6691

PAUL NICHOLAS WHELAN
January 18, 2013

---

**Page 166**

1   Q.   Mr. Bradstrom and Mr. Haynes were not replaced either, were
2        they?
3   A.   **By full-time people?**
4   Q.   By full-time Kelly Services direct-hire people.
5   A.   **Yes. It was a budgetary decision.**
6   Q.   Were you part of that decision?
7   A.   **No. The company is under a mandated expense control. There**
8        **is a name for it. There is a program that the company**
9        **instituted basically freezing new hires. It is all**
10       **budgetary. It was out of my hands, and I think it was out**
11       **of Tom's, too.**
12  Q.   Do you know when this was instituted?
13  A.   **I think it started in 2011 or 2010.**
14  Q.   Has the program been amended at all through 2012?
15  A.   **I don't know.**
16  Q.   But your understanding is that Mr. Bradstrom and Mr. Haynes
17       were not replaced by full-time Kelly Services employees
18       because of budgetary constraints?
19  A.   **Right. We haven't had any hiring in our department at all.**
20  Q.   Was Mr. Gatewood replaced?
21  A.   **No.**
22  Q.   But a contract was signed with Whelan Security on April 25,
23       2011?
24  A.   **March 25th.**
25  Q.   And contract security officers were brought in to continue

---

**Page 167**

1        24/7 operations at Kelly Services?
2   A.   **Right. To backfill the full-time employees.**
3   Q.   That used to work there?
4   A.   **Yes.**
5   Q.   The contract security officers have the same position
6        description as the security officers that had been
7        terminated or quit?
8   A.   **Yes, a security officer.**
9   Q.   They have the same position description, same duties, same
10       authority, same clearance, control room, all of that?
11  A.   **Yes.**
12  Q.   Do you have some hesitation?
13  A.   **I do.**
14  Q.   Why?
15  A.   **Because they are not full-time employees. They don't get**
16       **the same benefits, and they don't get the same perks. There**
17       **are a lot of perks and benefits and whatnot that the**
18       **full-time people have gotten that the contract people**
19       **don't.**
20  Q.   That's not what I am asking you.
21       Position description, as far as they have the
22       same duties?
23  A.   **Yes.**
24  Q.   They do rounds?
25  A.   **Yes.**

---

**Page 168**

1   Q.   They work in the control room?
2   A.   **Yes.**
3   Q.   They protect the site in the same way?
4   A.   **Yes.**
5   Q.   They have the same authority with the employees, that kind
6        of thing?
7   A.   **Yes.**
8   Q.   They report to you in the same way?
9   A.   **Yes.**
10  Q.   I understand that their paycheck may come from someplace
11       else. They don't have benefits from being a direct Kelly
12       Services employee?
13  A.   **Right. There is some internal stuff like that.**
14  Q.   Now, there are a variety of individuals who have worked for
15       you since that time?
16  A.   **Yes.**
17  Q.   And they were directly hired, as far as you know, through
18       Whelan Security Company?
19  A.   **Yes.**
20  Q.   Joseph Krupa?
21  A.   **Yes.**
22  Q.   Do you recall the amount of time approximately that Mr.
23       Krupa was supervised by you?
24  A.   **I think he worked for us for like five months.**
25  Q.   Approximately how old is Mr. Krupa?

---

**Page 169**

1   A.   **In his twenties.**
2   Q.   At what time period was this?
3   A.   **I think it was like April to October of 2012, I believe.**
4        **Those are rough dates.**
5   Q.   Aaron Hirsch, do you know about what time period he worked?
6   A.   **No. Sometime in 2011. It was three or four months.**
7        **I think he was 40 or 41, 39 or 40.**
8        MR. POTTER: I don't want you to guess at ages.
9   Q.   (By Ms. Sharp) Why does Mr. Joseph Krupa no longer work as
10       a security officer?
11       MR. POTTER: Object to foundation. He worked for
12       Whelan.
13       You can answer.
14  Q.   (By Ms. Sharp) Did you have anything to do with Mr. Krupa
15       no longer providing security officer services for Kelly
16       Services?
17  A.   **Yes.**
18  Q.   Why does he no longer provide security services to Kelly
19       Services?
20  A.   **He made a mistake handling an alarm situation, and we lost**
21       **confidence in his abilities.**
22  Q.   Did you have anything to do with Mr. Aaron Hirsch no longer
23       providing security services to Kelly Services?
24  A.   **No. He moved on to a better position.**
25  Q.   That's what he told you?

---

43 (Pages 166 to 169)

PAUL NICHOLAS WHELAN
January 18, 2013

| | |
|---|---|
| 1   A.   Yes. | 1   Q.   Erika Moritz? |
| 2   Q.   Thomas Szkola? | 2   A.   She is actually in Afghanistan with the army right now. She |
| 3   A.   He moved on to a better position within Whelan Security. | 3       is coming back to us. She is basically on a military leave |
| 4   Q.   Is that what he told you? | 4       of absence from Whelan Security, so she was removed from the |
| 5   A.   Yes. He is a supervisor now at one of their other sites. | 5       assignment. She is going to come back to us, I think. |
| 6   Q.   As far as you know, he still works there? | 6   Q.   Do you know her approximate age? |
| 7   A.   Yes. | 7   A.   Twenties. |
| 8   Q.   What is his approximate age? | 8   Q.   Gregory Butler? |
| 9           MR. POTTER: If you can approximate, fine. If | 9   A.   He worked for us for a few months. Probably three or four. |
| 10   you are just guessing, tell her I am guessing. Don't | 10       He moved on to a different position. He was in his |
| 11   answer. | 11       twenties, I think. |
| 12   Q.   (By Ms. Sharp) Do you know it based on appearance? | 12   Q.   Different position with Whelan? |
| 13   A.   I don't know. He was older than the rest of the crew. He | 13   A.   I believe so, yes. |
| 14       wasn't as old as Hirsch. | 14   Q.   And do you know his approximate age? |
| 15           I don't know. He had a wife and kids. I would | 15   A.   In his twenties. |
| 16       say thirties. | 16           He was one of our part-time guys that wanted more |
| 17   Q.   How long did he provide services to Kelly Services? | 17       hours. There were a couple of guys that were part time. |
| 18   A.   Three to six months. | 18           MR. POTTER: Just answer the question. |
| 19   Q.   Did you have anything to do with him no longer providing | 19   Q.   (By Ms. Sharp) Did he also have military experience? |
| 20       services to Kelly Services? | 20   A.   Who? |
| 21   A.   No. Like I said, he moved on to a better position. | 21   Q.   Mr. Butler. |
| 22   Q.   Brian Szmatula? | 22   A.   No. He had worked for -- |
| 23   A.   He was with us probably six to eight months. | 23           MR. POTTER: You answered. Thank you. |
| 24   Q.   Did you have anything to do with him no longer | 24   Q.   (By Ms. Sharp) Cody Kovacic? |
| 25       services to Kelly Services? | 25   A.   He worked for us for a year and moved on to a law |
| Page 170 | Page 172 |

| | |
|---|---|
| 1   A.   Yes. We cut back on the number of officers we had, and he | 1       enforcement position. |
| 2       went back to Whelan Security. | 2   Q.   So he had training and background in law enforcement? |
| 3   Q.   Do you know his approximate age? | 3   A.   Right. At university and Police Academy. |
| 4   A.   Twenty-five to thirty. | 4   Q.   Is that something that Whelan looked for, was people with |
| 5   Q.   Paul George? | 5       law enforcement experience for their security guards? |
| 6   A.   He left because of medical issues. He worked for us for | 6   A.   There is a big push to hire veterans, but law enforcement |
| 7       about six months. | 7       and military, yes. |
| 8   Q.   He told you it was medical? | 8   Q.   Is that something that they advertised? |
| 9   A.   Yes. Whelan Security actually removed him, because he was | 9           MR. POTTER: Foundation. |
| 10       missing too much time because of medical issues. | 10           If you know. |
| 11   Q.   Do you know his approximate age? | 11   A.   I know they advertised the military part. |
| 12   A.   He was 30 to 35. He was older. | 12   Q.   (By Ms. Sharp) Is that something that drew you to them? |
| 13   Q.   Mark Aren? | 13   A.   No. |
| 14   A.   Mark Aren resigned because of commuting distance, and he had | 14   Q.   What drew you to them? |
| 15       personal issues with his family, divorce, whatever. He | 15   A.   The fact they had a good bill rate, and that they would |
| 16       worked for us for about six months. | 16       provide us staff under the staffing model that we were |
| 17           Some of those guys were full time and some were | 17       interested in. |
| 18       part time. | 18   Q.   What is Cody's approximate age? |
| 19   Q.   Do you know his approximate age? | 19   A.   He is in his twenties. |
| 20   A.   In his twenties. He was in Iraq and came back. | 20   Q.   Timothy Racicot? |
| 21   Q.   Andrew Warner? | 21   A.   He worked for us for just over a year, and he now works for |
| 22   A.   He resigned and took a position in law enforcement. He | 22       the Department of Homeland Security. |
| 23       worked for us for about six months, five months. | 23   Q.   Does he have prior military training? |
| 24   Q.   Do you know his approximate age? | 24   A.   No. |
| 25   A.   Twenties. | 25   Q.   Was he seeking a government position that you know of? |
| Page 171 | Page 173 |

44 (Pages 170 to 173)

PAUL NICHOLAS WHELAN
January 18, 2013

| | |
|---|---|
| 1  A.  Seeking a government position? | 1  with us a year. |
| 2  Q.  Well, he is working for the Department of Homeland | 2  MR. POTTER:  Just answer her question.  She |
| 3  Security. | 3  didn't ask much.  She just said "Stephen Flynn"? |
| 4  A.  He is a -- what do you call it? | 4  THE WITNESS:  I am trying to be helpful. |
| 5  MR. POTTER:  TSA? | 5  MR. POTTER:  She has dates of birth, so just let |
| 6  THE WITNESS:  No. | 6  her ask. |
| 7  A.  -- border patrol. | 7  Q.  (By Ms. Sharp)  Katherine Kroneck, does she have any prior |
| 8  MR. POTTER:  ICE? | 8  law enforcement or military experience that you know of? |
| 9  THE WITNESS:  Yes.  He is a federal agent with | 9  A.  No. |
| 10  ICE. | 10  Scott Peterson, do you know if he has any prior military or |
| 11  Q.  (By Ms. Sharp)  Do you know his approximate age? | 11  law enforcement experience? |
| 12  A.  Twenties. | 12  A.  Yes. |
| 13  Q.  Chris Veltri? | 13  Q.  What does he have that you know of? |
| 14  A.  He worked for us for a year.  He actually moved to Grand | 14  A.  Marine Corps.  He is a college student. |
| 15  Rapids to follow his girlfriend.  He works for Lowe's. | 15  Kroneck has got a bachelor's in criminal justice, |
| 16  Q.  In security? | 16  if you want to count that as criminal justice experience. |
| 17  A.  Yes.  Loss prevention.  I guess you'd call it security. | 17  Q.  Gabriel Guzman, does he have any prior -- |
| 18  Q.  Loss prevention is a form of security, right? | 18  A.  Marine Corps. |
| 19  A.  Yes. | 19  Q.  Paul Skerske? |
| 20  Q.  His approximate age? | 20  A.  Marine Corps. |
| 21  A.  Twenties. | 21  Q.  Louis Delegato? |
| 22  Q.  When we went through some of the military background, you | 22  A.  Neither. |
| 23  didn't get a chance to tell me, does Joseph Krupa have any | 23  Q.  Do you know why the oldest person working for you currently |
| 24  military or law enforcement background that you know of? | 24  is 29? |
| 25  A.  Just a bachelor's in criminal justice. | 25  A.  Why? |
| Page 174 | Page 176 |

| | |
|---|---|
| 1  Q.  Aaron Hirsch? | 1  Q.  Yes. |
| 2  A.  He had a degree in criminal justice and some security | 2  A.  No. |
| 3  experience. | 3  Q.  Do you know that -- |
| 4  Q.  Thomas Szkola? | 4  A.  Actually, that's not true.  The oldest person working for me |
| 5  A.  He had been to the Police Academy.  I don't know what level | 5  I think he is 63. |
| 6  of education, but he had to have had at least an associate's | 6  Q.  That's Darryl? |
| 7  to do that.  And he had prior security service. | 7  A.  No.  Malcolm Thompson. |
| 8  Q.  Brian Szmatula? | 8  Q.  And what is his position? |
| 9  A.  I can't remember what his background was off the top of my | 9  A.  He is a coordinator. |
| 10  head. | 10  Q.  Is he a security officer? |
| 11  Q.  Paul George? | 11  A.  No. |
| 12  A.  He had prior security experience.  He actually had a | 12  Q.  The oldest security guard working for you is 29? |
| 13  bachelor's in communications or something. | 13  A.  Security officer.  No, Darryl.  He is 50-something. |
| 14  Q.  The current security officers that you have assigned to you | 14  Q.  Darryl is 50-something? |
| 15  are Kevin Schwall? | 15  A.  I don't know his exact age. |
| 16  A.  Yes. | 16  Q.  Darryl has been working for you how long? |
| 17  Q.  Do you know his approximate age? | 17  A.  For me or the company? |
| 18  A.  Twenties. | 18  Q.  Darryl has been working for Kelly Services for how long that |
| 19  Q.  Does he have any prior law enforcement experience? | 19  you know of? |
| 20  A.  No.  A bachelor's in criminal justice.  He might have his | 20  A.  Fifteen years.  We just celebrated his fifteenth. |
| 21  master's by now.  I know he is working on it. | 21  Q.  So he has been working for Kelly Services for about 15 |
| 22  Q.  How long has he been working for you? | 22  years.  Since that time -- let me start over.  Strike that. |
| 23  A.  Almost two years.  One year eight months or something. | 23  Mr. Isotalo was let go and not replaced, Dan |
| 24  Q.  Stephen Flynn? | 24  Tomica was let go and not replaced and contract employees |
| 25  A.  Bachelor's, Police Academy.  In his twenties.  He has been | 25  were sought out instead.  The oldest contract employee |
| Page 175 | Page 177 |

45 (Pages 174 to 177)

PAUL NICHOLAS WHELAN
January 18, 2013

1   currently working for Kelly Services is 29.
2   A.   I don't know that to be true.
3   Q.   I am looking at a list that was provided to me by your
4   attorney of the current contract employees working for Kelly
5   Services as security officers.  We just went through their
6   approximate ages and their experience.  I have their dates
7   of birth.  And you told me that Kevin Schwall is
8   approximately in his twenties.
9        According to the list that I have, the oldest
10  contract security officer working for Kelly Services is 29.
11       Do you know why?
12       MR. POTTER:  Objection.  Asked and answered.  He
13  just said no.
14  A.   No.
15  Q.   (By Ms. Sharp)  Did you find Mr. Tomica, Mr. Isotalo, Kyron
16  Bradstrom, Robert Haynes or Mr. Gatewood to be cranky?
17  A.   Cranky?
18       MR. POTTER:  You mean like in Austin Powers
19  cranky?
20  Q.   (By Ms. Sharp)  I think it is an adjective.  You seem good
21  at adjectives.
22       Cranky -- I think you understand the word.
23  A.   I don't think any of them were cranky.
24  Q.   You don't think you ever used that word?
25  A.   That I used it?

Page 178

1   Q.   Yes.
2        MR. POTTER:  To describe those guys you mean?
3        MS. SHARP:  Yes.
4   A.   I doubt it.  I know people that are cranky.  I use hinky
5   more than I use cranky.
6   Q.   (By Ms. Sharp)  Have you referred to them as slow?
7        MR. POTTER:  Mentally or physically?
8   Q.   (By Ms. Sharp)  Dan Tomica, Kyron Bradstrom, John Isotalo,
9   Robert Haynes or Ralph Gatewood.
10  A.   You mean slow in performing their duties?
11  Q.   Yes.
12  A.   Yes.
13  Q.   You thought they were slow in performing their duties?
14  A.   Yes.
15  Q.   Do you think that they were technologically challenged?
16       MR. POTTER:  Altogether as a group?
17  A.   As a group?
18  Q.   (By Ms. Sharp)  Either as a group, or if you want to speak
19  about them individually, that's fine.
20  A.   No, I don't think they were technologically challenged.
21  Q.   You thought that they were able to perform their jobs in
22  comparison to what you expected with technology?
23  A.   As a group, yes.
24  Q.   Do you find them to be rigid?
25  A.   More recalcitrant than rigid, but yes.  Resistant to

Page 179

1   change.
2   Q.   Did you find them to be out of touch?
3   A.   With what?
4   Q.   With their ability to change or, as you called it, work with
5   the model that Kelly Services needed for security officers.
6   A.   As a group they did okay.  I mean, there were issues.
7   Obviously, a company like Kelly is constantly upgrading
8   software and upgrading systems, and people have to keep up
9   with that.  As a group, they did fine.
10       MR. POTTER:  She is not talking about technology
11  now.
12       MS. SHARP:  If he wants to talk about technology,
13  we can talk about technology.
14  A.   As a group they did fine.
15       MR. POTTER:  If he is talking about technology,
16  he is not answering your question.
17  Q.   (By Ms. Sharp)  Did you feel any of them individually
18  couldn't keep up?
19  A.   No.
20  Q.   Did you find any of them to be vibrant?  Enthusiastic?  Full
21  of energy?
22  A.   Yes.
23  Q.   You did?
24  A.   Yes.
25  Q.   Which ones?

Page 180

1   A.   Darryl, Ralph.
2   Q.   Darryl currently works for you?
3   A.   Yes.
4   Q.   You thought Ralph was vibrant, enthusiastic and full of
5   energy?
6   A.   Yes.  We actually created a position for him because of his
7   personality.
8   Q.   What is the position you created for him?
9   A.   He worked at the front desk, basically handling lobby
10  security, greeting the visitors, people coming in and out.
11  Q.   Did you find them to be adaptable to change?
12  A.   As a group, yes.
13  Q.   You did find, as a group, that they were adaptable to
14  change?
15  A.   Yes.
16  Q.   The group of security officers that are working for you now,
17  who are mostly contract security officers, do you find them
18  to be adaptable to change?
19  A.   Yes.
20  Q.   Vibrant?  Enthusiastic?
21  A.   As a group, yes.
22  Q.   Full of energy?
23  A.   Yes.
24       MS. SHARP:  I'd like to take a short break, and
25  we will be done soon.

Page 181

46 (Pages 178 to 181)

** GRUSKIN & ASSOCIATES ** WEST BLOOMFIELD, MICHIGAN
248.737.6691

PAUL NICHOLAS WHELAN
January 18, 2013

| | |
|---|---|
| 1    (Brief pause was taken.) | 1  A.  Sometimes it is orally, but yes. |
| 2  Q.  (By Ms. Sharp)  Do you have a particular contact at Whelan | 2  Q.  Bob calls you back and says, they have a Michigan driver's |
| 3  Security? | 3  license, their education is bachelor's of criminal justice, |
| 4  A.  I have I would say three. | 4  criminal background pass, drug screen pass, they can read |
| 5  Q.  Who is that? | 5  and write English and you say send them over? |
| 6  A.  There is Patrick Smith, Robert Abraham and the third guy is | 6  A.  Yes. |
| 7  Jeffrey Stackhouse. | 7  Q.  Any other discussion? |
| 8      MR. POTTER:  This Lyle guy isn't your contact? | 8  A.  About criteria? |
| 9      THE WITNESS:  Lyle is a contact, but I talk to | 9  Q.  Yes. |
| 10  him infrequently.  Pat is who I talk to most. | 10  A.  No. |
| 11      Actually, Bob is who I talk to most.  Pat is who | 11  Q.  Have you provided him any criteria in the past about who to |
| 12  I talk to second most. | 12  look for? |
| 13      Pat is in Minnesota, and I think Lyle is in St. | 13  A.  Yes. |
| 14  Louis. | 14  Q.  What is the criteria you have provided him? |
| 15  Q.  (By Ms. Sharp)  When, for example, Chris Veltri moved to | 15  A.  Clean criminal record, a valid driver's license without any |
| 16  Grand Rapids and you needed a new security officer, who did | 16  major offenses, read and write English.  We have asked for |
| 17  you call? | 17  people with foreign language skills, because it is a global |
| 18  A.  Robert Abraham. | 18  company.  The ability to operate basic office machines, |
| 19  Q.  So when you need a new security officer at Kelly Services | 19  computers, if they know how to either use like a MacBook Pro |
| 20  you talked to Rob? | 20  and related software or Microsoft and related software. |
| 21  A.  Bob, yes. | 21      We use both, so that encompasses all of the |
| 22  Q.  Do you always talk to Bob when you need a new security | 22  applicants. |
| 23  officer at Kelly Services? | 23  Q.  Any certain educational level? |
| 24  A.  Yes. | 24  A.  No.  We have people from high school through working on |
| 25  Q.  What do you tell him when you call him and tell him you need | 25  master's degrees. |
| Page 182 | Page 184 |

| | |
|---|---|
| 1  a new security officer? | 1  Q.  So you have no educational requirements? |
| 2  A.  That we have the need for a security officer. | 2  A.  No. |
| 3  Q.  When he obtains a new person, do you do any interview at | 3      MR. POTTER:  Hold on a second.  Not even a high |
| 4  Kelly Services? | 4  school diploma? |
| 5  A.  No. | 5      THE WITNESS:  Yes, they have to have a high |
| 6  Q.  Do you do anything to screen, to follow up, to ensure that | 6  school diploma.  That's Whelan's policy, not ours.  So they |
| 7  the person that he is presenting is what you want for your | 7  do, yes. |
| 8  model? | 8      MR. POTTER:  So you would take a GED? |
| 9  A.  Yes. | 9      THE WITNESS:  If Whelan hired them, that would be |
| 10  Q.  What do you do? | 10  okay with us. |
| 11  A.  There is like -- what do you call it?  Not a prospectus, | 11  Q.  (By Ms. Sharp)  Have you told them that you are seeking |
| 12  like a C.V.  It's not even a C.V., really.  It is a | 12  people with military experience? |
| 13  checklist of what their qualifications are. | 13  A.  We don't turn them down, obviously, but no. |
| 14  Q.  Like a resume? | 14  Q.  Have you told them that you are seeking people with law |
| 15  A.  No.  Less than that.  Less than a C.V. | 15  enforcement experience? |
| 16      Do they have a driver's license, their education | 16  A.  Yes. |
| 17  level, criminal background, drug screen, stuff like that. | 17  Q.  You did tell them you are seeking people with law |
| 18  Their basic qualifications. | 18  enforcement experience? |
| 19  Q.  You are provided that? | 19  A.  Law enforcement and criminal justice, yes. |
| 20  A.  Read and write English, yes. | 20  Q.  Have you told them anything else about the type of persons |
| 21  Q.  What did you say? | 21  you are seeking? |
| 22  A.  Read and write English. | 22  A.  We had been looking for -- let me step back on the military |
| 23  Q.  That's on there? | 23  piece, because they are a big military employer. |
| 24  A.  Yes. | 24  Q.  Who is they?  Kelly? |
| 25  Q.  You are provided that checklist, and you review it? | 25  A.  No.  Whelan Security.  We inquired as to whether they had |
| Page 183 | Page 185 |

47 (Pages 182 to 185)

PAUL NICHOLAS WHELAN
January 18, 2013

| | |
|---|---|
| 1   like a wounded warrior program and they don't.  Nothing<br>2   really became of that.<br>3  Q.  Like disabled vets?<br>4  A.  **Yes.  They don't really have a separate program.**<br>5  Q.  Other than the checklist you provided me and the criteria<br>6   that you have given in the past, do you have any other<br>7   discussion when you call up and tell them you need a<br>8   security officer at Kelly?<br>9  A.  **The only other thing would be good communications skills,**<br>10   **analytical skills, things of that nature, their visitor and**<br>11   **customer facing.**<br>12  Q.  Did you ever have any of these discussions with Bob via<br>13   email?<br>14  A.  **No.  Generally, they are by telephone.**<br>15  Q.  So you don't have any of these criteria listed in an email<br>16   to and from him?<br>17  A.  **No.**<br>18  Q.  Other than the contract with Whelan Security, are there any<br>19   emails that discuss your request for security officers, the<br>20   ones you have now, things like that?<br>21  A.  **No.**<br>22  Q.  Did you get a chance to read Mr. Freck's deposition<br>23   testimony?<br>24  A.  **I did, yes.**<br>25        MR. POTTER:  What?  I don't have the transcript.<br><br>Page 186 | 1  A.  **Because you have told me, yes.**<br>2  Q.  Do you recall saying that to Mr. Freck?<br>3  A.  **Absolutely not.**<br>4  Q.  You have no recollection of that?<br>5  A.  **None.**<br>6  Q.  Do you have a recollection of meeting with Freck in the<br>7   parking lot approximately two or three months after Mr.<br>8   Isotalo's and Mr. Tomica's termination where he relayed to<br>9   you that Mr. Davis had just told him that Mr. Isotalo and<br>10   Mr. Tomica were terminated because of their age?<br>11  A.  **No.**<br>12  Q.  You don't even recall that being told to you?<br>13  A.  **No.**<br>14  Q.  Do you recall any conversations with Mr. Freck regarding Mr.<br>15   Isotalo's and Mr. Tomica's termination within two or three<br>16   months after their termination?<br>17  A.  **No.**<br>18  Q.  In the parking lot outside of where Mr. Freck has his<br>19   maintenance room, I will call it?<br>20  A.  **No.**<br>21  Q.  You don't ever recall saying the phrase to Mr. Freck, "Out<br>22   with the old and in with the new"?<br>23  A.  **No.**<br>24  Q.  And you don't know why the security officers that are from<br>25   Whelan Security now are all, at the most, age 29, whereas<br><br>Page 188 |
| 1       You didn't read it, because I haven't seen it<br>2   yet.<br>3       THE WITNESS:  Maybe what I saw wasn't that.  I<br>4   don't know.<br>5  Q.  (By Ms. Sharp)  Mr. Freck testified that Mr. Davis told him<br>6   and another Kelly employee that Mr. Isotalo and Tomica were<br>7   terminated because of their age.<br>8       Do you understand that that's an allegation in<br>9   this litigation?<br>10  A.  **Yes.**<br>11  Q.  And you heard that testimony, so you know that --<br>12       MR. POTTER:  I told him what Freck said.  But he<br>13   hasn't read the transcript, which was your question.<br>14       MS. SHARP:  That was my first question.  Then we<br>15   went past that.<br>16  Q.  (By Ms. Sharp)  You understand that that's an allegation in<br>17   this litigation?<br>18  A.  **Yes.**<br>19  Q.  Do you understand that Mr. Freck also alleges that after he<br>20   was told that by Mr. Davis, he went upstairs from his<br>21   maintenance room where this occurred and he ran into you,<br>22   where he then repeated this to you, and your response was,<br>23   "Out with the old and in with the new."<br>24       My first question is:  You understand that that<br>25   is what he alleges?<br><br>Page 187 | 1   the security officers who were hired by Kelly directly prior<br>2   were age 50 and above?<br>3       MR. POTTER:  Objection.  Asked and answered.  He<br>4   already told you no twice.<br>5       Tell her for the third time.<br>6  A.  **No.**<br>7       MS. SHARP:  That's all I have.<br>8       (Brief pause was taken.)<br>9       EXAMINATION<br>10  BY MR. POTTER:<br>11  Q.  Do you recall having a conversation with Mr. Freck and Mr.<br>12   Abbott in August of 2011 regarding Steve Davis?<br>13  A.  **Yes.**<br>14  Q.  Tell Ms. Sharp what that conversation was.<br>15  A.  **After Bob Haynes had been terminated, Randy Abbott and David**<br>16   **Freck came to me and said that Steve Davis had made comments**<br>17   **about me, I needed to watch my back and that he might be out**<br>18   **for me.**<br>19  Q.  Did they tell you what kind of comments he was making about<br>20   you?<br>21  A.  **No.**<br>22  Q.  Anything that had to do with your management?<br>23  A.  **It had to do with the manner with which I was managing**<br>24   **campus security versus how he had managed the group prior**<br>25   **to.**<br><br>Page 189 |

48 (Pages 186 to 189)

PAUL NICHOLAS WHELAN
January 18, 2013

```
 1   Q.   Did they make any allegations to you at that time that Davis
 2        had said that you were terminating people because of their
 3        age?
 4   A.   No.
 5                MR. POTTER:  That's all I have.
 6                RE-EXAMINATION
 7   BY MS. SHARP:
 8   Q.   Did you just testify to everything that Abbott and Freck
 9        told you on that day in August of 2011?
10   A.   Yes.
11   Q.   Did you ever have any other conversation with Freck and
12        Abbott regarding anything that Steve Davis had said to you?
13                Let me backup.
14                MR. POTTER:  To them you mean?
15   Q.   (By Ms. Sharp)  Had said to them about you?
16   A.   No.
17                MS. SHARP:  That's all I have.
18                (Deposition concluded at or
19                about approximately 3:50 P.M.
20                Signature of the witness was not
21                requested by counsel for the
22                respective parties hereto.)
23                       - - -
24
25
```

Page 190

```
 1   STATE OF MICHIGAN   )
 2                       ) SS
 3   COUNTY OF OAKLAND    )
 4              CERTIFICATE OF NOTARY PUBLIC
 5        I certify that this transcript is a complete, true and
 6   correct record of the testimony given by the Witness in the
 7   above-entitled matter.
 8        I also certify that prior to taking this deposition
 9   the Witness was duly sworn to tell the truth.
10        I also certify that I am not a relative or employee of
11   or an attorney for a party; or a relative or employee of an
12   attorney for a party; or financially interested in the
13   action.
14
15
16
17        _____
18        Karen Gruskin, CSR-3026
19        4669 Maura Lane
20        West Bloomfield, Michigan  48323
21        Notary Public, Oakland County, Michigan
22        My commission expires July 4, 2018
23
24
25
```

Page 191

** GRUSKIN & ASSOCIATES ** WEST BLOOMFIELD, MICHIGAN
248.737.6691