UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN A. ISOTALO, ET AL.,                                    Case No. 12-11253

       Plaintiffs,                                    Honorable Nancy G. Edmunds

v.

KELLY SERVICES, INC.,

       Defendant

_____/

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [21]**

This is an age discrimination employment case. Before the Court is Defendant Kelly Services Inc.'s motion for summary judgment on Plaintiff Daniel Tomica's federal and state age discrimination claims. (Dkt. 21, Def.'s Mot. Summ. J.)[1] Plaintiff alleges that Defendant violated the ADEA, 29 U.S.C. § 623(a)(1), and Michigan's Elliott-Larsen Civil Rights Act (ELCRA), Michigan Compiled Laws § 37.2202(1)(a), by terminating Plaintiff because of his age on March 30, 2011. (Dkt. 1, Pl.'s Compl. ¶¶ 62-65, 68, 78-80, 83.) Defendant argues that it had a valid, nondiscriminatory reason to terminate Plaintiff – Plaintiff's alleged violation of Defendant's Communication and Information Systems Use Agreement (Computer Agreement). Plaintiff contends that the proffered reason constitutes a pretext to obscure Defendant's discriminatory intent.

Defendant's motion hinges on two questions: (1) whether Defendant reasonably believed that Plaintiff had engaged in a violation of Defendant's Computer Agreement,

---

[1] This Court granted Defendant's motion for partial summary judgment, dismissing original plaintiff John Isotalo's claims, on May 14, 2013. (*See* Dkt. 20.)

which carries termination as a possible sanction; and (2) whether Plaintiff can show that this reason was pretext.

Because the business judgment rule protects Defendant's belief that Plaintiff engaged in a serious violation of company policy, and because Plaintiff has not produced sufficient evidence to show that Defendant's reasons were a pretext, the Court GRANTS Defendant's motion for summary judgment.

## I.    Facts

In early spring, 2011, Defendant was experiencing significant issues with the quality and performance of its security personnel. One employee went to prison after using Defendant's phones and computers to stalk a former romantic partner. (Def.'s Mot., Ex. B, Whelan Dep. 12:1-12:5, Jan. 18, 2013.) Defendant put the security group under the supervision of Mr. Paul Whelan in March, 2011 in response to "a series of incidents and events . . . in which the credibility and reputation of the group was called into question, including several thefts of money, just a general lackadaisical attitude (and) violations of company policy." (Whelan Dep. 18:20-18:24.) Also as a result, Defendant began the process of seeking better employees. (*Id.* 35:15-35:18.)

### A. March 16, 2011 – DEA agents conduct surveillance on Defendant's campus

On March 16, 2011, Mr. Paul Whelan, who would within the week assume a supervisory position over Defendant's campus security group, instructed employee John Isotalo to observe the parking lot for a specific employee, TW, and to record the license plate number of any car that TW got into. (Def.'s Mot., Ex. B, Whelan Dep. 9:14-9:15, 50:7-50:9, 50:15-50:18, Jan. 18, 2013.) Earlier that day, a DEA agent (JD) phoned Mr. Whelan and informed him "that the DEA had raided a house where TW lives, belonging

to a boyfriend, and they had confiscated property, including vehicles, from that residence." (Whelan Dep. 53:8-53:11.) JD wanted to know TW's means of transportation to work that day so that the DEA could conduct surveillance. (*Id.* 55:2-55:4.) Mr. Whelan asked Mr. Isotalo if he knew TW, who worked in an on-campus building called the Lindsey Center; Mr. Isotalo responded that he did. (*Id.* 62:7-62:10.)

Between 2:00 and 3:00 p.m., Mr. Whelan instructed Mr. Isotalo to "observe the parking lot, as our security officers normally do, to watch as [TW] left and to document the license plate of whichever car she got into." (Whelan Dep. 62:11-62:14, 63:18-63:19.) TW's supervisor previously informed Mr. Whelan that TW requested to leave early, around 3:00 p.m., citing a personal matter. (*Id.* 64:4-64:5.) Mr. Whelan directed Mr. Isotalo to remain in his vehicle, so as not to alert TW to the DEA's presence. (*Id.* 72:16-72:21.) Mr. Isotalo was to report the information to Mr. Whelan as soon as possible so that Mr. Whelan could relay it to the DEA agent. (*Id.*) Within the hour, Mr. Isotalo phoned Mr. Whelan with the requested information. (*Id.* 74:9-74:10, 74:18-74:19.) Mr. Whelan relayed the information to JD, who informed him that Mr. Isotalo had approached the DEA vehicle and spoken to the agent, potentially compromising the investigation. (*Id.* 75:16-75:19, 77:12-77:15.)

At 3:28 p.m., after Mr. Isotalo left for the parking lot, Mr. Whelan sent out an email to security staff notifying them that a DEA agent was parked in the parking lot, and that they should not approach or otherwise draw attention to the undercover vehicle. (*See* Def.'s Mot., Ex. L, Whelan Email, Mar. 16, 2011, 3:28 p.m.) Since Mr. Isotalo was conducting surveillance in the parking lot at that same time, the Court concludes that he did not receive the email before his encounter with the DEA agent. Although Mr. Whelan testified that his instructions to Mr. Isotalo were clear, Mr. Isotalo

3

testified that Mr. Whelan did not verbally inform him that the DEA agents were in the parking lot. (Whelan Dep. 84:14-84:16.) Mr. Whelan further learned that Mr. Isotalo had informed non-security employees that DEA agents were on the campus during a cigarette break. (*Id.* 90:5-90:8.) As a result, Mr. Whelan reported Mr. Isotalo's conduct to Mr. Steve Davis, then acting as the head of campus security. (*Id.* 92:21-92:25.)

### B. March 17 and 18, 2011 – Mr. Davis terminates Mr. Isotalo and Mr. Whelan assumes control of campus security

On March 17, 2011, Mr. Davis terminated Mr. Isotalo; the following day, Mr. Davis ceased to be the supervisor of the campus security group. (Whelan Dep. 109:18-109:20; 109:15.) Mr. Whelan then assumed the direct supervisory position formerly held by Mr. Davis. (*Id.* 14:5-14:6.)[2]

### C. March 23, 2011 – Plaintiff attempts to print email for Mr. Isotalo

On March 23, 2011, Plaintiff informed Mr. David Freck, then employed as a building engineer, that his computer and printer were not working. (Def.'s Mot., Ex. A, Pl.'s Dep. 22:15-22:16, Jan. 4, 2013.) The record contains conflicting testimony of what happened next. The conduct in dispute is regarding the email sent by Mr. Whelan on March 16, 2011, alerting security officers to the DEA surveillance presence in the parking lot, which Plaintiff allegedly forwarded to Mr. Freck. (*See* Def.'s Mot., Ex. E, Freck Email, March 23, 2011, 9:01 p.m.; *and* Ex. L, Whelan Email.)

Mr. Freck asserts that Plaintiff "was trying to send [the email] to John (Isotalo)" and that he "tried to send it to John and…couldn't." (Def.'s Mot., Ex. M, Freck Dep. 20:17-20:18, Jan. 3, 2013.) Mr. Freck testified that he "had [Plaintiff] send [the email] to

---

[2] Plaintiff argues that the facts of Mr. Isotalo's termination are not relevant to Plaintiff's claims. (*See* Pl.'s Resp. at 2.) The Court should use the facts of Mr. Isotalo's termination to contextualize Plaintiff's alleged wrongful conduct.

[Mr. Freck's] computer downstairs, and then [he] sent the email." (Freck Dep. 19:12-19:13.) Mr. Freck attempted to forward the email from his own computer to Mr. Isotalo, but does not know whether Mr. Isotalo ever received it. (*Id.* 20:23-20:24.) Mr. Freck stated that Mr. Whelan called him into his office and told him that he was on video working with Plaintiff's computer and asked him about the email. (*Id.* 18:25-19:3.) His version of events does not indicate how Mr. Whelan learned what email had been sent or even that any email was sent at all. At this time, Mr. Freck shared with Mr. Whelan his story about forwarding the email to Mr. Isotalo at Plaintiff's request. (*See id.* at 20-21.)

Plaintiff testified that he did not direct Mr. Freck to forward the email to himself or to print a copy. (Pl.'s Dep. 26:18-26:23.) Plaintiff argues that Mr. Freck's choice of which email to send to himself, or to send any email at all, was officious and wholly uninfluenced by Plaintiff. (*Id.*) Plaintiff testified that he never asked Mr. Freck for help printing or transmitting an email to Mr. Isotalo. (*Id.* 28:10-28:13.) Defendant's assertion that Mr. Isotalo contacted Mr. Freck to request that he help Mr. Tomica send the email plainly contradicts Mr. Freck's testimony to the contrary. (*See* Def.'s Mot. at 3; Freck Dep. 32:12-32:15.)

Mr. Whelan and Mr. Freck disagree on whether Mr. Freck initiated the conversation with Mr. Whelan that eventually led to Plaintiff's termination. Mr. Whelan testified that:

> David Freck approached [him] and said that he had been asked to print an email. He was uncomfortable with the request, because of the nature of it, and he wanted to report what he thought might be a violation of what we call the Code of Conduct, which is disseminating company information to people outside the organization.

(Whelan Dep. 122:14-122:19.) Mr. Whelan asserts that during their conversation, "basically what [Mr. Freck] said was he had been asked by John Isotalo to help Dan Tomica print an email." (Whelan Dep. 123:9-123:11.) Due to his belief that Plaintiff violated the Computer Agreement, Mr. Whelan set up a meeting between the two of them and a representative from Human Resources, Tracy Hopper, to discuss the matter the following day. (*Id.* 128:11-128:16.)

Despite dispute over the details, the record shows that Plaintiff's conduct resulted in either allowing a third party (Mr. Freck) access to his email account and messages, or that Plaintiff himself sent an email to Mr. Freck that was intended for security officers only. On Defendant's motion for summary judgment, the Court infers that Plaintiff did not request Mr. Freck to forward the email to Mr. Freck's email account.

### D.  March 24, 2011 – Investigatory meeting takes place

On March 24, 2011, Mr. Whelan, Plaintiff, and Ms. Hopper met to discuss Plaintiff's conduct of the previous evening. (*See* Def.'s Mot., Ex. F, Global Compliance Report ("Report") and Meeting Notes ("Notes"), Mar. 24, 2011.) Mr. Whelan indicates both in his deposition testimony and meeting notes that Plaintiff first explained that he was having general computer and printer issues, so he requested Mr. Freck's assistance. (Whelan Dep. 130:15-130:17; Notes.) After Plaintiff was confronted with a copy of the email from Mr. Freck's inbox, Mr. Whelan asserts that Plaintiff admitted "that he was trying to print the email out for John (Isotalo), and that he had asked Freck to assist with that." (*Id.* 130:19-130:21.) Mr. Whelan completed a report reflecting Plaintiff's Code of Conduct Violation and suspended him pending further investigation by Ms. Hopper. (*See* Report; Whelan Dep. 142:17-142:18.) He maintains that this report served

6

only to document the violation and was not used in the decision to terminate Plaintiff. (Whelan Dep. 143:1-143:11.)

Plaintiff's recollection of the March 24 meeting differs somewhat from Mr. Whelan's account. Plaintiff asserts that he did not share the email with Mr. Isotalo until "[a]fter [his] termination on the 30th." (Pl.'s Dep. 40:16.) Plaintiff denies both requesting that Mr. Freck help him print the email and his alleged admission that he printed the email for Mr. Isotalo. (*See id.* at 64.) Plaintiff indicates that he "possibly admitted" a violation of the Computer Agreement during the March 24, 2011 meeting. (*Id.* 65:24-66:3.)

### E.  March 30, 2011 - Human Resources terminates Plaintiff

On March 30, 2011, Defendant's management terminated Plaintiff, then aged 69. (Pl.'s Dep. 30:25-31:2, 31:8-31:9.) Mr. Whelan asserts, and Plaintiff produces no evidence to rebut, that he neither made that decision nor had any knowledge of who did. (Whelan Dep. 145:15-145:22.) Mr. Whelan and Ms. Hopper notified Plaintiff of his discharge by phone, with Ms. Hopper and Mr. Whelan both on the line. (*Id.* 148:15-148:18.) Mr. Whelan testified that he explained to Plaintiff that he was terminated because of his violation of the Computer Agreement. (*Id.* 148:22; *see* Report at 3.) Plaintiff denied in his E.E.O.C. complaint that he received any explanation for his discharge. (Pl.'s Dep. 52:15-52:16.)

In pertinent part, Defendant's Confidentiality and Non-Solicitation Agreement states: "all confidential information, whether embodied in electronic media or other forms…is property of the company exclusively." (Def.'s Mot., Ex. C, Confidentiality and Non-Solicitation Agreement ("Confidentiality Agreement"), at 2, Feb. 27, 2011.) The Confidentiality Agreement also states that the employee shall not transmit or disclose

7

such information "in any way to anyone." (*Id.*) Plaintiff agreed to these conditions "in consideration of [his] employment (and) continued employment" with Defendant. (*Id.* at 1.) Defendant's Computer Agreement states that emails "will be transmitted only to individuals who require them for business reasons." (Def.'s Mot., Ex. D, Communication and Information Systems Use Agreement ("Computer Agreement"), at 1, Feb. 27, 2011.) The Computer Agreement expressly states that the employee "fully understand(s) that failure to comply with this policy regarding the use of communication and information systems…may result in the termination of (his or her) employment." (*Id.* at 2.)

### F. April or May, 2011 – Mr. Whelan and Mr. Davis make alleged discriminatory comments regarding termination of Mr. Isotalo and Mr. Tomcia

Between one and two months after Plaintiff's dismissal, former security supervisor Steve Davis approached Mr. Freck and another building engineer, Randy Abbott, and began "venting" about Mr. Whelan. (Freck Dep. at 11-12.) Mr. Freck testified that Mr. Davis said "that they got rid of (Mr. Isotalo) because of his age." (*Id.* 12:17.) Mr. Freck confronted Mr. Whelan about this comment. Mr. Freck says that Mr. Whelan replied "out with the old and in with the new." (*Id.* 13:3-13:4.) Allegedly, Mr. Davis described Mr. Whelan's plan as "to get rid of all the old guys and bring in these other guys to do the job the way (Mr. Whelan) felt it should be run." (*Id.* 16:13-16:15.) Mr. Freck admits that Mr. Whelan "never mentioned the ages" of the new employees he wanted. (*Id.* 16:18.)

Mr. Whelan denies making these comments to Mr. Freck. (Whelan Dep. at 188.) On Defendant's motion for summary judgment, the Court infers that Mr. Freck believed

8

the comments were made. At minimum, Mr. Freck told Mr. Isotalo that Mr. Whelan made the alleged discriminatory comments. (Freck Dep. 27:25-28:3.)

## II.    Procedural History

On around November 20, 2011, Plaintiff filed a charge of age discrimination with the Equal Employment Opportunity Commission (E.E.O.C.). (Pl.'s Compl., ¶ 52.) The E.E.O.C. issued Plaintiff a right to sue letter around March 13, 2012. (*Id.* at ¶ 54.)

The Court granted partial summary judgment dismissing Mr. Isotalo's claims due to his successful disability claim, which acknowledged that he was not qualified for the job on the date he was fired. Defendant filed the instant motion for summary judgment on June 10, 2013 (*See* Dkt. 21, Def.'s Mot. Summ. J.) Plaintiff filed a response on July 1, 2013. (*See* Dkt. 23, Pl.'s Resp.) Defendant filed a reply on July 17, 2013. (*See* Dkt. 24, Def.'s Reply ("Reply").)

## III.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party may meet that burden "by 'showing' – that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Revised Rule 56 expressly provides that:

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

When the moving party has met its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike County Bd. of Education*, 286 F.3d 366, 370 (6th Cir. 2002).

## IV.   Analysis

The ADEA prohibits an employer from discharging an individual "because of such individual's age." 29 U.S.C. § 623(a)(1). Michigan's Civil Rights Act prohibits an employer from "[failing] or refus[ing] to hire or recruit, discharg[ing], or otherwise discriminat[ing] against an individual with respect to employment, compensation, or a term, condition, or privilege of employment because of…age." Mich. Comp. Laws § 37.2202(1)(a). Age discrimination claims brought under the Michigan statute are analyzed under the same standards as federal claims brought under the ADEA. *Geiger v. Tower Auto.*, 579 F.3d 614, 626 (6th Cir. 2009). *See also Bondurant v. Air Line Pilots Ass'n, Int'l*, 679 F.3d 386, 394 (6th Cir. 2012).

A plaintiff bears the burden to show that "age was the 'but-for' cause of the employer's adverse action." *Blizzard v. Marion Technical Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009)).

After the plaintiff establishes a prima facie case, the defendant must produce a valid, non-discriminatory reason for the adverse employment action. *Featherly v. Teledyne Industries, Inc.*, 486 N.W.2d 361, 364 (Mich. Ct. App. 1992) (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)). If the defendant produces a valid reason, the plaintiff must show that the proffered reason was merely a pretext to cover up defendant's discrimination. *Id*. The plaintiff may also show that the employer waited for a "legal, legitimate reason to fortuitously materialize" before firing an employee. *Hamilton v. General Electric Co.*, 556 F.3d 428, 436 (6th Cir. 2009). The key issue in this case is whether Plaintiff can show that Defendant's stated reasons for terminating his employment constitute pretext.

### A.  Plaintiff asserts a valid prima facie case of age discrimination

For ADEA claims, a plaintiff may establish a prima facie case of age discrimination by producing direct or circumstantial evidence. *Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 725 (6th Cir. 2012).

### 1.   Plaintiff does not bring forth direct evidence

Direct evidence "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Bhama v. Mercy Mem'l Hosp. Corp.*, 416 Fed. Appx. 542, 552 (6th Cir. 2011). The Sixth Circuit has noted that a "facially discriminatory employment policy or a corporate decisionmaker's express statement of a desire to remove employees in the protected group is direct evidence of discriminatory intent." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (internal citations omitted). Plaintiff argues that Mr. Whelan and Mr. Davis's statements to Mr. Freck following Plaintiff's termination serve as direct evidence because Mr. Whelan "was clearly a decisionmaker in regards to initiating the

2:12-cv-11253-NGE-RSW   Doc # 25   Filed 11/04/13   Pg 12 of 23   Pg ID 508

investigation" that resulted in Plaintiff's termination. (Pl.'s Resp. at 4.) The Court finds Plaintiff's argument deficient for two reasons: (1) Mr. Whelan did not make the decision to terminate Plaintiff and; (2) Mr. Whelan's comments are not specific enough to serve as direct evidence of discriminatory animus. (*See* Pl.'s Resp. at 5.)

First, Mr. Whelan does not match case law's definition of decisionmaker as required for his comments to serve as direct evidence. Case law does not extend the label of direct evidence to comments made by every manager or decisionmaker in the corporate setting. *Hopson v. Daimler Chrysler Corp.*, 306 F.3d 427, 433 (6th Cir. 2002). In order to serve as direct evidence, the speaker must have some influence over the adverse employment action taken against the plaintiff. *Id.* In *Hopson*, the Sixth Circuit held that comments made by a manager who lacked any involvement in the decision-making process could not constitute direct evidence. *Id.* Even an explicit statement that the employer's vice president "wanted younger people" did not constitute direct evidence where the speaker was not involved in the adverse decision. *Brown v. Packaging Corp. of Am.*, 338 F.3d 586, 589-90 (6th Cir. 2003).

Here, Mr. Whelan testified that he did not even know who decided to terminate Plaintiff, and that he was not consulted or contacted regarding the decision. (Whelan Dep. at 145, 147:15-147:18.) Mr. Whelan testified that three different people could have made the decision to terminate Plaintiff: Hopper's "manager…Tom Catalano (Defendant's vice president of global security)…[or] the general counsel." (*Id.* 146:9-146:11; 21:13-21:15.) Mr. Whelan was unable to identify which of the three individuals made the decision and did not even provide names for two of them. Plaintiff produces no evidence to show which individual made the termination decision, and relies solely on the fact that Mr. Whelan initiated the investigation. (Pl.'s Resp. at 4-5.) Plaintiff

12

asserts that Mr. Whelan's report was used in the termination decision but does not support this assertion with any confirmation from the true decisionmaker. (*Id.*)

The Supreme Court, in *Staub v. Proctor Hospital*, considered circumstances under which an employer may be liable for "employment discrimination based on the discriminatory animus of an employee who influenced, but did not make, the ultimate employment decision," in short known as a "cat's paw" case. 131 S.Ct. 1186, 1189 (2011). In *Staub*, the Supreme Court held that "if the independent investigation (conducted by the employer) relies on facts provided by the biased supervisor—as is necessary in any case of cat's paw liability—then the employer . . . will have effectively delegated the factfinding [sic] portion of the investigation to the biased supervisor." 131 S.Ct. at 1193. In *Staub*, the plaintiff was terminated for allegedly violating a directive made by supervisors to stay at his desk when not treating patients. *Id.* at 1189. This directive allegedly correlates with a company rule; the plaintiff alleges that this rule never existed and both rule and directive were constructed to further his supervisors' discriminatory animus. *Id.* Staub asserted that the allegations and directive stemmed from his supervisors' resentment of his status and obligations as a military reservist. *Id.* at 1189-90. Unlike in *Staub*, the policy that Plaintiff allegedly violated was not created in pursuance of Mr. Whelan's purported discriminatory animus.

In the Sixth Circuit, "when a decisionmaker makes a decision based on independent investigation, any causal link between the subordinate's…animosity and the adverse action is severed" and the plaintiff cannot rely on the cat's paw theory. *Roberts v. Principi*, 283 Fed. Appx. 325, 333 (6th Cir. 2008) (internal citation omitted). Plaintiff fails to prove that Mr. Whelan used an unidentified decisionmaker as his "dupe" to support a cat's paw argument. *Id.* at 333.

13

Second, the examples Plaintiff relies on all involve comments made by decisionmakers specifically referencing the old / young dichotomy.[3] Defendant correctly points out that Mr. Whelan's comments are not specific enough to constitute direct evidence. (Reply at 6.) In *Mora v. Jackson Memorial Foundation, Inc.*, the Eleventh Circuit found age discrimination where the employer fired the plaintiff and stated "I need someone younger I can pay less." 597 F.3d 1201, 1203 (11th Cir. 2010). In the Third Circuit, the court allowed the employer's comment that they were looking for "younger, single people" to serve as direct evidence. *Fatke v. Aetna, Inc.*, 308 F.3d 335 (3rd Cir. 2002). Finally, Plaintiff cites *Ezell v. Potter*, where the Seventh Circuit found that the defendant discriminated based on the plaintiff's age where the defendant stated that they sought "to get rid of older carriers and replace them with younger, faster carriers." 400 F.3d 1041, 1051 (7th Cir. 2005). Plaintiff's examples represent situations where the employer clearly expressed a preference for young individuals as opposed to old ones.

In the Sixth Circuit, "direct evidence generally cannot be based on isolated and ambiguous remarks," especially where the speaker was not a decisionmaker in the adverse decision. *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 382 (6th Cir. 2002). Although both Mr. Whelan and Mr. Davis made comments somewhere along the lines of "out with the old, in with the new," neither used the word young as used in Plaintiff's examples above. (Freck Dep. 16:18.) The saying "out with the old, in with the new" is also a common idiom that generally does not refer to age. The alleged comments do not require the Court to conclude that age discrimination occurred, and so are not direct evidence. *See Bhama*, 416 Fed. Appx. at 552.

---

[3] Plaintiff fails to produce an example from the Sixth Circuit where similar "old / new" language was found to constitute direct evidence of age discrimination.

14

Here, Defendant argues, and the Court agrees, that Mr. Whelan's statement is ambiguous at best, and very well may indicate a preference for different workers, or workers from a different contract supplier. (Reply at 6.) This conclusion is supported by the fact that in March of 2011, Defendant took several steps to improve the quality of its security group by (1) terminating a number of problematic employees, (2) replacing Mr. Davis with Mr. Whelan as direct supervisor, and (3) terminating Defendant's contract with Nationwide and obtaining a new contract with Whelan Security. (Whelan Dep. 11:25-12:1, 13:22-13:24, 9:14-9:15, 35:15-35:18; *see* Whelan Dep. at 19-20.)

For those two reasons, the Court finds that Plaintiff does not establish direct evidence of age discrimination. The Court instead considers the comments as probative circumstantial evidence of age discrimination.

### 2. Plaintiff produces sufficient circumstantial evidence to establish his prima facie case[4]

Where no direct evidence exists to support a plaintiff's claims, the plaintiff may rely on circumstantial evidence of discrimination. *Lefevers*, 667 F.3d at 725. Although the Supreme Court, in *Gross v. FBL Financial Services, Inc.*, indicated that they would not determine whether the *McDonnell Douglas* analysis applies to ADEA claims, the Sixth Circuit generally applies it in analyzing circumstantial evidence. 557 U.S. 167, 177 (2009); *see Geiger*, 579 F.3d at 622. In order to sustain an ADEA claim under the *McDonnell Douglas* standard, the plaintiff must show that he or she: (1) belonged to a protected class (e.g. was over 40 years of age); (2) suffered adverse employment action; (3) was qualified for the position held when the adverse action was taken; and

---

[4] At the hearing, Plaintiff's counsel stated that Plaintiff was only asserting a direct evidence case. Out of an abundance of caution, the Court analyzes Plaintiff's case under a circumstantial evidence proof as well.

(4) was replaced by a younger worker. *DiCarlo v. Potter*, 358 F.3d 408, 417 (6th Cir. 2004) (citing *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1159-60 (6th Cir. 1990)).

First, Plaintiff belonged to a protected class at the time Defendant discharged him. For ADEA claims, plaintiffs belong to the protected class once they have reached age 40. *DiCarlo*, 358 F.3d at 417. Plaintiff was 69 years of age when Defendant fired him on March 30, 2011. (Pl.'s Dep. 31:8-31:9, 30:25-31:2.)

Plaintiff's discharge satisfies the second prong -- adverse action.

Third, Plaintiff demonstrates that he was objectively qualified for the job when he was terminated. In the Sixth Circuit, a court "should focus on a plaintiff's *objective* qualifications" in determining whether the plaintiff was qualified for the job held. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575 (6th Cir. 2003). A plaintiff can meet this burden "by presenting credible evidence that his or her qualifications were at least equivalent to the minimum objective criteria for employment in the relevant field." *Id.* at 575-76. Finally, although qualifications vary depending on the position held, a court should generally "focus on criteria such as plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." *Id.* at 576. Mr. Whelan requested that employees have "clean criminal record, valid driver's license without any major offenses, read and write English . . . the ability to operate basic office machines (and) computers," but no specific educational level. (Whelan Dep. 184:15-184:25.) Plaintiff has attained a college degree and had several years of security experience when he began working for Defendant. (Pl's Dep. 7:13, 9.) At the time of his discharge, Plaintiff had ten years of experience in the security field. (*Id.* 9:9.)

Fourth, for the purposes of Defendant's summary judgment motion, the Court infers that Defendant replaced Plaintiff with younger employees. Mr. Whelan argues that

Plaintiff "was let go and not replaced and contract employees were sought out instead." (Whelan Dep. 177:24-177:25.) All new contract security guards obtained under the contract with Whelan Security are under age 30. (*Id.* at 178.) Only one security officer over age 30 remains employed by Defendant. (*Id*. 177:13.) Generally, age differences greater than ten years are presumed legally significant to show age discrimination. *Blizzard*, 698 F.3d at 284. In the Sixth Circuit, "a person is not considered replaced when his duties are absorbed by another person 'or when the work is redistributed among other existing employees already performing related work.'" *Geiger*, 579 F.3d at 623 (internal citations omitted). These situations generally arise in context of a workforce reduction plan or reduction in force (RIF). In workforce reduction cases, the plaintiff must meet a higher standard by showing that he or she was singled out for termination due to a protected characteristic. *Barnes v. GenCorp Inc.*, 896 F.2d 1465, 1466 (6th Cir. 1990). Mr. Whelan testified to Defendant's need to maintain a consistent level of security staffing, eliminating the possibility that Plaintiff was terminated pursuant to an RIF. (*See* Whelan Dep. at 38-39.) Here, Plaintiff's work was redistributed among existing Nationwide contract employees only until the contract with Whelan security began on April 25, 2011. (Whelan Dep. 165:10-165:14.)

The Court rejects Defendant's argument that contract employees later obtained from Whelan Security do not constitute replacements, as Mr. Whelan testified that contract officers fulfill substantially the same functions as Defendant's full time employees. (Whelan Dep. 27:5-27:14.) Defendant does not demonstrate that the replacement worker must possess the same job title as the terminated employee. A lapse in time between termination and replacement does not invalidate the conclusion that the plaintiff was replaced. *Blizzard*, 698 F.3d at 284 (internal citations omitted).

The Sixth Circuit has indicated that evidence of discriminatory comments made by someone who did not participate in the adverse decision may serve as probative circumstantial evidence on a discrimination claim. *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 393 (6th Cir. 2009).[5] When gauging the strength of such comments, the Court takes into account that "not every 'ageist comment by a corporate executive is relevant as evidence of a discriminatory corporate culture.'" *Anderson v. Otis Elevator*, No. 11-10200, 2013 WL 1506438, at *33 (E.D. Mich. Apr. 12, 2013) (Borman, J.) (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 356 (6th Cir. 1998). In *Ercegovich*, the Sixth Circuit directed lower courts to consider the existence of other circumstantial evidence, any temporal connection between the comments and the adverse decision, the purpose and content of the comments, and the position in the corporate hierarchy held by the speaker. *Anderson*, 2013 WL 1506438 at *33 (internal citations omitted).

In this case, Mr. Freck testified that Mr. Whelan, Plaintiff's supervisor, declared "out with the old, in with the new" during a conversation regarding a number of terminated employees, including Plaintiff. (Freck Dep. 13:3-13:4.) Mr. Whelan's comments are temporally isolated from the adverse action, having been made more than a month following Plaintiff's termination. (*Id.* 11:21.) Mr. Whelan's comments coincide more closely with the change from Nationwide Security to Whelan Security as contract security officer provider on April 25, 2011. (Whelan Dep. 165:15-165:17.) The

---

[5] Although Defendant argues that Plaintiff may not rely on circumstantial evidence to defeat summary judgment where Plaintiff has identified his prima facie case as relying on direct evidence, the Court finds that Defendant was on notice of Plaintiff's circumstantial case due to Plaintiff's use of "pretext" and "sham" in Plaintiff's original complaint. (*See* Reply at 6; Pl.'s Compl. at 8.) Defendant produces no precedent in support of its assertion that "Plaintiff has abandoned that basis for supporting his claims and cannot rely on it to survive summary judgment." (Reply at 6.)

Court concludes that the alleged discriminatory comments bolster Plaintiff's circumstantial case. The Court also concludes that Plaintiff's prima facie case is sufficiently supported by circumstantial evidence to satisfy *Geiger*.

"If a plaintiff establishes a prima facie case of discrimination with circumstantial evidence, the *McDonnell Douglas* burden-shifting test applies and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the termination. Then, the burden shifts back to the plaintiff to prove that the defendant's stated reason for termination is a pretext for discrimination." *Till v. Spectrum Juvenile Justice Services*, 805 F. Supp. 2d 354, 362 (E.D. Mich. 2011) (Edmunds, J.).

### B. Defendant provides a valid reason for Plaintiff's discharge

Defendant maintains that it terminated Plaintiff because he violated Defendant's Confidentiality and/or Computer Agreements. (Def.'s Mot. at 3.) Mr. Whelan testified that even without an intent to transfer the email to Mr. Isotalo, "[improper] disseminat[ion]" would be a violation of the Computer Agreement. (Whelan Dep. 161:4-161:5.) Even though the Court rejects Defendant's allegation that Plaintiff admitted his intent to transfer the email to Mr. Isotalo, and accepts Plaintiff's assertion that he did not send the email to Mr. Freck, the record still shows that Plaintiff violated the Computer Agreement. Plaintiff allowed unrestricted access to his email and computer to Mr. Freck. This contravenes Defendant's requirement that employees:

> protect the integrity of Communication and Information Systems by ensuring secure access to voice mail, e-mail and the Internet. This protection of integrity relies on safe practices including, but *not* limited to: maintaining secret passwords, *logging off the system before leaving your workstation, disallowing others to use your password to access Internet, voice mail or e-mail* and/or disallowing others to share your User ID and following the Company's or Customer's clean and locked desk procedure.

(Computer Agreement at 2, emphasis added.) The Computer Agreement explicitly states that violation of its terms could result in termination. (*Id.*) Plaintiff signed this Agreement less than a month before the events in question took place. (*Id.*) The Court does not question Defendant's conclusion that violation of these procedures would be sufficiently serious to justify termination.

### C. The business judgment rule protects Defendant's reasonable belief that Plaintiff violated an employment policy

The Court accepts Defendant's proffered reason for terminating Plaintiff because "an employer is not liable for employment discrimination 'as long as [it] has an honest belief in its proffered nondiscriminatory reason.'" *Till*, 805 F. Supp. 2d at 365 (citing *Michael v. Caterpillar Fin. Services Corp.*, 496 F.3d 584, 598 (6th Cir. 2007)). In order to benefit from the business judgment rule, the employer's reliance on the facts before it at the time the decision was made must be reasonable. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006). The plaintiff can disprove the reasonableness of the employer's reliance by showing that "the employer failed to make a reasonably informed and considered decision before taking its adverse action." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). This Court has previously found the employer's reliance unreasonable where the employer never informed the terminated employee that she was terminated for her sexual and racially offensive comments to other employees. *Till*, 805 F. Supp. 2d at 365. In *Till*, the Court held that the employer failed to make a sufficiently informed and considered decision required for business judgment rule protection because the record did not disclose the correct reason for plaintiff's discharge. *Id.*

20

Here, the facts available to Defendant showed that Plaintiff either forwarded an email to someone outside the security group or allowed unsupervised access to his computer and email account. Only one week prior, Mr. Whelan had been informed by a DEA agent, JD, that Mr. Isotalo's conduct in approaching the DEA surveillance vehicle could potentially harm an ongoing investigation. (Whelan Dep. 77:12-77:15.) The surrounding circumstances support Defendant's concern with Plaintiff's conduct. Mr. Whelan had also been concerned by Mr. Isotalo's conduct in divulging this same information to non-security employees. (*Id.* 102:11-102:14.) Although the parties dispute whether Mr. Whelan told Plaintiff why he was discharged, the Court concludes that Defendant conducted a reasonable inquiry before taking adverse action. Defendant informed Plaintiff of his violation of the Computer Agreement in a meeting, gave him an opportunity to explain the situation, and followed standard procedures by completing a report to document the events. (*Id.* at 128, 137, 142.) The Court also finds that the business judgment rule supports Defendant's nondiscriminatory explanation for Plaintiff's discharge.

### D. Plaintiff fails to establish that Defendant's proffered nondiscriminatory reason constitutes pretext

Where a defendant produces valid reasons for adverse employment action against the plaintiff, the plaintiff must show that defendant's proffered explanation is a pretext for discrimination. *Kocsis v. Multi-Care Mgmt. Inc.*, 97 F.3d 876, 883 (6th Cir. 1996). Plaintiff can show pretext in three general ways: (1) by showing that the alleged events never took place; (2) by proving that the events in question did not in fact motivate the employer's adverse action; and (3) by demonstrating that the events were not sufficient to justify discharge. *Id.* At the summary judgment stage, Plaintiff must

"produce sufficient evidence from which a jury could reasonably reject the employer's explanation for the adverse employment action." *Anderson*, 2013 WL 1506438 at *19 (internal citations omitted).

Although the parties disagree on the specifics, the record shows that Mr. Freck gained access to an email message never intended for his eyes. (Pl.'s Dep. 26:11-26:14.) Plaintiff cannot rely on prong one because the fact that Mr. Freck obtained the email shows a violation of the Computer Agreement, regardless of whether Plaintiff or Mr. Freck forwarded it. Second, Plaintiff does not prove that the events did not motivate his discharge. Generally, a plaintiff can do this by showing that "other employees, particularly employees not in the protected class, were not fired even though they were engaged in substantially identical conduct to that which the employer contends motivated its discharge of" the plaintiff. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (overruled on other grounds by *Gross*). Plaintiff does not allege that others violated the Computer Agreement or engaged in similar misconduct and were not discharged. Although several other security officers were terminated around this time, Mr. Whelan testified that Defendant was largely unsatisfied with the quality of security staff and endeavored to improve it. (Whelan Dep. 18:20-18:24.) Third, the Court finds that Plaintiff's violation of the Computer Agreement was sufficient to justify termination.

The Sixth Circuit cautioned against overly formalistic application of the three-part pretext analysis, emphasizing that "at the bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination." *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009). The Court holds that the evidence

does not allow the Court to answer "no" to the basic question – "did the employer fire the employee for the stated reason?" *Id.*

**V.      Conclusion:**

Although the Court finds that the Plaintiff sets forth a prima facie case of age discrimination, the Court also concludes that Defendant produces a valid non-discriminatory reason for Plaintiff's discharge. The Court GRANTS Defendant's motion for summary judgment because Plaintiff fails to establish that Defendant's proffered reason represents a pretext to conceal age discrimination.

S/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  November 4, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on November 4, 2013, by electronic and/or ordinary mail.

S/Johnetta M. Curry-Williams
Case Manager
Acting in the Absence of Carol A. Hemeyer